J. Gary Linder, Bar #020552
JONES, SKELTON & HOCHULI P.L.C.
40 N Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone:  (602) 263-7340
Fax:  (602) 200-7883
glinder@jshfirm.com

Attorneys for Defendant Menzies Aviation
(USA), Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Frontier Airlines, Inc.,<br><br>                                 Plaintiff,<br><br>            v.<br><br>Menzies Aviation (USA), Inc.,<br><br>                                 Defendant. | No. 2:20-cv-01432-ESW<br><br>**Defendant Menzies Aviation (USA), Inc.'s Motion for Extension of Discovery Deadlines** |

## TABLE OF CONTENTS

I.    Background ................................................................................................................1

II.   Argument ................................................................................................................2

    A.   Despite Having Diligently Sought Documents and Information Related to Frontier's Damages in this Matter, Menzies Has Learned New Facts Concerning Frontier's Damages Throughout the Discovery Process, and During the April 6, 2021 Deposition of Frontier's Director of Maintenance.                                                  3

1.    Menzies Has Received Conflicting Information from Frontier Regarding the Nature of Frontier's Lease-Related Damages.                3

2.    Menzies Has Received Conflicting Information from Frontier Regarding the Timeline of the Routine Maintenance and Non-Routine Repairs Performed on the Aircraft.                4

3.    In View of Frontier's Changing Disclosures and the Progression of Discovery in this Case, Menzies' Diligent Attempts to Understand Frontier's Damages Provide Good Cause for Extension of the Discovery Deadline.                9

B.   Frontier's April 2021 Productions Demonstrate the Existence of Additional Key Documents Related to Damages.                9

C.   Menzies Requires the Requested Extension in Order to Conduct the Deposition of at Least One Recently-Identified Frontier Employee.                12

D.   Menzies Requires the Requested Extension to Seek Additional Targeted Discovery Concerning Witnesses to the Incident.                13

III.   Conclusion ...........................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bright LLC v. Best W. Int'l Inc.*,
2017 WL 9565406 (D. Ariz. Dec. 14, 2017) ......................................................2, 11

*Flowers-Carter v. Braun Corp.*,
2020 WL 4462174 (D. Ariz. June 25, 2020) .........................................2, 8, 11, 12

*Lopez v. Mauisun Computer Sys., Inc.*,
2016 WL 524659 (D. Ariz. Feb. 10, 2016) ...................................................................11

*Murray v. Mayo Clinic*,
2016 WL 10644766 (D. Ariz. Jan. 11, 2016) ...................................................................11

**Rules**

Fed. R. Civ. P. 16(b)(4) ...................................................................................................2

Defendant MENZIES AVIATION (USA), INC. ("Menzies"), by and through its attorneys, hereby respectfully requests that the Court extend the deadlines for fact discovery and expert discovery in the above-captioned matter as follows:

| **Deadline** | **Current Deadline** | **Proposed Deadline** |
| --- | --- | --- |
| Fact discovery | April 23, 2021 | June 23, 2021 |
| Expert disclosures | May 24, 2021 | July 26, 2021 |
| Rebuttal expert disclosures | June 30, 2021 | August 30, 2021 |
| Expert depositions | July 30, 2021 | September 30, 2021 |
| Dispositive motions | September 30, 2021 | November 30, 2021 |

*See* Menzies' Proposed Order, annexed hereto as Exhibit A.

On April 20 and April 21, 2021, the parties exchanged email correspondence concerning Menzies' request to extend the discovery deadline and the categories of additional documents and information Menzies seeks to obtain.  The parties also conferred telephonically concerning the same on April 20, 2021.  Frontier advised that it would oppose Menzies' request for an extension of the discovery deadline.

I.   **BACKGROUND**

This is the second request for adjournment of the fact discovery deadline in this case.  The parties' Joint Scheduling Order set February 26, 2021 as the close of fact discovery.  ECF No. 26.  Prior to February 26, the parties each served interrogatories and requests for production of documents on the other, and Frontier also issued requests for admission.  ECF Nos. 33, 35.  On January 13, 2021, the parties jointly requested that the Court endorse a stipulation extending the fact discovery deadline to April 23, 2021.  ECF No. 36.  The Court granted this request.  ECF No. 37.  Because the January 14 stipulation did not address the expert disclosure deadline or other deadlines that would be affected by the adjournment of the fact discovery deadline, the parties filed a request on March 25, 2021 for the Court to extend the deadlines for expert disclosures, rebuttal expert

disclosures, expert depositions, and dispositive motions, each by sixty days, in keeping with their earlier stipulation.  ECF No. 53.  The Court granted this additional request on March 26, 2021.  ECF No. 54.

Since the Court's first adjournment of the fact discovery deadline, Frontier has deposed two former Menzies employees, and Menzies has deposed two current Frontier employees and one former Frontier employee.  Menzies has also served a second set of interrogatories and requests for production on Frontier.  ECF No. 47.  As set forth below, based on the information gathered from the April 6, 2021 deposition of Frontier's Director of Maintenance, as well as the information contained in the documents produced by Frontier in April 2021, Menzies requires the additional requested time to obtain and review outstanding documents surrounding the complex issue of damages in this matter, and to conduct at least one additional deposition of a Frontier employee who was only recently identified.

## II.   **ARGUMENT**

A request for an extension of discovery deadlines specified in a case management order is governed by Rule 16(b)(4) of the Federal Rules of Civil Procedure, which provides that a case management order "may be modified only for good cause and with the judge's consent."  *Flowers-Carter v. Braun Corp.*, No. 18 Civ. 03836 PHX-DWL, 2020 WL 4462174, at *2 (D. Ariz. June 25, 2020) (citation omitted).  "Parties demonstrate good cause by acting diligently to meet the original deadlines set forth by the court."  *Bright LLC v. Best W. Int'l Inc.*, No. 17 Civ. 00463 PHX-ROS, 2017 WL 9565406, at *1 (D. Ariz. Dec. 14, 2017) (citing Fed. R. Civ. P. 16, 1983 Advisory Committee Notes).  Here, as discussed

9338308.1

in full below, Menzies has diligently sought documents and information from Frontier in keeping with this Court's scheduling orders.  However, Menzies requires the additional requested time to conduct discovery concerning issues related to damages that were only disclosed during the April 2021 deposition of Frontier's Director of Maintenance, and to obtain documents from sources identified during this deposition and in Frontier's April 2021 productions.

**A. Despite Having Diligently Sought Documents and Information Related to Frontier's Damages in this Matter, Menzies Has Learned New Facts Concerning Frontier's Damages Throughout the Discovery Process, and During the April 6, 2021 Deposition of Frontier's Director of Maintenance.**

1. Menzies Has Received Conflicting Information from Frontier Regarding the Nature of Frontier's Lease-Related Damages.

Frontier's claims arise from an alleged incident in which a piece of ground handling equipment operated by a Menzies employee (purportedly in an unauthorized manner) collided with a Frontier airplane at Phoenix Sky Harbor International Airport (referred to herein as the "Incident").  Am. Compl., ECF No. 16, ¶¶ 7–8.  Frontier's claim for damages includes a substantial demand for lease charges which were initially described in the Amended Complaint as the cost of leasing alternative aircraft while the damaged aircraft was repaired.  *Id.* ¶ 11 ("As a result of the Mishap, the Aircraft required physical repair and was out of service for a time while the repairs were carried out, requiring Frontier to replace it for its airline operations by leasing another aircraft.").  Through the discovery process, and a series of disclosures made by Frontier, Menzies has come to understand that the leasing charges claimed by Frontier do not relate to the lease of a replacement aircraft, but instead appear to be fees and penalties charged by the lessor of the subject aircraft involved

3

in the Incident (referred to herein as the "Aircraft") between the date on which Frontier was contractually obligated to return the Aircraft, June 21, 2018, through the end of August 2018.  *Compare* Frontier's Oct. 9, 2020 Initial Disclosure Statement at p. 8 and Dec. 22, 2020 First Supplemental Disclosure Statement at p. 8, annexed hereto as Exhibit B, describing the lease-related damages as "aircraft damages associated with costs for aircraft lease rental") *with* Frontier's Jan. 25, 2021 Second Supplemental Disclosure Statement, annexed hereto as Exhibit C, at pp. 7, 9 (disclosing Frontier's Treasury Manager and Director of Maintenance as individuals likely to have discoverable information concerning "the delay in returning the [A]ircraft at issue because the repairs had to be completed, which delayed the return of the aircraft") *and* Frontier's Feb. 10, 2021 Third Supplemental Disclosure Statement, annexed hereto as Exhibit D, at p. 15 (clarifying fully that "Frontier was contracted to return the aircraft to the lessor on June 21, 2018," that "[p]er the lease, Frontier had to repair the aircraft before returning it," and that "[t]he time necessary for the repairs forced Frontier to return the aircraft late and thus incur penalties per the lease").  In sum, even as Frontier was producing documents related to the underlying Incident and the required repairs to the Aircraft (Frontier produced one set of documents in early January, one in late January, and one in early February), the nature of Frontier's claimed lease-related damages remained unclear until well into the discovery period.

     2.  <u>Menzies Has Received Conflicting Information from Frontier Regarding the Timeline of the Routine Maintenance and Non-Routine Repairs Performed on the Aircraft.</u>

Frontier now claims that due to the damage allegedly caused by Menzies, Frontier was unable to return the Aircraft to the lessor by June 21, and that Menzies is thus obligated

9338308.1

to indemnify Frontier for the resultant leasing fees and penalties charged by the lessor from June 21 through August 2018. *See* Ex. D, at p. 15. Notably, Frontier was contractually obligated to perform certain routine "lease-end" maintenance and refurbishment on the Aircraft, irrespective of the Incident. *See* Frontier's Response to Menzies' First Set of Interrogatories, annexed hereto as Exhibit E, at Interrogatory No. 8. Frontier had planned for this routine maintenance to take up to 52 days in total – that is, prior to the Incident involving Menzies, Frontier had planned to take the Aircraft out of service from May 1, 2018 until June 21, 2018, when the aircraft was due to be returned to the lessor, and the routine lease-end work was scheduled to be performed between May 1 and June 21. *Id.* Had this work taken longer than 52 days to perform, Frontier would have incurred penalties and fees for the period beyond June 21, regardless of any additional damage allegedly caused by Menzies. *See* Excerpts from Transcript of Deposition of Frontier Treasury Manager, Sharath Sashikumar, annexed hereto as Exhibit F, at pp. 41:13–42:4 (Q: "If the C8 [maintenance] check had taken longer than 51 days, would Frontier still have . . . incurred a penalty?" . . . . A: "If the damage hadn't happened and we worked on it and if it was five days late, we would have paid that base rent for those five days." Q: "So the penalty had nothing to do with why. It's just a function of whether you turned [the aircraft] in on time or not?" A: "The penalty is a way for the lessor to recoup the fact that they have not got their airplane when they thought they would get it back, right."). Thus, as an initial matter, documents and information concerning Frontier's determination that the routine maintenance and lease-return work would take no more than 52 days, and documents and information concerning the amount of time this work would have taken had the Incident

9338308.1

involving Menzies not occurred, are directly related to Frontier's lease-related damages in this matter.  (Likewise, documents and information concerning the nature, progression and duration of the repairs stemming from the Incident – including documents showing whether the diagnostics, repairs and inspections of the damage were all necessary and conducted without undue delay – are also clearly related to Frontier's damages in this matter.)  As such, Menzies' First Set of Interrogatories and First Set of Requests for Production, which were served on January 12, 2021 (ECF No. 35), requested all such materials.

Having understood prior to the commencement of this litigation that the Aircraft underwent some routine maintenance in addition to damage repairs, Menzies intended for its First Set of Interrogatories and Requests for Production of Documents to yield documents and information showing why the maintenance and repairs could not be conducted simultaneously.  *See* Ex. E, at Interrogatory No. 8 ("Describe in detail the process of conducting repairs and maintenance checks on the Aircraft following the Incident, including the process of deciding whether to conduct maintenance checks at the same time as . . . the aircraft repairs . . . .") and Interrogatory No. 11 ("Identify the individuals who oversaw repairs and maintenance checks on the Aircraft following the Incident, and describe fully and completely the estimates, findings and reports reflecting the nature of the repairs and maintenance checks . . . and the reasons why such repairs and maintenance checks were not completed prior to June 2018.").  In response to Menzies' Interrogatory No. 8, Frontier explained that "the damage repairs had to be completed before the routine lease-return maintenance work could be completed" because "the damage repairs required the aircraft to undergo a process called 'zero-stress shoring,' during which

6

the force applied to the aircraft had to be controlled to ensure the integrity of the structural repairs, which in turn precluded simultaneous maintenance work until the aircraft could be 'un-shored.'" *See* Ex. E, at p. 8.  Frontier also produced additional documents related to the repairs.   Accordingly, Menzies' Second Set of Interrogatories and Requests for Production of Documents, served March 9, 2021 (*see* ECF No. 47), sought documents and information detailing the amount of time it took for each phase of the four-month-long repair and maintenance process – first the repairs, and then the maintenance – to be completed, as well as the results of the diagnostics that were conducted on the Aircraft immediately following the Incident (which would have addressed the issue of zero-stress shoring), and Frontier's communications with the lessor of the Aircraft regarding the reasons for the delay in returning the Aircraft.

Subsequently, during the April 6, 2021 deposition testimony of James Mach, Frontier's Director of Maintenance, Menzies learned that the repairs related to the Incident were in fact largely conducted simultaneously with – *not* prior to – other routine maintenance that Frontier had agreed to perform prior to returning the Aircraft to the lessor. *See* Excerpts from Transcript of Deposition of James Mach, annexed hereto as Exhibit G, at p. 74:15-24 (Q: ". . . . were all three of those things [repairs, maintenance checks, and lease-return tasks] going on at the same time?"  A: ". . . . yes, all three events took place at the same time . . . ."). According to Mr. Mach, the routine lease-end work that Frontier was scheduled to perform between May 1 and June 21, 2018 includes over 1,500 maintenance tasks, and the length of time required to complete these tasks generally depends on numerous factors, including the regular wear and tear on a given aircraft, and

7

the extent of the hidden internal damage to the aircraft. *Id.* at p. 43:15-17 (Mach: "There's probably – I'm guessing there's probably at least 1500 maintenance tasks that are incorporated in a C8 [maintenance] check"), pp. 77:17–78:8 ("[D]uring a . . . heavy maintenance level check, the bulk of the task cards that are assigned . . . [require] open up and inspection. . . .   In other words . . . the task card tells you to open a floorboard and evaluate the floor beams underneath the floor board.  That's a routine task card.  And . . . when you open [the aircraft] up, if you find either corrosion or underlying structure damage or any type of action that would require maintenance, then you would generate what they called a nonroutine.  And then that nonroutine is then negotiated based on the required time and materials it takes to repair it.  So every routine task may or may not generate a nonroutine based on the level of finding or the level of exposure that it asks you to review.").   Further, Mr. Mach testified that the amount of lease-end work performed by Frontier varies from lease to lease, as Frontier typically negotiates with the lessor prior to the return date concerning the nature and extent of the maintenance and refurbishment Frontier will complete.  *Id.* at p. 51:18-19 (Mach: "[T]he lessor will typically try to get a brand-new airplane out of us, but we have to hold firm . . . .").

All told, it became clear only after Mr. Mach's deposition that the amount of time required to complete the routine lease-end work and non-routine repairs could not be easily broken down into phases; rather, Menzies would need to obtain additional documents and information concerning the airworthiness and wear-and-tear on the Aircraft prior to the Incident, the results of the 1,500 routine "task cards" that were performed on the Aircraft, the extent of hidden damage revealed when the Aircraft was opened up during the routine

9338308.1

maintenance checks, the relationship between the "Incident-related" repair work and the routine maintenance work which were conducted simultaneously, Frontier's system for distinguishing between the repair work and the maintenance work, and Frontier's status updates to the lessor of the Aircraft throughout the four-month repair period.

3. <u>In View of Frontier's Changing Disclosures and the Progression of Discovery in this Case, Menzies' Diligent Attempts to Understand Frontier's Damages Provide Good Cause for Extension of the Discovery Deadline.</u>

Good cause exists for amending a scheduling order where the requesting party seeks additional time to conduct discovery concerning newly disclosed information. *Flowers-Carter*, 2020 WL 4462174, at *2. Here, "no amount of diligence could have prevented the situation at issue." *Id.* (finding a "textbook example" of good cause for extending discovery deadline where the requesting party "expended significant time and resources attempting to nail down the facts" surrounding a disputed issue, and the opposing party offered "a series of changing disclosures"). Indeed, despite Menzies' earnest effort to "nail down" the facts concerning the complex issue of damages in this case, the nature of Frontier's disclosures and the information made available to Menzies throughout the discovery process has necessitated the requested extension of time.

**B. <u>Frontier's April 2021 Productions Demonstrate the Existence of Additional Key Documents Related to Damages.</u>**

In response to Menzies' First Set of Requests for Production of Documents, which demanded that Frontier produce records, communications, and other documents concerning the maintenance and repairs performed on the Aircraft following the Incident, Frontier initially stated that it would be overly burdensome to produce the extensive "aircraft records" stored on its cloud-based system maintained by a third-party vendor,

9

FLYdocs.  *See* Frontier's Responses to Menzies' First Set of Requests for Production of Documents, annexed hereto as Exhibit H, at pp. 2–4.  Accordingly, in February 2021 Frontier produced responsive communications and records that were presumably stored outside of FLYdocs, which provided only limited information concerning the nature and extent of the lease-return work and damage-related repairs conducted between May 1 and the end of August 2018.

However, on April 5, in response to Menzies' Second Set of Requests for Production and on the eve of depositions, Frontier produced additional communications and records which provided more insight into the details and timeline of the lease-return process and non-routine repairs.  In particular, several of these documents pertain to Frontier's decision-making surrounding the repair work (including Frontier's request for Airbus to (possibly unnecessarily) conduct additional investigation of the damage to the Aircraft in late April 2018 (*see, e.g.*, FRONTIER001912–13, annexed hereto as Exhibit I)), Frontier's sourcing of parts (and Airbus' possible delays in shipping some parts – *see, e.g.*, FRONTIER001846, FRONTIER001907, annexed hereto as Exhibit J), Frontier's reporting of the progression of the repairs to the lessor (*see, e.g.*, FRONTIER001788–91, annexed hereto as Exhibit K), and generally the flow of information between Frontier, Airbus, and Frontier's third-party provider of heavy maintenance and repair work, PEMCO.  The majority of these documents were responsive to Frontier's First Set of Requests for Production (which requested, *inter alia*, "[a]ll reports . . . communications, or other documents reflecting or describing the process of conducting repairs and maintenance checks on the Aircraft following the Incident, including the process of deciding whether to

10

conduct maintenance checks at the same time as . . . the aircraft repairs . . . ."), but were only produced after Menzies served its Second Set of Requests for Production.  According to Frontier's written responses to Menzies' Second Set of Requests for Production, these documents (which were produced the day before the deposition of James Mach, Frontier's Director of Maintenance) had previously been in Mr. Mach's custody and control.  *See* Frontier's Responses to Menzies' Second Set of Requests for Production of Documents, annexed hereto as Exhibit L, at p. 2.

Notably, many of these April 2021 documents included the third-party vendor FLYdocs as a recipient.  The fact that routine email communication concerning the repair and maintenance of the Aircraft was forwarded to FLYdocs as part of Frontier's ordinary course of business suggests that there are additional documents stored on FLYdocs that are not in Mr. Mach's custody and control, which directly relate to the details of the routine lease-end work and repairs that were conducted on the Aircraft.  Indeed, according to Mr. Mach, virtually all of Frontier's email communications – not just "aircraft records" – are stored on FLYdocs.  To the extent Frontier claims that it is impossible to conduct a targeted search for documents on FLYdocs, additional responsive documents may be in the custody and control of Frontier's Senior Manager of Maintenance who was on site while the repairs and lease-end checks were being performed (this individual, discussed further below, was identified by Mr. Mach as the highest-level Frontier employee who was on site at PEMCO's facility in Tampa, Florida throughout the four-month repair and maintenance period), and/or in the custody and control of several other custodians identified in Frontier's April 2021 productions.

9338308.1

In sum, it is now clear that a) Frontier's prior search criteria, which excluded a search of FLYdocs, was unreasonable and likely filtered out a substantial number of communications concerning the details of the lease-end maintenance and repairs, and b) Frontier's responses to Menzies' First Set of Requests for Production did not account for documents in the custody and control of key custodians such as Frontier's Director of Maintenance, who oversaw the repairs to the Aircraft.  As such, the proposed extension of the discovery deadline is necessary in order for Menzies to obtain documents similar to those produced in April 2021, which are currently hosted on FLYdocs and/or in the custody and control of custodians other than Mr. Mach.  *See Bright LLC*, 2017 WL 9565406, at *1 (good cause for extension of discovery deadline exists where the parties have been working diligently on discovery "but have not yet exchanged all relevant documents"); *Murray v. Mayo Clinic*, No.  14 Civ. 01314 PHX-SPL, 2016 WL 10644766, at *2 (D. Ariz. Jan. 11, 2016) (extending discovery deadline in order to allow parties to supplement responses to disputed discovery requests); *Lopez v. Mauisun Computer Sys., Inc.*, No. 12 Civ. 00414 TUC-BPV, 2016 WL 524659, at *5 (D. Ariz. Feb. 10, 2016) (extending discovery deadline in order to allow the requesting party to obtain documents referenced during deposition).

### C. <u>Menzies Requires the Requested Extension in Order to Conduct the Deposition of at Least One Recently-Identified Frontier Employee.</u>

Mr. Mach testified that while he was ultimately responsible for overseeing the maintenance and repairs on the Aircraft, he was not physically present while the maintenance and repairs were being conducted; rather, Frontier's Senior Manager of Maintenance, Thom DeMint, had an office at the PEMCO facility where the work was

9338308.1

being conducted, and was involved in the day-to-day repair and maintenance activities conducted by PEMCO.  *See* Ex. G at p. 51:24 (Mach: "I wasn't on site."), p. 27:21-25 (Q: "Would Mr. DeMint know a bit more about the specifics associated with what happened to that aircraft when it was at the PEMCO facility?"  A: "With regards to the – all of the maintenance being performed, yes.").   Accordingly, Menzies requires the additional requested time to conduct the deposition of Mr. DeMint and any other Frontier maintenance personnel who may yet be identified by Frontier.  *See Flowers-Carter*, 2020 WL 4462174, at *2 (extending discovery deadline in order to allow for the deposition of particular witnesses).

### D. **Menzies Requires the Requested Extension to Seek Additional Targeted Discovery Concerning Witnesses to the Incident.**

Menzies' Interrogatory No. 2 asked Frontier to identify the Frontier employees who were present at Sky Harbor Airport at the time of the Incident.  To date, Frontier has named only one employee who was on site when the Incident occurred, former Frontier mechanic Elias Sanchez.  *See* Ex. E, at p. 2.  Yet, according to Mr. Sanchez's April 7, 2021 deposition testimony, there was at least one additional Frontier employee at or near the location of the Incident who was acting in a managerial capacity at the time.  *See* Excerpts from Transcript of Deposition of former Frontier mechanic, Elias Sanchez, annexed hereto as Exhibit M, at p. 29:8-11 (Sanchez: "Generally . . . my lead[] . . . would just instruct me of what I needed to do."), 30:8-10 (Sanchez: "[M]y lead would contact Menzies and they would handle the logistics of everything."), 30:17-20 ("Q: Do you know when your lead would contact Menzies employees, was that in person or over some sort of radio?   A: "In

13

person.").  According to Mr. Sanchez, this individual instructed him to board the Aircraft, and likely knew which piece of ground handling equipment (i.e., the "belt loader") would be used to grant Mr. Sanchez access to the Aircraft.  *Id.* at p. 36:2-11 (Q: "Do you know if there were any stairs that were operational at the time of the incident?"  A: "There were not any stairs."  Q: "And that is the way it had been the whole time?"  A: "Yes, sir."  Q: "Since there were no stairs, it sounds like the only way you would access the aircraft . . . would be via the belt loader?"  A: "Correct.").  Frontier must amend its response to this interrogatory, and Menzies should be afforded the opportunity to seek related discovery concerning this unnamed individual's role in the Incident.  *See Flowers-Carter*, 2020 WL 4462174, at *3.

III.   **<u>CONCLUSION</u>**

Based on the foregoing, Menzies respectfully requests that the Court grant the proposed two-month extension of the discovery deadline and other related deadlines so that Frontier may produce the outstanding categories of documents and information outlined above, and in order for Menzies to a) review and evaluate the same, and b) conduct the depositions of Frontier employees who were involved with the repairs and maintenance on a day-to-day basis, including Senior Manager Thom DeMint, who was identified during the April 6, 2021 deposition of James Mach.

14

9338308.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED this 23rd day of April, 2021.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ J. Gary Linder
   J. Gary Linder
   40 N Central Avenue, Suite 2700
   Phoenix, Arizona 85004
   Attorneys for Defendant Menzies Aviation
   (USA), Inc.

15

9338308.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of April, 2021, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

Adam E. Lang
Matt Jarvey
Snell & Wilmer, LLP
One Arizona Center
00 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
alang@swlaw.cin
mjarvey@swlaw.com
Attorneys for Plaintiff Frontier Airlines, Inc.

/s/ Jennifer Bernardo_____

16

9338308.1