# Exhibit E

Adam E. Lang (#022545)
Matt Jarvey (#031350)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: alang@swlaw.com
         mjarvey@swlaw.com

*Attorneys for Plaintiff Frontier Airlines, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Frontier Airlines, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>Menzies Aviation (USA) Incorporated,<br><br>    Defendant. | No. 2:20-cv-01432-ESW<br><br>**PLAINTIFF FRONTIER AIRLINES, INC.'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES** |

Plaintiff Frontier Airlines, Inc. ("Frontier"), by and through counsel undersigned, hereby responds to Defendant's First Set of Interrogatories as follows:

### INTERROGATORIES

**INTERROGATORY NO. 1:**

State the name and address of the person answering these Interrogatories, and, if applicable, the person's official position or relationship to you.

**RESPONSE:**

Counsel for Frontier prepared the answers to these interrogatories based on information gathered from Frontier.

**INTERROGATORY NO. 2:**

Identify by name and job title each of your employees who was present at Phoenix

Sky Harbor Airport at the time of the Incident.

**RESPONSE:**

Frontier is aware of only one Frontier employee who was present at Phoenix Sky Harbor Airport and who witnessed the Incident when it occurred: Elias Sanchez, who was a mechanic.

To the extent that Defendant requests the identity of every single Frontier employee who happened to be present at Phoenix Sky Harbor Airport when the incident occurred, but who did not witness the Incident, Frontier objects under Rule 26(b)(1) that such a request is not relevant to any claim or defense, and the burden or expense of identifying every single Frontier employee who happened to be at the airport during the Incident would outweigh the likely benefit of such information.

**INTERROGATORY NO. 3:**

Describe in detail each act or omission on the part of any party to this lawsuit and/or any third parties that you contend contributed to the damages you claim in this lawsuit.

**RESPONSE:**

Defendant, through its agents and/or employees, ran a belt loader into the side of a Frontier aircraft, causing significant damage to the aircraft.

One of Defendant's employees, Shantell Jordan, operated the belt loader without proper training and in such a manner that caused the belt loader to run into and damage Frontier's aircraft. As Mr. Jordan drove the belt loader toward Frontier's aircraft, he failed to place the belt loader in neutral and he improperly pressed the belt loader's accelerator, rather than the brake, which caused the belt loader to strike and damage Frontier's aircraft. Mr. Jordan acknowledged his error in a written statement. *See* FRONTIER 000087. Also, no guide person was used while Mr. Jordan attempted to operate the belt loader near the aircraft, as required by policy and protocol.

Another of Defendant's employees, Robert Lammon, was Mr. Jordan's supervisor. Mr. Lammon also acknowledged in a written statement that Mr. Jordan caused the belt

loader to hit Frontier's aircraft. *See* FRONTIER 000088. Mr. Lammon asked and permitted Mr. Jordan to operate the belt loader despite the fact that Mr. Jordan was not properly trained to do so, was not properly signed off on operating a belt loader, and should not have been operating a belt loader under the policies and procedures that governed Defendant's performance of ground handling services.

Another of Defendant's employees who was responsible for investigating the incident, David Yanez, acknowledged in his investigation report that Mr. Jordan failed to follow proper policies and procedures, used equipment (the belt loader) that he was not qualified to operate, and used equipment (the belt loader) for an unintended purpose. *See* FRONTIER 000083. Mr. Yanez acknowledged in his report that Mr. Jordan "was not signed off on the equipment [belt loader] and therefore, should not have been operating the equipment." *See* FRONTIER 000084.

In the weeks leading up to the Incident, Frontier had discovered that untrained employees of Defendant were working on or near Frontier aircraft. Frontier notified Defendant numerous times leading up to the Incident that Defendant was not to permit untrained employees to work near Frontier aircraft. Moreover, in the months leading up to the Incident, one of Frontier's managers, Graham Gunner, instructed Mr. Jordan to leave the ramp (the outdoor, ground area) near one of Frontier's aircraft because Mr. Jordan was not trained to perform work on the ramp. Later, approximately one week before the Incident, Mr. Gunner specifically warned Defendant that it was not to permit untrained employees to work near Frontier aircraft, and that doing so was likely to lead to an aircraft being damaged. Despite Frontier's instructions and warnings, however, Defendant permitted an untrained employee, Mr. Jordan, to operate a belt loader near a Frontier aircraft, and in so doing Mr. Jordan indeed damaged Frontier's aircraft.

Defendant's actions described above also violated several policies and procedures enumerated in Frontier's Ground Service Manual, which, together with other documents, governs the ways in which Defendant was to provide ground handling services for Frontier. Frontier's Ground Service Manual is produced at FRONTIER000919–1350. It provides,

among other things: the requirement that Defendant's employees be trained on the specific pieces of equipment they operate (§ 40.10.1); restrictions on where belt loaders can be placed—i.e., at cargo doors and not at doorways (§ 40.10.10); the necessity of using a guide person for procedures performed close to the aircraft to avoid accidents, contacts, or crashes (§ 40.10.11); and the method of operating a belt loader (§ 40.15). Defendant violated the standards set forth in the sections cited above.

**INTERROGATORY NO. 4:**

Describe fully and completely the damage history of the component parts of the Aircraft that were allegedly damaged as a result of the Incident, for the five years prior to the Incident.

**RESPONSE:**

Documents providing a detailed description of the maintenance performed on the aircraft at issue as a result of the Incident are produced at FRONTIER001354–1771.

To the extent that Request No. 4 seeks the aircraft's full damage history for all if its component parts for five years prior to the Incident, Frontier objects under Rule 26(b)(1) that such a request is not relevant to any claim or defense, and the burden or expense of identifying that prior history would outweigh the likely benefit of such information. The request for five years of prior history is both irrelevant and unduly burdensome. Prior damage history is irrelevant because Frontier only seeks repair-related damages for work performed immediately after and as a result of the Incident. Procuring all prior damage history would require Frontier to procure and review historical maintenance records, which would be unduly burdensome because of the volume of such records and the method in which they are stored. The aircraft's maintenances records are stored via a cloud-based system maintained by a third-party vendor, FLYdocs. That system maintains documents in a manner that does not allow Frontier to locate quickly all documents that are strictly related to maintenance, let alone maintenance related to the specific parts of the aircraft damaged in the Incident. There are typically tens or even hundreds of thousands of maintenance

documents stored for a given aircraft. Accordingly, locating and reviewing all such documents would be unduly costly both in terms of time and monetary expense.

**INTERROGATORY NO. 5:**

State the total amount of damages you claim in this lawsuit, including a computation of each category of damage alleged and the factual basis for each item of damages.

**RESPONSE:**

Pursuant to Rule 26(a)(1)(A)(iii), a computation of Frontier's damages, by category, is included in Section III of Frontier's initial and supplemental disclosure statements. In short, Frontier's damages comprise three categories:

- <u>Flight operations costs</u>: Frontier had to re-route aircraft to substitute for the damaged aircraft's scheduled flight on April 1, 2018. This caused Frontier to incur costs associated with staffing the substituted aircraft—e.g., crew compensation, transportation, hotel, per diem, as well as fuel costs for the re-routed aircraft. Frontier also incurred the fuel and pilot costs of ferrying the damaged aircraft to the repair facility in Tampa.
- <u>Maintenance costs</u>: Frontier incurred maintenance costs in repairing the damage that Defendant caused to the aircraft at issue. These costs included the cost of parts, labor, and tools necessary to complete the repairs, as well as diagnostic and repair-planning services performed by Airbus, the aircraft's manufacturer.
- <u>Lease penalty costs</u>: Frontier's lease governing the aircraft at issue has been produced at FRONTIER000248–426. Under the lease, Frontier was required to keep the aircraft in good repair (§ 8.12), to return it in a repaired condition (§ 12 & Schedule 3), and to pay lease penalty charges if the aircraft was returned late (§ 12.3(a)(iii)). The aircraft was supposed to be retuned in late June 2018. But the time it took to complete the repairs forced Frontier to return the aircraft late, which in turn forced Frontier to incur lease penalty costs that Frontier would not have incurred had it been able to return the aircraft on time.

- 5 -

Frontier also seeks its attorney's fees, expenses, and costs incurred in this matter, pursuant to Rule 54(d), A.R.S. § 12-341.01, and the parties' agreements including Paragraph 4, § 4.1 of the Standard Ground Handling Agreement – Simplified Procedure, Annex B.80 – Locations(s), Agreed Services and Charges (effective Jan. 1, 2018). *See* FRONTIER000070.

**INTERROGATORY NO. 6:**

Provide a breakdown of damages you are claiming for flight operations, including flight crew costs and ground operations, stating the date on which each such cost was incurred and how it resulted from the Incident.

**RESPONSE:**

Pursuant to Rule 26(a)(1)(A)(iii), a computation of Frontier's damages, by category, is included in Section III of Frontier's initial and supplemental disclosure statements. That computation includes a breakdown of Frontier's damages associated with flight operations. Frontier's flight operations damages are also detailed by category and date at FRONTIER000095–97, 699–703, 722–727, 735–741, 742–745, 914–918. Frontier had to re-route aircraft to substitute for the damaged aircraft's scheduled flight on April 1, 2018. This caused Frontier to incur costs associated with staffing the substituted aircraft—e.g., crew compensation, transportation, hotel, per diem, as well as fuel costs for the re-routed aircraft. Frontier also incurred the fuel and pilot costs of ferrying the damaged aircraft to the repair facility in Tampa.

**INTERROGATORY NO. 7:**

Provide a breakdown of damages you are claiming for aircraft repairs, including costs for air freight shipping, labor, parts and materials, and maintenance checks, stating the dates on which each such cost was incurred, and how it resulted from the Incident.

**RESPONSE:**

Pursuant to Rule 26(a)(1)(A)(iii), a computation of Frontier's damages, by category,

- 6 -

is included in Section III of Frontier's initial and supplemental disclosure statements. That computation includes a breakdown of Frontier's damages associated with aircraft repairs, with citations to the underlying invoices for the components of the repair costs. Many of the underlying invoices detail the dates on which the costs were incurred, but all reflect costs associated with repair work between April and September 2018. The costs associated with aircraft repairs were incurred in repairing the damage Defendant caused to the aircraft at issue.

**INTERROGATORY NO. 8:**

Describe in detail the process of conducting repairs and maintenance checks on the Aircraft following the Incident, including the process of deciding whether to conduct maintenance checks at the same time as, weeks after, or months after the aircraft repairs were conducted.

**RESPONSE:**

Defendant damaged the aircraft on April 1, 2018, at Phoenix Sky Harbor Airport. Frontier outsources heavy maintenance and repairs for its aircraft to a third-party provider, PEMCO World Air Services ("PEMCO"), which performs such repairs on Frontier's aircraft from PEMCO's hangar in Tampa, Florida. Shortly after the aircraft was damaged on April 1, 2018, Frontier flew the aircraft to PEMCO's hanger in Tampa for repairs. PEMCO was not able to immediately begin work on the aircraft, however, because its hangar was full of aircraft that had been previously scheduled for repair or maintenance work, including other aircraft that were undergoing lease-return maintenance work shortly before their lease-return deadlines. Accordingly, Frontier's damaged aircraft had to be parked outside of PEMCO's hangar until space opened up in the hangar on May 1, 2018, which is when the aircraft was originally scheduled to be inducted into the hangar in advance of its June 21, 2018, lease return date. Repair work could not be performed while the aircraft was parked outside the hangar for several reasons: PEMCO crews were already completely occupied with previously scheduled work in the hangar; there is no reasonably

- 7 -

1  feasible way to perform heavy maintenance work outside of the hanger; and the type of
2  repairs needed for the damaged aircraft at issue required the aircraft to be inside the hangar,
3  protected from outdoor elements.

4  Once the aircraft was inducted into the hangar on May 1, 2018, it had to undergo
5  extensive and time-consuming repairs due to the damage. Under its lease, Frontier was
6  required to keep the aircraft in good repair and to return it in a repaired condition. Because
7  the damage was non-routine, the aircraft's manufacturer, Airbus, had to assess the damage
8  and draft a repair plan for PEMCO to execute, to ensure that the aircraft was airworthy.
9  Moreover, the damage repairs had to be completed before the routine lease-return
10 maintenance work could be completed; the damage repairs required the aircraft to undergo
11 a process called "zero-stress shoring," during which the force applied to the aircraft had to
12 be controlled to ensure the integrity of the structural repairs, which in turn precluded
13 simultaneous maintenance work until the aircraft could be "un-shored." After the damages
14 were repaired and the aircraft was un-shored, the aircraft then underwent the routine
15 maintenance work, which was completed immediately after the repair process—not
16 "weeks" or "months" after.

17 The process of completing repairs and maintenance work on the aircraft is
18 summarized in the daily status report records for the aircraft repairs, which have been
19 produced at FRONTIER001354–1551.

21 **INTERROGATORY NO. 9:**

22 Provide a computation of damages you are claiming for aircraft leasing charges,
23 stating the dates on which each such charge was incurred, how it resulted from the Incident,
24 and an explanation of why it was necessarily incurred.

25 **RESPONSE:**

26 Pursuant to Rule 26(a)(1)(A)(iii), a computation of Frontier's damages, by category,
27 is included in Section III of Frontier's initial and supplemental disclosure statements. That
28 computation includes a breakdown of Frontier's damages associated with leasing charges,

- 8 -

1  with citations to the underlying invoices for those leasing charges.

2  The leasing charges relate to Frontier's late return of the aircraft that Defendant damaged. Frontier's lease governing the aircraft at issue has been produced at FRONTIER000248–426. Under the lease, Frontier was required to keep the aircraft in good repair (§ 8.12), to return it in a repaired condition (§ 12 & Schedule 3), and to pay lease penalty charges if the aircraft was returned late (§ 12.3(a)(iii)). The aircraft was supposed to be retuned in late June 2018. But the time it took to complete the repairs forced Frontier to return the aircraft late, which in turn forced Frontier to incur lease penalty costs that Frontier would not have incurred had it been able to return the aircraft on time. Frontier incurred lease penalty costs associated with June, July, and August 2018. *See* FRONTIER000117–119.

**INTERROGATORY NO. 10:**

Identify any and all adjusters and/or surveyors who investigated or reviewed this Incident on your behalf, and describe fully and completely the inspections and investigations conducted on the Aircraft as a result of the Incident.

**RESPONSE:**

Frontier is not aware of any insurance adjusters and/or surveyors who have investigated or reviewed the Incident on Frontier's behalf.

Frontier's maintenance personnel, including Frontier's Director of Maintenance, James Mach, evaluated the damage to Frontier's aircraft, as did representatives of Airbus (the aircraft's manufacturer) and PEMCO (the third-party heavy maintenance provider who performed the repair work). In particular, Airbus engineers evaluated the damage to the aircraft while it was in Tampa, and created a repair plan for PEMCO to follow in executing the repairs.

**INTERROGATORY NO. 11:**

Identify the individuals who oversaw repairs and maintenance checks on the Aircraft

1  following the Incident, and describe fully and completely the estimates, findings and reports
2  reflecting the nature of the repairs and maintenance checks performed from April through
3  August 2018, and the reasons why such repairs and maintenance checks were not completed
4  prior to June 2018.

**RESPONSE:**

Frontier's Director of Maintenance, James Mach, ultimately oversaw the repairs and maintenance on the aircraft following the Incident. A description of the nature of the repairs is included in response to Interrogatory No. 8 above. Additionally, Frontier has produced detailed documentation related to the aircraft's repair at FRONTIER001354–1771. The reasons why the repairs were not completed prior to June 2018 are detailed in response to Interrogatory No. 8 above.

**INTERROGATORY NO. 12:**

State whether anything has been paid or is payable from any third party for the damages listed in your answers to these Interrogatories, and if so, state the amounts paid or payable, the name and business address of each person or entity who paid or owes said amounts, and which of those third parties have or claim a right of subrogation.

**RESPONSE:**

Frontier's damages have not been paid by, and to Frontier's knowledge are not payable from, any third party—except perhaps by Defendant's insurer(s) to the extent that Defendant is covered under any insurance policies that would require Defendant's insurer(s) to pay Frontier's damages.

**INTERROGATORY NO. 13:**

Identify all persons who are believed or known by you or your attorneys to have any knowledge concerning any of the claims or defenses in this lawsuit, including the location of evidence, and specify the subject matter about which each witness has knowledge.

**RESPONSE:**

To Frontier's knowledge, the persons who might have knowledge regarding the claims and defenses in this lawsuit—and the subject matter of that knowledge—are identified in Frontier's and Defendant's initial and supplemental disclosure statements. Any person identified in the documents produced in this case could also, potentially, have knowledge regarding the claims and defenses in this lawsuit.

**INTERROGATORY NO. 14:**

State whether you are aware of any statement or remark made by or on behalf of any party to this lawsuit concerning any claims or defenses in this lawsuit, including to any investigative entity, and if so, identify the parties to the communication, and the date, time, place, and substance of each statement.

**RESPONSE:**

On or about April 1, 2018, Defendant, through its agents/employees—including Shantell Jordan, Robert Lammon, and David Yanez—made written statements, concerning the claims and defenses in this lawsuit, as detailed in response to Interrogatory No. 3 above. Those written statements have been produced at FRONTIER000083–88. Those written statements were initially provided to Frontier manager Graham Gunner. A Frontier mechanic, Elias Sanchez, also provided a statement, produced at FRONTIER000721.

Later, on or about April 1 or 2, 2018, Messrs. Jordan, Lammon, and Yanez made verbal statements to Mr. Gunner to the same effect as their written statements. Mr. Jordan also made statements to the effect that he knew he was not trained to operate a belt loader, but that Mr. Lammon has asked him to do so, and that using a belt loader was simply a quicker method of accomplishing the desired task than the alternative methods.

On April 2, 2018, employees of Frontier and Defendant participated in a conference call related to the Incident. The list of invitees to that call has been produced at FRONTIER000582–583. During the call, Mr. Yanez acknowledged the fact that Defendant had been warned ahead of the Incident about having only trained employees working near Frontier aircraft, and the fact that Mr. Jordan used the belt loader despite not being trained

to do so.

More broadly, the correspondence and investigation reports/packets that Frontier has produced involving statements of employees of Frontier or Defendant all "concern" the subject matter of this lawsuit.

To the extent that Defendant seeks statements that Frontier employees have made to Frontier's counsel related to this lawsuit, Frontier objects to disclosing such statements because those statements are protected by the attorney-client privilege.

DATED this 19th day of February, 2021.

SNELL & WILMER L.L.P.

By: *s/Matt Jarvey*
Adam E. Lang
Matt Jarvey
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
*Attorneys for Plaintiff Frontier Airlines, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2021, I emailed and mailed via U.S. Mail the attached document to the following:

J. Gary Linder
Jones, Skelton & Hochuli, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, AZ 85004

*Attorneys for Defendant Menzies Aviation (USA), Inc.*


 *s/ Kathy Sprinkle*