J. Gary Linder, Bar #020552
JONES, SKELTON & HOCHULI P.L.C.
40 N Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone:  (602) 263-7340
Fax:  (602) 200-7883
glinder@jshfirm.com

Attorneys for Defendant Menzies Aviation
(USA), Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

Frontier Airlines, Inc.,

                              Plaintiff,

v.

Menzies Aviation (USA), Inc.,

                              Defendant.

No. 2:20-cv-01432-ESW

**REPLY IN SUPPORT OF DEFENDANT MENZIES AVIATION (USA), INC.'S MOTION FOR EXTENTION OF DISCOVERY DEADLINES**

        For the reasons stated in the motion and below, Defendant Menzies Aviation moves for a short two-month extension of time to pursue limited discovery.

## I.    BACKGROUND

        This is a negligence and breach-of-contract case.  Frontier Airlines sued Menzies Aviation in state court on March 31, 2020 asserting a single claim for negligence. [Doc. 1 (Compl.).]  Frontier alleged that a Menzies employee crashed a belt loader into a plane leased by Frontier causing damage.  [*Id.* at ¶ 7.]  After the case was removed to this Court, Frontier filed an amended complaint on August 11, 2020.  [Doc. 16.]  The amended complaint added a claim for breach of contract based on allegations that Menzies: (a) failed to perform the contracted-for services in conformity with Frontier's standards; and (b) failed to indemnify Frontier for losses arising from Menzies' supposed negligence.  [*Id.* at ¶¶ 28–29.]

        Frontier answered the amended complaint on August 26, 2020 [Doc. 23]; the Court entered a case management order on September 18, 2020 [Doc. 26]; and the parties

9382589.1

exchanged initial disclosure statements in October 2020.  [Doc. 27, 28.]  Frontier initially alleged that its damages included the following: "the Aircraft required physical repair and was out of service for a time while the repairs were carried out, requiring Frontier to replace it for its airline operations by leasing another aircraft."  [Doc. 16, ¶ 11.]  Frontier's initial disclosure statement repeated this theory by describing the claimed damages as including "aircraft damages associated with costs for aircraft lease rental."  [Doc. 55-2 at p. 9.]

On January 25, 2021, Frontier completely and unexpectedly changed its theory of damages.  Frontier shifted its focus away from allegedly having to lease another plane, and instead focused on the supposedly delayed return of the damaged plane to the lessor, which purportedly included "extra costs Frontier incurred in the lease-return process due to the damage to the aircraft."  [Doc 55-3 at pp. 8, 10; *see also* Doc. 55-4 at p. 16.]  Importantly, this shift in Frontier's theory of damages did not occur until *after* Menzies served its first round of discovery requests upon Frontier.  [Doc. 35.]

In the weeks following Frontier's late-January surprise, Frontier inundated Menzies with information, some relevant and some not.   Frontier served its third supplemental disclosure on February 10, 2021 [Doc. 41], and its responses to Menzies' initial discovery requests on February 19, 2021.  [Doc. 44.]  These disclosures included hundreds of pages of documents—an overwhelming amount of information—which required time to process so that Menzies could understand the meaning of the produced information, and distinguish between what was relevant and what was not.  [Doc 55-4.].  For example, Frontier's responses to Menzies' initial discovery requests, in many instances, merely responded by citing to a bates number without explanation, making it extremely tedious to decipher Frontier's position.  [Doc 55-5.]

Meanwhile, Menzies was producing its own disclosures to Frontier.  Menzies served its supplemental responses to Frontier's discovery requests on February 11, 2021 [Doc. 42], and a supplemental disclosure statement on February 12, 2021.  [Doc. 43.]  By early-March, Menzies was far enough along in processing the mountain of information disclosed by Frontier, it finally felt prepared to start deposing witnesses.  On March 8,

1   2021, Menzies noticed the depositions of Frontier employees, James Mach and Sharath

2   Sashikumar [Doc. 45, 46], and on March 10, 2021 noticed the deposition of Eli Sanchez.

3   [Doc. 48.]

4          In between those dates, on March 9, 2021, Menzies served Frontier with

5   additional discovery requests.  [Doc. 47.][1]  Frontier argues these deposition notices and

6   discovery requests were tardy and demonstrate a lack of diligence because they were not

7   served until March 2021.  But Frontier conveniently overlooks the change in its theory of

8   damages that occurred on January 25, 2021, and the staggering amount of information

9   produced in the month of February, all of which required time to process and digest before

10   Menzies could thoughtfully tailor its next round of discovery requests or depose any

11   witnesses.

12          The witness depositions revealed additional contradictions and omissions in

13   Frontier's disclosures.  For example, whereas Frontier's February 19, 2021 answers to

14   Menzies' first set of interrogatories explained that "the damage repairs had to be completed

15   before the routine lease-return maintenance work could be completed" [Doc. 55-5 at pp.

16   8–9 (Resp. No. 8)]; the April 6, 2021 deposition of James Mach, Frontier's Director of

17   Maintenance, revealed for the first time that the repairs related to the incident were in fact

18   largely conducted simultaneously.  [Doc. 55-7 at p. 6 (Mach dep., 74:13–24).]

19          Additionally, Mach testified that Frontier's Senior Manager of Maintenance

20   (Thom DeMint)—not Mach—was the one on site during the relevant time, and DeMint is

21   the person most knowledgeable about the plane's maintenance and repairs.  [Doc. 55-7 at

22   (Mach dep., 51:22–52:2, 27:21–25).]  Tellingly, Frontier never listed Mr. DeMint as a

23   witness in any of its three disclosure statements.  [Doc. 55-4.]  This is significant because,

---

25          [1] Frontier's responses to these requests [Doc. 55-12] included documents that were
     responsive to but omitted from Frontier's response to Menzies' first discovery requests.
26   As an excuse, Frontier asserted these documents were in Mach's possession.  This not only
     shows delay on Frontier's part warranting an extension of the discovery period, but also
     that there may still be other responsive documents that have yet to be disclosed, but are in
27   the possession of other witnesses discussed below.  *See Gazian v. Wells Fargo Bank NA*,
     2015 WL 3448575, at *2–3 (D. Ariz. May 29, 2015) (finding good cause for reopening
28   discovery after defendant disclosed an email which should have been disclosed in response
     to plaintiffs' earlier requests).

3

according to Mach, DeMint almost certainly has discoverable and highly relevant information that, at a minimum, requires a deposition.  Also likely is the notion that DeMint may have additional documents in his possession that should have been disclosed months ago given Frontier's prior failure to timely disclose information that was in Mach's possession.

Finally, while Frontier named only one employee who was on site when the underlying incident occurred—former Frontier mechanic Elias Sanchez—Sanchez testified there was at least one additional Frontier employee who was acting in a managerial capacity at or near the location of the accident at the relevant time.  [Doc. 55–13 (Sanchez dep., 29:8–11, 30:8–10, 30:17–20, 36:2–11).]  Because Frontier failed to disclose the existence or identity of this key witness, and Menzies only discovered the need to identify this witness through the deposition of Sanchez, additional targeted discovery is both reasonable and necessary for this purpose.

## II.    MENZIES WAS DILIGENT.

Frontier wrongly argues the foregoing demonstrates a lack of diligence by Menzies.  In truth, this record shows that Menzies has been more than diligent.  Menzies propounded discovery requests, noticed depositions, and timely complied with its own disclosure obligations, all within the period for discovery established by the Court. Menzies pursued this strategy for discovery based on Frontier's disclosures, and Menzies should not have to suffer where contradictions and omissions in those disclosures led to surprises late in the discovery period.  Such an outcome would only encourage sandbagging and place the burden on defendants to ensure that plaintiffs meet their own disclosure obligations.

Nevertheless, Frontier accuses Menzies of lacking diligence because it: (a) waited until January 12, 2021 to propound its first discovery request; (b) waited until March to start noticing depositions; and (c) waited until three days before the discovery cut-off to request more time.  Frontier is wrong on all three points.  As a threshold matter, that Menzies waited until January 12, 2021 to propound its first discovery request is not even

1   relevant given Frontier's January 25, 2021 surprise change in damages theories.  Due to

2   the late timing of this significant shift in damages theories, it makes no difference whether

3   Menzies sent its first discovery request in early-October 2020 or early-January 2021, for

4   Menzies had no fair notice of Frontier's damages theory until late-January 2021.[2]

5          Frontier is also not playing fair in asserting that Menzies lacked diligence by

6   waiting until March before starting to notice depositions.  Of course, viewing this fact in

7   isolation might give the appearance of delay.  But when viewed in context, the sequence

8   of events described above makes perfect sense.  Menzies needed to process and understand

9   Frontier's voluminous February disclosures before it could meaningfully depose Frontier's

10  employee witnesses.  Frontier acknowledged this point in asserting that it "produc[ed]

11  hundreds of pages of repair/maintenance records and day-by-day status reports of work

12  performed following the incident" [Doc. 62 at 8:3–5], and that "Frontier produced the

13  documents ahead of Menzies's depositions so that Menzies could use them during the

14  depositions."  [*Id.* at 8:22–23.]  In other words, Frontier fully admits that it inundated

15  Menzies with information during the time leading up to Menzies' depositions, *and* that it

16  knew Menzies needed this information to make the depositions meaningful.[3]

17         Frontier cannot take unfair advantage of these facts by arguing Menzies

18  should have instantly understood the significance of Frontier's disclosures the second they

19  were received.  For example, Frontier argues the only reason that DeMint and another

20  unnamed individual were "recently identified" as witnesses is that Menzies waited so long

21  to take Mach's and Sanchez's depositions.  But again, Menzies cannot reasonably have

22  been expected to meaningfully depose Mach and Sanchez before it understood the

23  significance of Frontier's voluminous February disclosures, which took time to process

24  and digest.

---

25         [2] Notably, Frontier itself did not begin pursuing discovery in this matter until mid-
26  December 2020: Frontier served its first sets of written discovery requests on December
    16 and December 22, 2020.  [Doc. 33, 34.]

27         [3] The parties were also actively engaged in settlement negotiations during this
28  period.  [Doc. 32; Doc. 62-1.]  *See Navarrete-Hudson v. Air Methods Corp.*, 2007 WL
    9724148, at *2 (D. Ariz. Mar. 30, 2007) (granting extension of discovery deadline despite
    six earlier extensions, in view of the parties' good-faith settlement efforts).

9382589.1

Finally, Frontier shows its true colors in arguing that Menzies lacked diligence by not moving for an extension of the discovery cut-off until April 23, 2021. As Frontier and the Court are both aware, Menzies motion relies heavily on the deposition testimony of Mach, Sanchez, and Sashikumar. But Menzies did not receive copies of these transcripts until April 15, 2021 (Mach/Sanchez) and April 19, 2021, respectively. [**Ex. N**, Reporter Certifications.] This timeline shows that Menzies was more than diligent in reviewing the transcripts and producing a complex motion within just a few days of receiving the transcripts. On balance, the foregoing shows that Menzies has been more than diligent.

## III.    THE SCOPE OF ADDITIONAL DISCOVERY IS LIMITED.

Next, Frontier mischaracterizes the scope of Menzies' request for additional discovery. Frontier would have the Court believe that Menzies wants to go on some limitless "fishing expedition" for the sole purpose of "burdening" Frontier.[4] In truth, the scope of Menzies' request is very narrow and specifically targeted. Menzies simply wants to depose one or, at most, two more witnesses (depending on the existence and identity of the unnamed individual referenced by Sanchez), and discover any relevant documents that may be in these witnesses' possession or otherwise available to Frontier. This is no grand "fishing expedition," as Frontier misleadingly attempts to characterize it. And Menzies had no notice these witnesses even existed until it deposed Mach and Sanchez, which, as discussed above, happened at the earliest possible time that Menzies could meaningfully depose them.[5]

---

[4] Frontier claims it "has every reason to believe" that the purpose of Menzies' request is to impose additional costs on Frontier, but failed to identify what those reasons are. In truth, Menzies' simple request is exactly what the motion says it is: two more months of discovery to uncover the information listed in the motion and above, which Frontier should have disclosed from the inception, and Menzies did not learn about until the Mach and Sanchez depositions.

[5] This is alone sufficient to warrant an extension. *See Flowers-Carter v. Braun Corp.*, 2020 WL 4462174, at *3 (D. Ariz. June 25, 2020) (granting extension requested on the last day of the discovery period where the requesting party only learned the significance of a particular deponent late in the discovery process); *Gazian*, 2015 WL 3448575, at *3 n.1 (rejecting argument that party should have deposed a witness earlier, since at that early stage party "did not know the information contained in the later-disclosed email – information that would have made [the deponent]'s deposition more relevant").

Frontier's machinations do not end there.  It further attempts to mislead the Court in arguing that Menzies never opposed Frontier's objections to discovery requests before the close of discovery, and should not be allowed to do so now (or at all in the event of an extension).  But Frontier's earlier disclosures and any objections contained therein are not even at issue here.  Menzies simply wants to take limited additional discovery on the discrete issues described above.  Frontier even acknowledged this point in admitting that "Menzies's motion does not timely raise the dispute either because the motion only seeks an extension of time."  [Doc. 62 at 13:18–20.]  Precisely.  Frontier is merely trying to scare the Court away from granting a short extension by making vague references to phantom discovery disputes that do not even exist.

## IV.     FRONTIER'S SHIFTING POSITIONS WARRANTS AN EXTENSION.

Frontier is also wrong in arguing that its damages disclosures only "changed" in the sense that they got more detailed as discovery proceeded.  The record above shows this is plainly false.  Frontier's amended complaint and initial disclosure were clear: the theory of damages was predicated on having to lease a replacement aircraft.  Not until January 25, 2021 did Frontier completely switch lanes by asserting its damages theory was now predicated on costs associated with delay in returning the damaged aircraft to its lessor.  This shift in Frontier's damages theory mooted everything Menzies had none previously, including (a) investigating and answering the amended complaint; (b) analyzing and processing Frontier's initial disclosure; and (c) propounding its first set of discovery requests.

Frontier must know its position on this point is meritless, for it again attempts to distract the Court with another non-issue.  Frontier asserts that, "[g]iven the nature of Menzies's requests about the timing of the repair and maintenance work, it appears that Menzies did in fact understand Frontier's damage theory when it began conducting discovery."  [Doc. 62 at 11:12–15.]  Balderdash.  Just because a defendant pursues discovery regarding a personal injury plaintiff's hospital bills doesn't mean he has notice of the plaintiff's theory of damages.  That's why Rule 26(a)(1)(A)(iii) requires parties to

1  disclose "a computation of each category of damages claimed by the disclosing party."

2  Frontier cannot shirk this this obligation by arguing that Menzies sought discovery

3  regarding the general timing of the repair and maintenance work on the subject aircraft

4  (which Frontier objected to).

5          Frontier's disclosures on this subject were misleading in any event.  Until the

6  April 6 deposition of James Mach, Frontier consistently described the process of its repairs

7  and routine lease-end maintenance as essentially phased, with all repairs taking place

8  before the pre-scheduled period of routine maintenance.  Frontier's January 29, 2021

9  settlement communication, which Frontier now holds out as a good-faith attempt to clarify

10 its damage theory, doubles down on this incorrect description as follows:

11              [T]he damage repairs had to be completed before the routine
                lease-return  maintenance work could be completed; the
12              damage repairs required the aircraft to undergo a process called
13              "zero-stress shoring," during which the force applied to the
                aircraft had to be controlled to ensure the integrity of the
14              structural repairs, which in turn precluded simultaneous
                maintenance work.  After the damages were repaired, the
15              aircraft then underwent the routine maintenance work.

16

17 [Doc. No. 62-1 at p. 2 (emphases added).]  On February 19, Frontier reiterated this account

18 almost verbatim, in response to Menzies' Interrogatory No. 8 concerning why the repairs

19 and maintenance could not have been performed concurrently.   [Doc. 55-5 at p. 8.]

20 However, during Mach's April 6, 2021 deposition, Menzies learned for the first time that

21 the repairs related to the Incident were in fact conducted simultaneously with – not prior to

22 – the routine maintenance that Frontier had agreed to perform prior to returning the Aircraft

23 to the lessor.[6]

_____

24        [6] During the exchange cited in Frontier's response, Mach stated the only continuous
   span of time during the entire four-month repair period when no maintenance could be
25 performed and only repair work could be performed, was a period of approximately *three
   weeks*.  [Doc. 62-1 at 18 (Mach dep., 61:10-16) (Q: "Do you know . . . how long it was that
26 you couldn't complete any other maintenance?"  A: "As I recall it was a window of about
   three weeks.").]  During this three-week period, the Aircraft did in fact undergo a process
27 of "zero-stress jacking," and no routine maintenance could take place due to the fact that
   50 percent of the Aircraft's fasteners had been removed.  *Id.* at 60:15–61:1, 61:21-22.  For
28 the remainder of the four-month repair period, however, on any given day either repair
   work, maintenance work, or both could have been performed.  [Doc. 55-7 at 74:20-75:5.]

Accordingly, it only became clear *after* Mach's deposition that the amount of time required to complete the routine lease-end work and non-routine repairs could not be easily broken down into phases, and that Menzies would need to seek additional discovery concerning: the airworthiness and wear-and-tear on the Aircraft prior to the Incident (which impacts the course and duration of the routine maintenance work); the results of the 1,500 "task cards" that were performed on the Aircraft; whether there were any "non-routine" maintenance tasks generated from the 1500 routine task cards, and most importantly (1) the relationship between this routine maintenance work and the repair work, (2) Frontier's system for distinguishing between PEMCO's repair and maintenance work (since Menzies should clearly not be responsible for the cost of labor or materials which went toward routine lease-end maintenance), and (3) Frontier's status updates to the Aircraft's lessor throughout the four-month repair period.

Frontier next errs in arguing that Menzies "[did not] change course in response to [Frontier's January 29] letter," and that "the letter did not appear to affect Menzies's discovery strategy in any way."  In reality this change in Frontier's damages theory was significant to Menzies and potentially damaging to Frontier's claim for lease-related damages.  The contract pursuant to which Menzies provided ground services to Frontier on the date of the Incident exempts Menzies from liability for consequential damages.  [**Ex. O**, Menzies_000001-25, at p. 17.]  Consequential damages are those "reasonably foreseeable losses" that "flow from a breach of contract."  *See, e.g.*, *McAlister v. Citibank (Arizona), a Subsidiary of Citicorp*, 171 Ariz. 207, 211 (App. 1992).  Damages which flow from an injured party's contract with a third party may constitute consequential damages.  *See generally Construct Tech Corp. v. City of Coeur D'Alene*, 67 F.3d 306 (9th Cir. 1995).

Here, Frontier's leasing costs make up over half of Frontier's total damages claim [Doc. 62-1 at p. 2], and whether they were "reasonably foreseeable" to Menzies at the time of contracting, or whether they were too attenuated from Menzies' performance under the contract is particularly questionable, which is why understanding Frontier's

9382589.1

disclosures was so important before Menzies could follow up with additional discovery requests on this issue. Whether Frontier's claimed leasing costs arise from its loss of use of the Aircraft during the repair period, or from its inability to timely return the Aircraft pursuant to a preexisting lease, was therefore highly consequential to Menzies' defenses and discovery strategy in this matter.

## V.   THE SO-CALLED "COLLATERAL IMPLICATIONS" ARE NON-ISSUES.

Finally, Frontier makes one last-ditch effort to distract the Court with three so-called "collateral issues," which are really non-issues. First, Frontier argues that a discovery extension would effectively allow Menzies to circumvent the time limit on discovery disputes set in the Court's Case Management Order. Again this is a non-issue because, as Frontier was quick to point out, Menzies' motion did not raise any specific discovery dispute. Indeed, Menzies has done everything in its power to *avoid* bringing a discovery dispute before the Court. This motion is an attempt to do just that by giving Frontier a chance to make complete disclosures as it was required (but failed) to do in the first instance by omitting the two key witnesses described above.[7]

Second, Frontier argues a discovery extension would somehow invite discovery disputes that would require even more time to litigate. As a threshold matter, Frontier failed to (and cannot) articulate why the two witnesses described above and information in their possession would be subject to a discovery dispute. Rather, Frontier is merely trying to preemptively litigate a hypothetical discovery dispute based on its past objections, which (as Frontier acknowledged) are not even before the Court. This is just another attempt to mislead and distract the Court from the real issue, which is a simple request for a short extension of the time for limited discovery described above.[8]

---

[7] In any event, if additional discovery ultimately gives rise to a discovery dispute, so be it. That a discovery dispute may theoretically arise at some point in the future is no reason to preclude additional discovery where (as here) the additional discovery is essential to a resolution of this case on the merits. After all, public policy favors the disposition of cases on the merits.

[8] Frontier has not identified any actual prejudice from such a short extension of the discovery period. Nor could it do so given that Frontier requested and was granted an extension of the discovery period previously. *See* Doc. 36; **Ex. P**, Emails Between Matt Jarvey and Gary Linder dated Jan. 8 to 13, 2021.

Third, Frontier argues that a discovery extension would unfairly provide cover for Menzies to remedy supposed deficiencies in its own disclosures.  Specifically, Frontier argues that "[i]f discovery were to be re-opened, Menzies … might attempt to remedy its [supposedly] deficient disclosures and responses and supplement the record with additional witnesses and documents to support its own case."  To begin, this is a strange argument given that the very purpose of discovery is to uncover information for use at trial.  Of course Menzies wants to discover information that will be useful at trial—that's the whole point of requesting additional discovery.

In any event, Frontier's argument that Menzies' disclosures have been "woefully deficient" is just another non-issue intended to distract the Court.  Frontier admits it never challenged the adequacy of Menzies' disclosures before now, and that issue is not even relevant to the only question pending—whether to allow a short extension of time to pursue limited discovery.  Frontier is merely trying to distract the Court with non-issues in hopes of painting Menzies as some sort of bad actor.  Indeed, Frontier's brief repeatedly argues that if there was a problem with a party's disclosures, that contention could (and should) have been brought to the Court before now.  If Menzies cannot rely on the "woefully deficient" nature of Frontier's disclosures to support the extension request, Frontier similarly should not be allowed to rely on the supposedly deficient nature of Menzies' disclosures in opposing that request.

## VI.  CONCLUSION

For the foregoing reasons, Menzies moves for a two-month extension of the discovery period to: (1) depose DeMint; (2) identify and depose the Frontier managerial employee who was present when the accident happened according to Sanchez; and (3) discover any relevant documents that may be in these witnesses' possession or otherwise accessible to Frontier relating to the simultaneous performance of the aircraft's routine maintenance and accident-related repairs.

11

9382589.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED this 14th day of May, 2021.

JONES, SKELTON & HOCHULI, P.L.C.


By  /s/ J. Gary Linder
    J. Gary Linder
    40 N Central Avenue, Suite 2700
    Phoenix, Arizona 85004
    Attorneys for Defendant Menzies Aviation
    (USA), Inc.

9382589.1

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of May, 2021, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

Adam E. Lang
Matt Jarvey
SNELL & WILMER, LLP
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
alang@swlaw.cin
mjarvey@swlaw.com
Attorneys for Plaintiff
Frontier Airlines, Inc.

/s/ Ginger Stahly

13



*EXHIBIT N*

```
1  STATE OF ARIZONA          )
                             )  SS.
2  COUNTY OF MARICOPA        )

3
           BE IT KNOWN that the foregoing transcript was
4  taken before me, COURTNEY C. VANDERWALKER, a Certified
   Reporter in the State of Arizona; that the witness
5  before testifying was duly sworn by me to testify to the
   whole truth; that the questions propounded to the
6  witness and the answers of the witness thereto were
   taken down by me in shorthand and thereafter reduced to
7  print under my direction; that the foregoing pages are a
   true and correct transcript of all proceedings, all done
8  to the best of my skill and ability.

9          [X]  Review and signature was requested.

10         [ ]  Review and signature was waived.

11         [ ]  Review and signature not required.

12         I CERTIFY that I am in no way related to any
   of the parties hereto nor am I in any way interested in
13 the outcome hereof.

14         I FURTHER CERTIFY that I have complied with
   the ethical obligations set forth in ACJA 7-206.
15 DATED at Gilbert, Arizona this 15th day of April, 2021.

16

17         _____
           COURTNEY C. VANDERWALKER, RPR
18         AZ Certified Reporter No. 50597

19         *    *    *    *    *    *
           I CERTIFY that SEYMOUR REPORTING SERVICES has
20 complied with the ethical obligations set forth in ACJA
   7-206.
21

22         _____
           Rosina Seymour, RPR, Owner
23         Seymour Reporting
           Arizona RRF No. R1000
24

25
```

```
 1  STATE OF ARIZONA          )
                              )  SS.
 2  COUNTY OF MARICOPA        )

 3
            BE IT KNOWN that the foregoing transcript was
 4  taken before me, COURTNEY C. VANDERWALKER, a Certified
    Reporter in the State of Arizona; that the witness
 5  before testifying was duly sworn by me to testify to the
    whole truth; that the questions propounded to the
 6  witness and the answers of the witness thereto were
    taken down by me in shorthand and thereafter reduced to
 7  print under my direction; that the foregoing pages are a
    true and correct transcript of all proceedings, all done
 8  to the best of my skill and ability.

 9          [X]  Review and signature was requested.

10          [ ]  Review and signature was waived.

11          [ ]  Review and signature not required.

12          I CERTIFY that I am in no way related to any
    of the parties hereto nor am I in any way interested in
13  the outcome hereof.

14          I FURTHER CERTIFY that I have complied with
    the ethical obligations set forth in ACJA 7-206.
15  DATED at Gilbert, Arizona this 15th day of April, 2021.

16

17          _____
            COURTNEY C. VANDERWALKER, RPR
18          AZ Certified Reporter No. 50597

19          *    *    *    *    *    *
            I CERTIFY that SEYMOUR REPORTING SERVICES has
20  complied with the ethical obligations set forth in ACJA
    7-206.
21

22          _____
            Rosina Seymour, RPR, Owner
23          Seymour Reporting
            Arizona RRF No. R1000
24

25
```

SHARATH SASHIKUMAR   APRIL 09, 2021

```
 1   STATE OF ARIZONA        ) SS.
                             )
 2   COUNTY OF MARICOPA      )

 3

 4       BE IT KNOWN that the foregoing proceedings were
     taken before me, KATE E. ROUNDY, RPR, Certified Reporter
 5   No. 50582 that the witness before testifying was duly
     sworn by me to testify to the whole truth; that the
 6   foregoing 66 pages are a full, true, and accurate record
     of the proceedings, all done to the best of my skill and
 7   ability; that the proceedings were taken down by me in
     shorthand and thereafter reduced to print under my
 8   direction.

 9
                 [X]  Review and signature was requested.
10
                 [ ]  Review and signature was waived.
11
                 [ ]  Review and signature was not requested.
12
             I CERTIFY that I am in no way related to any of
13   the parties hereto nor am I in any way interested in the
     outcome hereof.
14
             I FURTHER CERTIFY that I have complied with the
15   ethical obligations set forth in ACJA 7-206.  Dated at
     Phoenix, Arizona, this 19th day of April, 2021.
16

17   _____
                 Kate E. Roundy, RPR
18               Certified Reporter
                 Certificate No. 50582
19

20               *        *        *

21
             I CERTIFY that SEYMOUR REPORTING SERVICES has
22   complied with the ethical obligations set forth in ACJA
     7-206.
23

24   _____
                 Rosina Seymour, RPR, Owner
                 Seymour Reporting Services
25               Arizona RRF No. R1000
```

*EXHIBIT O*

# STANDARD GROUND HANDLING AGREEMENT - SIMPLIFIED PROCEDURE

## ANNEX B8.0 – LOCATION(s), AGREED SERVICES AND CHARGES

to the Standard Ground Handling Agreement (SGHA) of 2013

| | |
|---|---|
| between: | **Frontier Airlines, Inc.** |
| having its principal office at: | 4545 Airport Way<br>Denver, CO 80239 |

and hereinafter referred to as the "Carrier"

| | |
|---|---|
| and: | **Menzies Aviation (USA) Inc.** |
| having its principal office at: | 4900 Diplomacy Road<br>Fort Worth, TX 76155 |

and hereinafter referred to as the "Handling Company"

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

| | |
|---|---|
| effective from | January 1, 2018 |
| This Annex B8.0 for | |
| the location(s): | Phoenix Sky Harbor International Airport (the "Airport" and "PHX") |
| is valid from: | January 1, 2018 |
| and replaces: | B1.0 with Simplicity Ground Services, LLC |

## PREAMBLE:

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of 2013 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full. By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

Menzies_000001

## PARAGRAPH 1. HANDLING SERVICES AND CHARGES

1.1.    For a single ground handling consisting of the arrival and subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A:

### SECTION 1. REPRESENTATION, ADMINISTRATION AND SUPERVISION
**1.1    Representation**
**1.1.2**  Liaise with local authorities.
**1.1.3**  Indicate that the Handling Company is acting as handling agent for the Carrier.
**1.1.4**  Inform all interested Parties concerning schedules of the Carrier's aircraft.

**1.2    Administrative Functions**
**1.2.3**  Prepare, forward, file and retain for a period specified in the Annex B (not less than ninety (90) days), messages/reports/statistics/documents and perform other administrative duties in the following areas
  (a) station administration
  (b) passenger services
  (c) ramp services
  (d) load control
  (e) flight operations
  (h) support services
  (k) other: training records (retain for at least one (1) year after the completion of services for the Carrier at Airport)
**1.2.4**  Maintain the Carriers manuals, circulars, and other relevant operational documents connected with the performance of the services.
**1.2.5**  (a) Check
  (b) Sign
  (c) Forward
  on behalf of the Carrier items including, but not limited to, invoices, supply orders, handling charge notes, work orders

**1.3    Supervision and/or Coordination**
**1.3.1**  (a) Supervise
  (b) Co-ordinate
  services contracted by the Carrier with third party(ies)
**1.3.2**  Provide Turnaround coordinator (TRC)
**1.3.3**  Ensure that the third party(ies) is(are) are informed about operational data and Carrier's requirements in a timely manner.
**1.3.4**  Liaise with the Carrier's designated representative
**1.3.5**  Verify availability and preparedness of personnel, equipment, Loads, documentation of third party(ies).
**1.3.6**  Meet aircraft upon arrival and liaise with crew.
**1.3.7**  Decide on non-routine matters.
**1.3.8**  Verify dispatch of operational messages.
**1.3.9**  Note irregularities and inform the Carrier.

Menzies_000002

**1.4 Station Management**

**1.4.1**   Provide representative on behalf of the Carrier to act
          (b) non-exclusively

**1.4.3**   Attend local airport meetings on behalf of the Carrier
          (a) report to the Carrier results/contents of the meetings

**1.4.7**   Perform and report quality/performance measurements

**1.4.8**   Handle the contents of Carrier's company mail pouches

**SECTION 2. PASSENGER SERVICES**

**2.1**   **General**

**2.1.1**   Inform passengers and/or public about time of arrival and/or departure of Carrier's
          aircraft and surface transport.

**2.1.2**   Make arrangements for stopover, transfer and transit passengers and their baggage
          and inform them about services available at the airport.

**2.1.3**   When requested by the Carrier,
          (a) provide
          special equipment, facilities and specially trained personnel, for assistance to
          1.  unaccompanied minors
          3.  VIPs.
          4.  transit without visa passengers (TWOVs)
          5.  deportees
          6.  special medical transport
          7.  others, as specified by the Carrier
          (b) arrange for (with provider the Carrier has retained)
          Special equipment, facilities and specially trained personnel, for assistance to
          2.  persons with reduced mobility (PRMs)

**2.1.4**   (a) Provide for
          passenger assistance when flights are interrupted, delayed or cancelled.  Such
          assistance shall include:
          (1) Meal vouchers
          (2) Rebooking
          (3) Transportation
          (4) Hotel accommodation
          (5) Personnel

**2.1.5**   If applicable, arrange storage of baggage in the bonded store (any fees to be paid
          by the passenger)

**2.1.6**   (a) Notify the Carrier of complaints and claims made by the Carrier's passengers.

**2.1.7**   Report to the Carrier any irregularities discovered in passenger and baggage
          handling.

**2.1.8**   (b) Arrange for
          (1) check-in counter(s)/position(s)
          (5) set up of the Carrier's specific items, such as but not limited to carpets, mobile
              signage, queuing control stanchions
          (6) other facilities as specified by the Carrier

**2.1.9**   Perform the following ticketing/sales functions
          (a) reservations

Menzies_000003

(b) issuance of transportation documents
(c) ancillary services/sales
(d) e-ticketing
(e) other as specified by the Carrier

**2.2      Departure**
**2.2.1**  Perform pre-flight editing
**2.2.2**  Check and ensure
    (a) that tickets are valid for the flight(s). The check shall not include the fare.
    At the following locations:
    (1) check-in area
    (4) gate
    (6) other locations specified by the Carrier
**2.2.3**  (a) Check travel documents for the flight(s) concerned.  In the event that the
        Handling Company does not have access to information that verifies visa
        validities the Handling Company will not have liability.  The Handling
        Company shall not be liable for immigration fines in the event of non-bona
        fide travel documents or other events which are outside of their control.
    (b) Enter required passenger and/or travel document information into Carrier's
        and/or government system.
    At the following locations:
    (1) check-in area
    (4) gate
    (6) other locations specified by the Carrier
**2.2.4**  (a) Weigh and/or measure checked and/or cabin baggage
    (b) Record baggage figures for
    1.  initial flight.
    2.  subsequent flight(s).
    At the following locations:
    (a) check-in area
    (d) gate
    (f) other locations specified by the Carrier
**2.2.5**  Excess baggage
    (a) determine excess baggage
    (b) issue excess baggage ticket
    (c) collect excess baggage charges
    (d) detach applicable excess baggage coupons
    At the following locations:
    (1) check-in area
    (4) gate
    (6) other locations specified by the Carrier
**2.2.6**  Tag
    (a) checked baggage
    (b) cabin baggage
    for
    (1) initial flight.

Menzies_000004

       (2) subsequent flight(s).

       At the locations:

       (a) check-in area

       (d) gate

       (f) other locations specified by the Carrier

**2.2.7**   Effect conveyance of checked baggage to the baggage sorting area

       At the following locations:

       (a) check-in area

       (d) gate

       (e) other locations specified by the Carrier

**2.2.8**   Effect conveyance of Out of Gauge (OOG)/oversized checked baggage to the baggage sorting area

       At the following locations:

       (a) check-in area

       (d) gate

       (e) other locations specified by the Carrier

**2.2.9**   Collect airport and/or any other service charges from departing passengers

       At the following locations:

       (a) check-in area

       (d) gate

       (e) other locations specified by the Carrier

**2.2.10**  (a) Carry out the Carrier's seat allocation or selection system

       (b) Issue boarding pass(es)

       (c) Detach applicable flight coupons

       for

       1.  initial flight

       2.  subsequent flight(s)

       At the following locations:

       (a) check-in area

       (d) gate

       (f) other locations specified by the Carrier

**2.2.11**  Handle

       (a) Denied Boarding process

       (b) Denied Boarding Compensation

       At the following locations:

       (1) check-in area

       (4) gate

       (5) other locations specified by the Carrier

**2.2.12**  Direct passengers

       (a) through controls to departure gate

**2.2.13**  Handle upgrade/downgrade functions

       At the following locations:

       (a) check-in area

       (d) gate

       (e) other locations specified by the Carrier

**2.2.14**  Handle standby list

Menzies_000005

At the following locations:
    (a) check-in area
    (d) gate
    (e) other locations specified by the Carrier
**2.2.15** At the gate perform
    (a) verification of cabin baggage
    (b) boarding process
    (c) reconciliation of passenger numbers with aircraft documents prior to departure
    (d) other gate functions as specified by the Carrier
**2.2.16** (a) collect
    (b) reconcile
    (c) handle
    and forward to Carrier transportation documents (flight coupons, or other flight related documents) uplifted from departing passengers
**2.2.17** Perform post-flight editing

**2.3**   **Arrival**
**2.3.1** (a) perform
    opening/closing aircraft passenger doors
**2.3.2** Direct passengers
    (a) from aircraft through controls
**2.3.3** (a) Provide
    (1) Transfer counter
    (2) Connection services
    (3) Baggage recheck
**2.3.4** Handle lost, found and damaged property matters.
    (a) Provide
    (1) acceptance of baggage irregularity reports
    (2) entering of data into baggage tracing system
    (3) maintaining baggage tracing system files for at least one (1) year
    (4) making payment for incidental expense
    (6) handling of communications with passengers
    (b) Arrange (as directed by the Carrier)
    (5) delivery of delayed baggage to passengers
    (7) repair or replacement of damaged baggage

**PASSENGER SERVICES NOTES:**
- Ticket counters must open at least two (2) hours prior to scheduled departure and remain continually staffed until departure.
- Gates must open at least one (1) hour prior to scheduled departure, or fifteen (15) minutes prior to scheduled arrival, whichever is greater.
- Baggage claim carousels and Baggage Service Offices must be staffed from the time of aircraft arrival until at least fifteen (15) minutes after all baggage is delivered, all carousels are cleared of baggage, and all missing baggage claims are completed and filed in the Carrier's electronic system.

Menzies_000006

## SECTION 3. RAMP SERVICES

**3.1** **Baggage Handling**

3.1.1 Handle baggage in
(a) the baggage sorting area
(b) other locations as specified by the Carrier

3.1.2 Prepare for delivery onto flights
(a) bulk baggage

3.1.3 Establish the number and/or weight of
(a) bulk baggage *(keep track of heavy bags separately)*
and provide the load control unit with the information

3.1.4 Offload
(a) bulk baggage

3.1.5 Prioritize baggage delivery to claim area

3.1.6 Deliver to claim area
(a) baggage
(b) Out of Gauge (OOG)/oversize baggage

3.1.7 Transfer baggage
(a) Provide
(1) sortation of transfer baggage.
(2) storage of transfer baggage prior to dispatch.
(3) transport of transfer baggage to the sorting area of the receiving carrier.

3.1.8 Handle crew baggage

**3.2** **Marshalling**

3.2.1 (a) Provide
marshalling at arrival and/or departure.

3.2.2 Operate automated guidance systems

**3.3** **Parking**

3.3.1 (a) Provide
(b) Position and/or remove
wheelchocks

3.3.2 (a) Provide
(b) Position and/or remove
(6) safety cones
(7) other items as specified by the Carrier

**3.4** **Ancillary Items**

3.4.1 (a) Provide
(c) Operate
(1) Ground power unit
(2) Fixed ground power
(3) Cooling unit
(4) Heating unit
(5) Air start unit

Menzies_000007

**3.5     Ramp to Flight Deck Communication**

**3.5.1**   Provide headsets.

**3.5.2**   Perform ramp to flight deck communication
   (a) during push-back.
   (b) during tow-in.
   (c) during engine starting
   (d) for other purposes

**3.6     Loading and Unloading**

**3.6.1**   (a) Provide
   (c) Operate
   (1) passenger steps.
   (3) loading bridges.

**3.6.3**   (a) Provide
   (c) Operate
   equipment for loading and/or unloading.

**3.6.4**   (a) Provide
   delivery and pick-up of
   (1) Baggage
   (2) Mobility devices
   at aircraft doors or other agreed points

**3.6.5**   (a) Provide
   assembly and transport of
   (1) baggage
   (5) documents
   (6) company mail
   between agreed points on the airport

**3.6.6**   (a) Unload aircraft, returning lashing materials to the Carrier.
   (b) Load and secure Loads in the aircraft.
   (c) Redistribute Loads in the aircraft.
   (e) Report final load distribution to the Load Control unit.

**3.6.7**   Open, close and secure aircraft hold doors
   (a) aircraft lower deck
   (b) aircraft main deck

**3.6.9**   (a) Provide
   safeguarding of all Loads requiring special handling (e.g., valuables) during
   1.   loading/unloading
   2.   transport between aircraft and designated point on the airport

**3.7     Safety Measures**

**3.7.1**   (a) Provide
   (1) portable fire extinguisher on motorized/self-propelled ramp equipment
   (2) ramp fire extinguisher, if not provided by airport authority
   (b) arrange for
   (1) attendance of airport fire services at aircraft

**3.7.2**   Perform visual external safety/ground damage inspection of

Menzies_000008

(a) doors and panels and immediate surroundings
(b) other inspection items as specified by the Carrier
(1) immediately upon arrival
(2) immediately prior to departure
and communicate the results to flight crew and the Carrier's representative

**3.7.3**   Check that all doors and access panels are properly closed and locked

**3.8**   **Moving of Aircraft**
**3.8.1**   (a) Provide
(1) tow-in and/or push-back of aircraft
(2) towing of aircraft between other points
(4) wing-walkers
**3.8.2**   (a) Towbars (a limited number) to be provided by the Carrier
(b) Towbars to be provided by the Handling Company
(c) Store and maintain towbar(s) provided by the Carrier

**3.10**   **Interior Cleaning – Per the Carrier's Turn, RON, Redeye and Heavy Clean**
**Policies, as applicable**
**3.10.1**   Clean
(a) flight deck, if specified, under the control of a person authorized by the Carrier
(b) passenger and crew compartments (other than flight deck)
(1) empty ash trays
(2) dispose of litter
(3) clear waste from overhead stowage
(4) wipe tables
(5) seats, seat back pockets and passenger service units
(6) floors (vacuum carpet, mop/wipe other)
(7) empty refuse bins
(8) surfaces in pantries, galleys (sinks, working surfaces, ovens and surrounds)
and toilets (wash basins, bowls, seats, mirrors and surrounds)
(9) remove, as necessary, any contamination caused by airsickness, spilled food or
drink and offensive stains
(10) telephones/handsets, screens and other equipment
(11) inside windows
**3.10.2**   Remove and dispose of
(a) litter/waste
(b) food and food-related material (galley waste)
**3.10.3**   Perform cabin dressing
(b) arrange seat belts
(f) restock bathroom/toilet items
(g) replace/restock seat back pocket items
(h) other cabin items as specified by the Carrier
(1) replacement materials provided by the Carrier
(2) cleaning devices/tools provided by the Handling Company
**3.10.4**   (a) Disinfect
(b) Deodorize

Menzies_000009

the aircraft with

(2) materials provided by the Handling Company, as selected/directed by the Carrier

**3.11    Toilet Service**

**3.11.1** (a) Provide

    (1) servicing (empty, clean, flush and replenish fluids)

    (2) triturator/disposal service

**3.12    Water Service**

**3.12.1** (a) Provide

    (1) draining tanks

    (2) replenish tanks (water standard as specified by the Carrier)

    (3) water quality tests

**3.14    Storage of Cabin Material**

**3.14.1** (a) Provide

for storage space for the Carrier's cabin material

**3.14.2** Take inventory

**3.14.3** (b) Arrange for

replenishment of stocks

**3.15    Catering Ramp Handling**

**3.15.1** Unload/load and stow catering supplies from/on aircraft (*deliver bags of ice and/or bottled water to cabin entry on turns, and on request)*

**RAMP SERVICES NOTES:**

Minimum ramp staffing (each properly trained and current) within the aircraft footprint:

- A319/A320:    3 per flight
- A321:          4 per flight

**SECTION 4. LOAD CONTROL AND FLIGHT OPERATIONS**

**4.1    Load Control**

**4.1.1** Deliver load control related documents between the aircraft and appropriate airport buildings and vice versa.

**4.1.2** (a) Process

(b) Sign

Documents and information, including but not limited to, loading instructions, load and trim sheets, Captain's load information and manifests where:

    (2) Handling Company is performing inputs/updates when Load Control is performed by the Carrier or third party

**4.2    Communications**

**4.2.1** Inform all interested parties concerning movements of the Carrier's aircraft.

Menzies_000010

**4.2.2** (a) Compile, receive, process and send all messages in connection with the services performed by the Handling Company. The Handling Company is authorized to use the Carrier's originator code or double signature procedure

(b) Inform the Carrier's representative of the contents of such messages

**4.2.3** (a) Provide

(b) Operate

means of communication between the ground station and the Carrier's aircraft (at all times while the aircraft are on the ground and when the aircraft are in the air and within VHF range).

**4.3    Flight Operations**

**4.3.1** Inform the Carrier of any known project affecting the operational services and facilities made available to its aircraft in the areas of responsibility as specified in Annex B.

**4.3.2** (b) Arrange for

meteorological documentation and aeronautical information

(1) at the airport locations(s) as defined in Annex B

**4.3.3** (a) Provide

Delivery of flight operations related documentation to the aircraft and obtain signature of the pilot-in-command, where applicable

(1) At the airport location(s) as defined in Annex B

**4.3.4** (a) Analyse the operational considerations

(b) Request

make available the operational flight plan according to the instructions and data provided by the Carrier

(1) at the airport locations(s) as defined in Annex B

**4.3.7** Provide the crew with a briefing

**4.3.8** (c) Deliver

(1) the fuel order

(2) the fuel distribution form

**4.3.9** Provide ground handling party(ies) with weight and fuel data

**4.3.10** Obtain a debriefing from incoming crews, distributing reports or completed forms to offices concerned.

**4.4    Crew Administration**

**4.4.1** Distribute crew schedule information provided by the Carrier to all parties concerned.

**4.4.4** Direct crews through airport facilities

**4.4.7** Inform the Carrier representative of any crew indisposition or potential absence.

**SECTION 6. SUPPORT SERVICES**

**6.2    Automation/Computer Systems**

**6.2.1** (c) Operate

Computer hardware and other equipment, as directed by the Carrier, to enable access to

(1) Carrier's system

Menzies_000011

**6.2.2**   Perform the following functions in
    (a) Carrier's system
    (b) Handling Company's system
    for
    (1) Training
    (2) Passenger reservations and sales
    (3) Passenger service
    (4) Baggage reconciliation
    (5) Baggage tracing
    (6) Operation, load control
    (10) Maintenance reporting
    (11) Other functions

**6.2.3**   Manage Automated Check-in device(s) and
    (a) Provide
    (1) Stock control
    (2) Stock replenishment
    (b) Arrange for
    (4) Routine maintenance
    (5) Servicing and repair
    (6) Other as specified by the Carrier

**6.5**   **Ramp Fuelling/Defueling Operations**
**6.5.1**   Liaise with ramp fuel suppliers
**6.5.8**   Check and verify the delivered fuel quantity
**6.5.9**   Deliver the completed fuel order to the Carrier's designated representative

**6.7**   **Catering Services — Liaison and Administration**
**6.7.1**   Liaise with the Carrier's catering supplier

**SECTION 7. SECURITY**
**7.1**   **Passenger and Baggage Screening and Reconciliation**
**7.1.1**   (a) Provide
    1.   matching of passengers against established data
    2.   security questioning
**7.1.2**   (b) Arrange for
    1.   screening of checked baggage
    2.   screening of transfer baggage
    3.   screening of mishandled baggage
    4.   physical examination of checked, transfer and mishandled baggage
    5.   identification of security cleared baggage
**7.1.3**   (b) Arrange for
    1.   screening of passengers
    2.   screening of cabin/unchecked baggage
    3.   physical examination of passengers and cabin/unchecked baggage
**7.1.4**   (a) Provide
    1.   identification of passengers prior to boarding

Menzies_000012

    2.   reconciliation of boarded passengers with their baggage
    3.   positive baggage identification by passengers
    4.   offloading of baggage for passengers who fail to board the aircraft

**7.4**    **Ramp**

**7.4.1**    (a) Provide
    control of access to
    (1) aircraft
    (2) designated areas

**7.4.2**    (a) Provide
    (1) searching of
    (2) guarding of
    (3) sealing of
    (a) aircraft
    (b) designated areas
    (c) baggage in the baggage make-up area

**7.4.3**    (a) Provide
    security personnel
    (1) to safeguard all Loads during the transport between aircraft and designated locations
    (2) during offloading and loading of aircraft

**GROUND SERVICE EQUIPMENT AT AIRPORT**

The Handling Company shall supply, operate, fuel, and maintain, at its own expense sufficient quantities of Ground Service Equipment (GSE) to perform the Services. Should the Carrier provide any GSE or other equipment, the Handling Company will be responsible to operate, fuel and maintain (utilizing a progressive or preventative maintenance program approved by the Carrier) the GSE and other equipment at the Handling Company's sole expense, except that the Carrier will be responsible for all single item repairs in excess of $1,000, unless the repairs are required as a result of the Handling Company's negligence or failure to properly maintain.

- The Handling Company shall provide, at a minimum:
  - access to an additional pushback tractor as a spare;
  - access to additional towbars as spares;
  - access to additional belt loaders as spares;
  - access to additional baggage tugs as spares;
  - access to additional baggage carts as spares;
  - access to a GPU as a spare;
  - access to a conditioned air cart as a spare;
  - access to a lav truck or cart as a spare;
  - access to an air start as a spare;
  - access to a set of portable stairs; and
  - two vacuum cleaners of sufficient capacity to adequately service the Carrier's aircraft.
- The Carrier will provide:
  - one pushback tractor;

Menzies_000013

- two tow bars;
- four belt loaders;
- four baggage tugs;
- fifteen baggage carts;
- one conditioned air cart;
- one lav cart;
- one air start unit;
- one wheelchair; and
- one aisle chair.

**CARRIER LEASED PROPERTY AT AIRPORT**

The Handling Company will be allowed use of the Carrier's leased property/facilities (for providing services to the Carrier only and not in any way associated with the provisioning of services to other parties), which may change from time to time, at Airport at no additional charge and shall keep said property/facilities clean, neat, orderly, and maintained at the Handling Company's sole expense.  Costs to repair or refurbish Carrier's leased property/facilities as a result of failure to clean or maintain, negligence, damage or neglect caused by the Handling Company will be the sole responsibility of the Handling Company.

1.2.    Rates (in USD) for the services defined in sub-paragraph 1.1.of this Annex B are as follows:

| Daily Turns | Aircraft Type | Turn Rate^ | RON/ Security Rate^ |
|---|---|---|---|
| | A319 | $428.53 | $76.13 |
| Up to 10 Turns | A320 | $448.83 | $76.13 |
| | A321 | $507.53 | $95 |

^Rates for single and dual ops.

| | |
|---|---|
| Airstart: | $45.00 per start |
| GPU: | $27.00 per 30 minutes or portion thereof |
| Air stairs: | $30.00 per 30 minutes or portion thereof |
| Air condition/heat unit: | $27.00 per 30 minutes or portion thereof |
| Aircraft tow (no brake riding): | $75.00 per tow |

Delays >60 minutes for a full team*:        $153.00 per hour*

*Only charged for the duration greater than sixty (60) minutes that the Carrier's flight is delayed and only to the extent the Handling Company pays its employees additional wages due to the Carrier's late operations.  For delays in excess of sixty (60) minutes, delay charges are calculated from the scheduled departure time.  Additionally, an apportioned individual hourly rate will apply when the Carrier specifically requests additional staffing on an ad hoc basis.

Incentives and Credits

Menzies_000014

The Carrier's goal is to establish reasonable and attainable targets that are clearly communicated to the Handling Company to establish a performance-based and results-oriented agreement to maximize operational results and benefit to both Parties.

1. Quarterly Performance

|  |  | Incentive / Discount | Range |
|---|---|---|---|
| OT/TR Departure 78% | Exceeds | Bonus 2%* | >84% |
|  | Target | None | 73-84% |
|  | Low | Discount 1% | 63-<73% |
|  | Not Performing | Discount 3% | <63% |
| AO Head Starts 97% (Controllable) | Exceeds | Bonus 1%* | >98% |
|  | Target | None | 93-98% |
|  | Low | Discount 1% | 83-<93% |
|  | Not Performing | Discount 3% | <83% |
| STATION MBR | Exceeds | Bonus 2%* | <80% |
|  | Target | None | 80-110% |
|  | Low | Discount 1% | >110% |
|  | Not Performing | Discount 3% | >125% |

*Not eligible to receive if attributable damage in quarter.

2. Monthly Performance

|  |  | Station Monthly Departures | | |
|---|---|---|---|---|
|  |  | <63 | 63-212 | >212 |
| AO Controllable Flight Delays | >10 Minutes | Discount Specific Flight(s) 10% | | |
| Baggage | Each Flight with last bag > 25 Minutes | Discount Specific Flight(s) 10% | | |
| Complaint(s) | Verified complaint re service* | $50 per Occurrence | | |
| Station Audits / Events | Passed | No Discount | | |
|  | Failed | Discount Month 5% Consecutive Audit Fail is 10% | | |
|  | Repeat Findings | $500.00 per Repeat Finding | | |
|  | Incomplete Training Records | $500.00 | | |
|  | Improper Training | $500.00 | | |
| FOD Walks | Observed failure to conduct (pre or post flight) | $50 per Occurrence | | |
| Customer Service Uniforms | Incomplete, dirty, untidy | $25 per Occurrence or Complaint after first notice, per employee | | |

Menzies_000015

| Minimum Staffing | Below Desired/Appropriate Level (per flight, total to fluctuate with overall flight volume) | $200/Day | $500/Day | $1,000/Day |
|---|---|---|---|---|

\* The Handling Company will be afforded an opportunity to disprove such complaints.

1.3.   Handling in case of technical landing for other than commercial purposes will be charged at:

1.3.1   50% of the above rates when additional hours/staffing is needed, provided that a physical change of load is not involved; and

1.3.2   10% of the above rates when during existing shifts, provided that a physical change of load is not involved.

1.4.   Handling in case of return to ramp will not be charged extra, provided that a physical change of load is not involved.

1.5.   Handling in case of return to ramp involving a physical change of load will be charged as for handling in case of technical landing in accordance with Sub-Paragraph 1.3 of this Annex.

1.6.   No extra charges will be made for providing services on legal holidays, weekends, evenings, or at night.

1.7.   Above indicated rates will be applicable for non-scheduled/diverted flights as well during the term of this Agreement.

1.8.   In the event of a flight cancellation, the following charges will apply, based on notice:

Less than 4 hours:                          Full charge
4 hours to less than 8 hours:     50% of applicable rate
8 hours to less than 24 hours:   25% of applicable rate
24 hours or more:                          No charge

1.9   The rates depicted in this Annex B do not provide for a change in law, regulation or ruling by any governmental authority (beyond what is known or should be known by the Handling Company on or before January 1, 2018) materially altering the hours of service, rates of pay or working conditions.  Should such take effect, then, upon advance written notice from the Handling Company to the Carrier detailing the impact thereof, the Handling Company's charges will become subject to renegotiation by the Carrier and the Handling Company in good faith to take into account such costs.

## PARAGRAPH 2.  ADDITIONAL SERVICES AND CHARGES

2.1.   All services not included in Paragraph 1 of this Annex that the Carrier requests will be charged at the rate(s) agreed to by the Parties.

Menzies_000016

**PARAGRAPH 3.  DISBURSEMENTS**

3.1.    Any disbursements made by the Handling Company on behalf of the Carrier, must be preapproved in writing by the Carrier, will be reimbursed by the Carrier at cost price (no mark-up or surcharge).

**PARAGRAPH 4.  LIMIT OF LIABILITY AND INDEMNIFICATION**

4.1    Sub-Article 8.5 of the Main Agreement is modified to read in full as follows:

"Notwithstanding Sub-Article 8.1, the Handling Company shall indemnify, defend and hold harmless the Carrier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by the Handling Company (or anyone directly or indirectly employed by the Handling Company or anyone for whose acts the Handling Company may be liable) in the performance or non-performance of services under this Annex B, except where such acts or omissions were instructed or authorized by Carrier in writing, including but not limited to:
- Death of or injury to any person or persons;
- False arrest, detention, imprisonment, searches or malicious prosecution;
- Libel, slander and/or defamation of character;
- Violations of the right of privacy; or
- The loss, theft, damage or destruction of property, including the property of the Carrier, the Handling Company and third persons.

Furthermore, the Handling Company shall defend, indemnify and hold the Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, TSA, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors other than acts or omissions instructed or authorized by Carrier in writing subject to a limitation of $13,750.00 per violation."

4.2    The indemnification obligation of the Handling Company referred to in Article 8 of the Main Agreement shall be modified so as to include any loss, cost, or damage resulting from flight delays or cancellations caused by the performance or nonperformance of services under this Annex B.  Such liability shall not exceed $15,000,000.00.

4.3    UNLESS SPECIFICALLY PERMITTED BY THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, CONSEQUENTIAL OR EXEMPLARY DAMAGES, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF REVENUE OR LOST PROFITS, ARISING FROM ANY PROVISION OF THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE

Menzies_000017

POSSIBILITY OF SUCH DAMAGES, AND EACH PARTY HEREBY RELEASES AND WAIVES ANY CLAIMS AGAINST THE OTHER PARTY REGARDING SUCH DAMAGES.

## PARAGRAPH 5.  INSURANCE

5.1.   The Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at the Handling Company's sole expense, the following insurance coverage: (a) Commercial General Liability (including Premises, Products and Completed Operations, Hangarkeepers, Personal/Advertising Injury, and Contractual coverages) for bodily injury, including personal injury, and property damage, (b) Automobile Liability for owned, non-owned and hired vehicles and trailers, (c) Employer's Liability, and (d) Workers' Compensation, with the coverages and limits of liability not less than shown below.

| | |
|---|---|
| Commercial General Liability: | $50,000,000 OCC/AGG |
| Premises: | $25,000,000 OCC |
| Products & Completed Operations: | $25,000,000 OCC |
| Hangarkeepers: | $5,000,000 OCC |
| Personal/Advertising Injury: | $5,000,000 OCC |
| Contractual: | $5,000,000 OCC |
| Automobile Liability: | $1,000,000 OCC |
| Employer's Liability: | $1,000,000 OCC |
| Workers' Compensation: | Per State/Federal Requirements, but not less than $1,000,000 OCC |

The Handling Company will issue a Certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions.

1)   The Carrier is included as an Additional Insured as their interests may appear.

2)   All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.

3)   This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.

4)   Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.

5)   In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).

6)   Provide a waiver of subrogation against the Additional Insureds.

Menzies_000018

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to the Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

The Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

## PARAGRAPH 6.  AREA OF RESPONSIBILITY

6.1    The area of responsibility as mentioned in Sub-Section 4.3 of Annex A is: N/A.

## PARAGRAPH 7.  TRANSFER OF SERVICES

7.1    Notwithstanding Sub-Article 3.1 of the Main Agreement, the Handling Company shall not subcontract the services of Annex A to another party.

## PARAGRAPH 8.  PAYMENT, INVOICING, SETTLEMENT

8.1    Notwithstanding Sub-Article 7.2 of the Main Agreement, payment shall be effected through the Automated Clearing House (ACH).  The Handling Company's invoices shall include the following information for payment:
   Bank Name: HSBC Bank USA, NA
   ABA No. 021001088
   Credit the Account of:  Menzies Aviation (USA) Inc.
   Acct. No. 269050574
   Ref: _____
   Invoice Number(s): _____

8.2    With reference to Sub-Article 7.3 of the Main Agreement, the Parties establish the following payment terms:

The Handling Company will send invoices to the Carrier through the Coupa Supplier Network.  All invoices must contain a description of the goods and/or services and the applicable pricing.  Notwithstanding Sub-Article 7.1 of the Main Agreement, the Handling Company shall submit invoices to the Carrier and the Carrier shall pay the Handling Company within thirty (30) days of receipt of the Handling Company's invoice. In the event the Carrier disputes any charge or fee set forth in any invoice, the Carrier shall notify the Handling Company of the discrepancy in billing.  Both Parties shall then seek in good faith to resolve the disputed amount(s).  Upon the resolution of any disputed amount, the Carrier shall promptly pay the balance due to the Handling Company.

## PARAGRAPH 9.  SUPERVISION AND ADMINISTRATION

9.1    The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for

Menzies_000019

the Carrier by other organization(s) under cover of separate agreement(s):  All Airport services.

## PARAGRAPH 10.  DURATION, MODIFICATION, AND TERMINATION

10.1    Duration

10.1.1  Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, this Annex B shall remain in effect from January 1, 2018 through November 30, 2019 (the "Initial Term"), and thereafter until terminated by either Party upon one hundred twenty (120) days' prior written notice to the other Party.

10.1.2  In the event that the Carrier's flight operations at the Airport are halted or substantially decreased for any reason, this Agreement (and payment for services hereunder) may be suspended for the duration of such halts or decreases, on twenty-four (24) hour notice by the Carrier to the Handling Company.

10.1.3  Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, the rates contained in Paragraph 1 shall remain in effect through (at a minimum) the Initial Term.

10.2    Modification

10.2.1  Any modification to this Annex B shall be made by a written amendment signed by both Parties.

10.3    Termination

10.3.1  Notwithstanding Sub-Paragraph 10.1.1 of this Annex B, this Annex B may be terminated by either party upon one hundred twenty (120) days' written notice to the other party.

10.3.2  The Carrier will provide notice to the Handling Company of any service failures.  The Handling Company shall have thirty (30) days from written notice to cure any deficiencies.  After thirty (30) days if the deficiencies have not been sufficiently corrected, the Carrier may terminate this Agreement for cause upon an additional thirty (30) days' written notice to the Handling Company and the Carrier shall be entitled to receive its cost of cover from the Handling Company for the remainder of the Initial Term.

## PARAGRAPH 11.  NOTIFICATION

11.1    In accordance with Sub-Article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective Parties as follows:

> To Carrier:
> Frontier Airlines, Inc.
> 4545 Airport Way
> Denver, Colorado 80239
> U.S.A.
> Telephone:  720-374-4200
> Facsimile:  Not Authorized for Notification
> Attn:  General Counsel

Menzies_000020

Attn:  Director, Ground Handling Contracts

To Handling Company:
Menzies Aviation (USA) Inc.
4900 Diplomacy Road
Fort Worth, Texas 76155
U.S.A.
Telephone:  310-200-3800
Facsimile:
Electronic Mail:  paul.walton@menziesaviation.com
Attn: Sr. Vice President, Sales & Commercial Operations

## PARAGRAPH 12.  GOVERNING LAW

12.1    In accordance with Article 9 of the Main Agreement, this Annex B shall be governed by and interpreted in accordance with the laws of the State of Delaware, U.S.A.

12.2    In accordance with Article 9 of the Main Agreement, courts for the resolution of disputes shall be the Federal and/or State Courts of the State of Colorado, U.S.A.

## PARAGRAPH 13.  FORCE MAJEURE

13.1    Article 11.9 of the Main Agreement shall not apply to this Agreement.

13.2    If either Party is affected by a Force Majeure event, such affected Party shall promptly notify the other Party of the nature and extent of the circumstances in question.

13.3    Notwithstanding any other provision of this Agreement neither Party shall be deemed to be in breach of this Agreement, or otherwise be liable to the other, for any delay in performance or other non-performance of any of its obligations under this Agreement to the extent that the delay or non-performance is due to a Force Majeure event.

13.4    If any event of Force Majeure occurs, the date(s) for performance of the obligation(s) affected shall be postponed for so long as is made necessary by the event of Force Majeure, provided that if any Force Majeure event continues for a period exceeding one (1) month, either Party shall have the right to terminate this Annex B forthwith on written notice to the other Party.

13.5    The Party affected by Force Majeure shall take all reasonable steps available to it to minimize the effects of Force Majeure on the performance of its obligations under this Agreement.

13.6    For the purpose of this Agreement "Force Majeure" means any circumstances that is not reasonably foreseeable and beyond the reasonable control of the Party relating to its performance of this Annex B, including: acts of God, fires, floods, explosions, acts or restraints of governments or public authorities, war, revolution, riot or civil commotion,

despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences.

## PARAGRAPH 14.  TRAINING

14.1    All working hours of the Handling Company's employees resulting from the Carrier's specific training requirements as reasonably required by the Carrier will be borne by the Handling Company.  Expenses resulting from specific training requirements by the Carrier will be borne by the Handling Company.

14.1.1  Training necessitated due to attrition shall be at the Handling Company's sole expense, which may include but not be limited to costs associated with a training site, employee hours, employee hotels, instructor hotels, travel, employee per diem, instructor per diem, and an instructor fee of $250.00 per day or portion thereof.

14.2    The Handling Company undertakes the responsibility to provide training(s) to its employees as per the Carrier's policy(ies).

14.3    The Handling Company shall promptly and accurately record all training activities of each of its employees, as well as the results of such training.

14.4    No employee of the Handling Company may work a flight of the Carrier's unless training has been received, completed, and passed in accordance with the Carrier's training policy. Fill-ins are not acceptable if they are not properly trained and appropriately signed-off to handle the Carrier's flight(s).

## PARAGRAPH 15.  COMPLIANCE WITH LAWS

15.1    The Handling Company shall comply with all applicable federal, state and local laws and executive orders and regulations issued pursuant thereto, including without limitation Airport rules and to the extent applicable to this Annex B, the provisions contained within Section 202 of the Executive Order 11246, as amended (41 C.F.R. § 60-1.4), Section 4.2 of the Vietnam Era Veterans Readjustment Act (41 C.F.R. § 60-300.4), Section 503 of the Rehabilitation Act of 1973 (41 CFR § 60-741.4), the Air Carrier Access Act of 1986 (14 C.F.R. Part 382, Non-discrimination on the Basis of Handicap in Air Travel), the Americans with Disabilities Act, as amended (28 C.F.R. Part 35).

15.2    The Handling Company shall secure any and all permits or licenses that may be required by any governmental or Airport authority in order to perform the Handling Services, shall comply with all workers' compensation, employer's liability and other Federal, State, County, Municipal, or Airport laws, ordinances, rules and regulations required of an employer performing the Services. The Handling Company shall also make all reports and remit all withholding or other reductions from the compensation paid its employees as may be required by any Federal, State, County, Municipal, or Airport law, ordinance, rule or regulation. The foregoing obligations are in addition to those provided elsewhere in this Annex B.

Menzies_000022

15.3    Consistent with the Air Carrier Access Act of 1986 and 14 CFR Part 382, the Handling Company shall not discriminate against any otherwise qualified individual with a disability, by reason of such disability, in performing services under this Annex B.  In any matter relating to the Handling Company's provision of services under this Annex B to qualified individuals with a disability, the Handling Company's employees shall comply with any directives of the Carrier.

15.4    Failure to comply with any provision of this Paragraph 15 by the Handling Company shall constitute a breach of this Annex B and the Carrier shall have the right to immediately terminate this Annex B.

## PARAGRAPH 16.  CONFIDENTIALITY AND DATA PROTECTION

16.1    The information contained in this Agreement and any subsequent amendments or supplements hereto, as well as any other information relating to the Parties' business (including, but not limited to, financial, operational, personal data of the Parties' respective employees, officers or customers, operating manuals, procedures and know-how) is strictly confidential and must not be shared with any third party other than a Party's legal and financial advisers and auditors who are bound by professional confidentiality rules, or as may be required by relevant laws and orders of courts or administrative bodies.

16.2    The Handling Company hereby agrees and undertakes not to make, issue or dispatch any public announcement or public communication (including, but not limited to responding to inquiries by any press, radio, television or other media) relating to any aspect of the Carrier's business or operations (including, but not limited to, the number of passengers carried, any incidents, accidents or occurrences involving the Carrier's aircraft, passengers or employees) without the prior written consent of the Carrier, except responding to inquiries by authorities conducting an official investigation where the Handling Company is required by law to make such statements. In the case of any such disclosure to regulatory authorities, the Handling Company shall notify the Carrier in advance of such disclosure and consult with the Carrier over the need for and scope of any such disclosure and where disclosure is required, the Handling Company shall seek to impose a confidentiality requirement where the confidential information is not subject to statutory restrictions on disclosure by the recipient. The Handling Company will be responsible for any breach of the foregoing provision by its employees, officers, representatives, agents or subcontractors.

16.3    Prior written consent to any disclosure shall be obtained from the Carrier.  In the event of any breach of the publicity restrictions set out in Section 16.2 above, the Handling Company will be liable to pay a lump sum compensation to the Carrier as indemnification, in the amount of USD 10,000 (ten thousand US Dollars) per event. This does not preclude the Carrier from seeking compensation for damages in excess of the amount of the lump sum compensation.

Menzies_000023

16.4    The Handling Company is responsible for the security of the personal data, including but not limited to personally identifiable information, of the Carrier's passengers ("Data") in its custody and possession. The Handling Company agrees that beginning on the date that the services commence under this Agreement, and continuing as long as the Handling Company possesses, stores, transmits or processes Data, the Handling Company shall not do or omit to do anything which may cause the Carrier to be in breach of any applicable privacy and security laws (including but not limited to data protection laws and electronic communications data protection and privacy laws) and shall employ and maintain appropriate and adequate technological, physical, administrative, organizational and procedural safeguards so as to: (a) protect the confidentiality, integrity or availability of Data and (b) comply with the requirements of all privacy and security laws.

16.5    To the extent that the Handling Company processes Data as the Carrier's data processor under this Agreement, the Handling Company shall (i) only act on the instruction of the Carrier in accordance with this Agreement provided that such instruction is in compliance with the applicable law; and (ii) not process Data outside of the Airport without the prior written consent of the Carrier.  Notwithstanding any other provisions of this Agreement, the Handling Company shall be liable for and shall indemnify the Carrier against any loss or damages arising from the breach of the obligations defined in this Paragraph 16 by the Handling Company.

16.6    The obligations in this Paragraph 16 shall continue to bind the Parties after the expiration or termination of this Agreement, for whatever reason.

## PARAGRAPH 17.  ANTI BRIBERY AND CORRUPTION

17.1    The Carrier has strict anti-corruption policies and practices. The Handling Company undertakes that it will not, at any time before, during, or after the term of this Agreement, do anything whether on behalf (expressly or implicitly) of the Carrier or in relation to the transaction which is the subject of this agreement or the provision of the services which is capable of being interpreted as a corrupt practice or bribery for the purpose of any applicable law, US or other.

17.2    Each Party shall promptly report to the other Party any request or demand for any undue financial or other advantage of any kind received by it in connection with the performance of this Agreement or additional/other business.

## PARAGRAPH 18.  MISCELLANEOUS

18.1    Each provision of this Agreement is severable and distinct from the others.  Both Parties intend that every such provision shall be and remain valid and enforceable to the fullest extent permitted by law.  If any such provision is or at any time becomes to any extent invalid, illegal or unenforceable under any enactment or rule of law, it shall to that extent be deemed not to form part of this Agreement but (except to that extent in the case of that provision) it and all other provisions of this Agreement shall continue in full force and

Menzies_000024

effect and their validity, legality and enforceability shall not be thereby affected or impaired.

18.2    In case of any inconsistency between this Annex B and the Main Agreement, the provisions of this Annex B shall prevail.

18.3    The relationship of the Parties is that of independent contractors dealing at arm's length. Except expressly agreed by the Parties otherwise herein, nothing in this Agreement shall constitute the Parties as partners, joint venturers or co-owners, or constitute either Party as the agent, employee or representative of the other, or empower either Party to act for, bind or otherwise create or assume any obligation on behalf of the other, and neither Party shall hold itself out as having authority to do the same. This Agreement does not prevent either of the Parties from entering into similar agreement with third parties in respect of services defined herein.  Article 3.2 of the Main Agreement shall not apply to this Agreement.

18.4    The Parties acknowledge and agree that a breach by the other Party of any of the terms of this Agreement may result in irreparable and continuing damage to the other for which there may or will be no adequate remedy at law, and that in the event of such breach, the non-breaching Party shall be entitled to apply for injunctive relief and/or a decree for specific performance and such other and further relief as may be appropriate.

18.5    This Agreement may be entered into in the form of two or more counterparts each executed by one or both of the Parties but, taken together, executed by both and, provided that both the Handling Company and the Carrier so enter into the Agreement, each of the executed counterparts, when duly exchanged or delivered, shall be deemed to be an original, but, taken together, they shall constitute one instrument.

18.6    All vendors that do business with the Carrier are required to enroll in the Frontier Airlines Vendor Screening Program.  The Handling Company's completion and approval of the vendor screening program is required prior to the Carrier's accounts payable department issuing payment for any invoices or debts incurred.  The Handling Company is required to go through setup, maintain compliance, and will be responsible for all associated fees. More information can be obtained at http://frontier.globalrms.com/.

Signed the _20th_ day of _April_        , 2018        Signed the _09th day of March, 2018

At Denver, Colorado, U.S.A.                       At Dallas, Texas, U.S.A.

for and on behalf of                              for and on behalf of
Frontier Airlines, Inc.                           Menzies Aviation (USA) Inc.

By: _____                       By: _____
Name: Howard Diamond                              Name: John Sayers
Title: SVP, General Counsel                       Title: Sr. Vice President, Finance, Americas

Menzies_000025

# *EXHIBIT P*

| From: | Jarvey, Matt |
|---|---|
| To: | GARY LINDER |
| Cc: | Lang, Adam; Jennifer Bernardo |
| Subject: | RE: Frontier: Discovery Items |
| Date: | Wednesday, January 13, 2021 12:10:27 PM |
| Attachments: | image001.png |
| | image002.png |

Great, we'll get it filed. Thanks.

Matt Jarvey

Snell & Wilmer L.L.P.

One Arizona Center

Phoenix, Arizona 85004-2202

Office: 602.382.6270

mjarvey@swlaw.com   www.swlaw.com



**From:** GARY LINDER <Glinder@JSHFIRM.com>

**Sent:** Wednesday, January 13, 2021 12:09 PM

**To:** Jarvey, Matt <mjarvey@swlaw.com>

**Cc:** Lang, Adam <alang@swlaw.com>; Jennifer Bernardo <Jbernardo@JSHFIRM.com>

**Subject:** RE: Frontier: Discovery Items

**[EXTERNAL] glinder@jshfirm.com**

Looks good to me.  Thanks for putting it together.



From: Jarvey, Matt [mailto:mjarvey@swlaw.com]

Sent: Wednesday, January 13, 2021 12:05 PM

To: GARY LINDER

Cc: Lang, Adam; Jennifer Bernardo

Subject: RE: Frontier: Discovery Items

Hi Gary,

Attached is a draft stipulation and proposed order.  Please let us know if you have any comments.
We'd like to get this filed yet today.

Matt Jarvey
Snell & Wilmer L.L.P.
One Arizona Center
Phoenix, Arizona 85004-2202
Office: 602.382.6270
mjarvey@swlaw.com  www.swlaw.com



---

**From:** GARY LINDER <Glinder@JSHFIRM.com>
**Sent:** Tuesday, January 12, 2021 1:07 PM
**To:** Jarvey, Matt <mjarvey@swlaw.com>
**Cc:** Lang, Adam <alang@swlaw.com>; Jennifer Bernardo <Jbernardo@JSHFIRM.com>
**Subject:** RE: Frontier: Discovery Items

---

**[EXTERNAL] glinder@jshfirm.com**

---

I agree that we should adjust the deadline(s).    Feel free to send over a stipulation for me to approve.

I will get back to you on the witnesses and dates that work.

Gary



**J. GARY LINDER** | Partner
Jones, Skelton & Hochuli, P.L.C.
40 North Central Avenue, Suite 2700 | Phoenix, AZ 85004
**P** (602) 235-7106 | **F** (602) 200-7883
**website** | **bio** | **vCard** | **map** | **email** | **linkedin** | **facebook** | **twitter**

---

From: Jarvey, Matt [mailto:mjarvey@swlaw.com]
Sent: Friday, January 08, 2021 5:34 PM
To: GARY LINDER
Cc: Lang, Adam
Subject: Frontier: Discovery Items

Hi Gary,

I left a voicemail for you earlier, but I wanted to follow up via email on a couple of topics.

**Depositions**

We plan to notice depositions of the following Menzies folks early next week:

- Shantell Jordan

- Robert Lammon
- David Yanez

We'd like to do these during the last two weeks of January.  Please let us know if there are particular dates that work for the folks on your side.  Please also let us know if any of these folks are no longer at Menzies (we understand this might be the case at least for Mr. Yanez), and if so, whether you know their new contact information.

**Schedule**

As you know, we have a deadline to complete discovery by February 26, 2021.  We think it might make sense to extend that deadline out—perhaps a couple of months—just to give some breathing room.  Let us know if you're amenable to that, and we can submit a stipulation.

As always, we're happy to jump on a call to discuss anything.  Have a good weekend.

Matt Jarvey
Snell & Wilmer L.L.P.
One Arizona Center
Phoenix, Arizona 85004-2202
Office: 602.382.6270
mjarvey@swlaw.com   www.swlaw.com



This electronic mail transmission contains information from the law firm Jones, Skelton & Hochuli, P.L.C. that may be confidential or privileged. Such information is solely for the intended recipient, and use by any other party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this message, its contents or any attachments is prohibited. Any wrongful interception of this message is punishable as a Federal Crime. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this message in error, please notify the sender immediately by telephone (602) 263-1700. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

This electronic mail transmission contains information from the law firm Jones, Skelton & Hochuli, P.L.C. that may be

confidential or privileged. Such information is solely for the intended recipient, and use by any other party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this message, its contents or any attachments is prohibited. Any wrongful interception of this message is punishable as a Federal Crime. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this message in error, please notify the sender immediately by telephone (602) 263-1700. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.