J. Gary Linder, Bar #020552
JONES, SKELTON & HOCHULI P.L.C.
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-7340
Fax: (602) 200-7883
glinder@jshfirm.com

Attorneys for Defendant Menzies Aviation (USA), Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Frontier Airlines, Inc., <br><br>    Plaintiff, <br><br> v. <br><br> Menzies Aviation (USA), Inc., <br><br>    Defendant. | No. 2:20-cv-01432-ESW <br><br> **STATEMENT OF FACTS IN SUPPORT OF DEFENDANT MENZIES AVIATION (USA), INC.'S MOTION FOR SUMMARY JUDGMENT** |

In accordance with Local Rule 56.1(a), Defendant MENZIES AVIATION (USA), INC. ("Menzies") submits the following Statement of Facts in conjunction with its Motion for Summary Judgment concerning the damages recoverable by Plaintiff FRONTIER AIRLINES, INC. ("Frontier") in this action.

**I.    THE PARTIES' GROUND HANDLING AGREEMENT**

1.      This action concerns an incident which took place on April 1, 2018 at Phoenix Sky Harbor International Airport, where a piece of equipment operated by an employee of Menzies in the course of performing ground handling services for Frontier struck a Frontier aircraft. Am. Compl. ("Compl."), ECF No. 16, ¶¶ 7–8.

2.      On the date of incident, Menzies personnel were providing ground handling services to Frontier pursuant to a service agreement (MENZIES_000001–27, attached hereto as Exhibit A ("Ex. A")) designated as "Annex B" to the 2013 Standard Ground Handling Agreement ("SGHA") published by the International Air Transport

Association ("IATA") (FRONTIER000001–10, attached hereto as Exhibit B ("Ex. B")). Compl. ¶ 6.

3. The Preamble to Annex B sets forth the parties' agreement that "the terms of the [SGHA] shall apply to this Annex B as if such terms were repeated here in full," thus incorporating the SGHA. MENZIES_000001, Ex. A. The Annex also provides that "[i]n case of any inconsistency between this Annex B and the [SGHA], the provisions of this Annex B shall prevail." See MENZIES_000025, Ex. A.

4. While the IATA SGHA provides a framework for the relationship between carriers and ground handling companies, including limitations of liability (Ex. B, FRONTIER000008–9), accounting and payment (FRONTIER000007), and handling companies' standards of work (FRONTIER000008), the Annex enumerates Menzies' specific ground handling responsibilities at Phoenix Sky Harbor Airport (Ex. A, MENZIES_000014–16 and fully addresses Menzies' obligations with regard to damages arising from Menzies' performance of services (MENZIES_000017–18).

5. With regard to standards of work, the main SGHA provides in part that "[t]he Handling Company shall carry out all . . . services . . . having a safety aspect, for example, load control, loading of aircraft and handling of dangerous goods, in accordance with the Carrier's instructions." Ex. B, FRONTIER000006.

6. Article 5.2 of the SGHA reiterates, "[t]he Handling Company shall carry out all . . . services in accordance with the Carrier's procedures and instructions. In the case of absence of instructions by the Carrier, the Handling Company shall follow its own standard practices and procedures." Id.

7. Article 5.5 states, "[t]he Carrier shall supply the Handling Company with sufficient information and instructions to enable the Handling Company to perform its handling properly." FRONTIER000007.

8. Frontier's Ground Service Manual provides detailed instructions on how ground handling personnel are expected to operate ground handling equipment including belt loaders, how to enplane and deplane passengers, how to load and tow

aircraft, and how numerous other ground handling tasks are to be performed. See FRONTIER000930–943, FRONTIER-001056–57, FRONTIER001060–62, FRONTIER001072–73, FRONTIER001220–22, Excerpts from Frontier's Ground Service Manual, attached hereto as Exhibit C ("Ex. C")).

9. Paragraph 12 of the Annex provides that "this Annex B shall be governed by and interpreted in accordance with the laws of the State of Delaware," which is also the state where Menzies is incorporated. Ex. A, MENZIES_000021; Answer of Menzies to Am. Compl., ECF No. 23 ¶ 2.

II. **THE SUBJECT INCIDENT**

10. Menzies' ground handling responsibilities under Annex B included, inter alia, administrative functions such as maintaining certain manuals and records; liaising with dispatch and station management; and passenger services including handling baggage, ticketing, boarding, and de-boarding. See Ex. A, MENZIES_000007. Menzies also contracted to perform ramp services for Frontier, which included interior cleaning, general aircraft maintenance, and marshalling aircraft on the ground. MENZIES_000010-12.

11. One of Menzies' responsibilities was to help perform pushbacks of Frontier aircraft and to tow aircraft between gates and other points on the tarmac. MENZIES_000009.

12. In 2018, Frontier had only one gate at Sky Harbor, so that Frontier regularly had to "play musical aircraft" with several planes that would arrive and depart throughout the day, rotating aircraft between a parking pad on the jetway and the Frontier gate. See Excerpts from Deposition of Elias Sanchez (attached hereto as Exhibit D ("Ex. D")), at 26:19-25.

13. Some of Menzies' ramp services required cooperation between Menzies personnel and Frontier personnel, including Frontier's line A&P mechanics who are generally tasked with conducting pre-flight and post-flight inspections and performing scheduled maintenance. Id. at 18:4-7.

14. A "brake ride" is a safety precaution wherein a mechanic rides in the cockpit of an aircraft while a ground handling agent tows the aircraft to or from a gate, so that the mechanic can apply the brakes in the event of an emergency. Id. at 11:2-8; 22:12-20.

15. In 2018, any time an aircraft was moved, either to or from a gate, a "brake ride" would need to be performed. Id. at 28:10-11. And any time an aircraft needed to be moved, a Menzies employee would inform Frontier's lead mechanic that Menzies was about to tow an aircraft, and the Frontier lead would dispatch a Frontier mechanic to conduct the brake ride. Id. at 30:8–31:14.

16. On April 1, 2018, the Frontier lead mechanic asked Frontier A&P mechanic Elias Sanchez to perform a brake ride while Menzies towed the A319 from the jetway to the gate. Id. at 17:5; 29:8-11; 27:18–28:3.

17. In order for the brake rider to gain access to the cockpit while the aircraft was located out on the tarmac, a piece of equipment such as stairs or a ladder would need to be pulled up to the aircraft door. Id. at 11:9-20.

18. At Sky Harbor Airport in 2018, it was a common practice for belt loaders – conveyor belts used to load baggage onto aircraft – to be used for the purpose of enplaning and deplaning brake riders. Id. at 33:5-22.

19. Since 1) there had not been any stairs available at Frontier's gate for at least ten months prior to the date of incident (id. at 16:23-17:3; 36:2-11), 2) Frontier and Menzies had to perform several brake rides per day (id. at 33:15-18) (Indeed, in April 2018 Sanchez performed multiple brake rides a day, virtually every day that he was on duty. (Id. at 22:9-11).), and 3) the belt loader would frequently be used to allow brake riders on and off of aircraft (id.), Frontier's lead mechanics and station managers were well aware of the use of belt loaders as a mechanism for gaining access to aircraft (id. at 45:1-3 (Q: "Did your station manager know that belt loaders were being used to access the aircraft?" A: "Yes, sir.")).

9793015.1

20. At approximately 12:25 a.m. on the date of incident, Menzies employee Shantell Jordan was tasked with helping Mr. Sanchez board the aircraft and perform a brake ride while the aircraft was towed to the gate. Id. at 36:4–37:14; Compl. ¶ 7.

21. At some point while Mr. Jordan was positioning a belt loader near the door of the aircraft so that Mr. Sanchez could board, the belt loader made contact with the aircraft, approximately 2 feet below the door. Ex. D at 38:3-15; Compl. ¶ 8.

### III.   LEASING AND MAINTENANCE OF FRONTIER'S AIRCRAFT

22. Frontier leases, rather than owns, all of the aircraft in its fleet. See Excerpts from Deposition of James Mach (attached hereto as Exhibit E ("Ex. E")), at 21:22-25.

23. This action concerns an Airbus A319 aircraft that was leased to Frontier by SMBC in 2006, with Wells Fargo Bank Northwest, National Association as owner/trustee of the aircraft. See FRONTIER000134, FRONTIER000140, included in Excerpts from Frontier/SMBC Lease Agreement (attached hereto as Exhibit F ("Ex. F")); Excerpts from Deposition of Sharath Sashikumar (attached hereto as Exhibit G ("Ex. G")) at 20:2-19, 12:20-24.

24. The aircraft was due to be returned to SMBC on or around June 21, 2018, upon completion of certain maintenance checks. See Ex. F, FRONTIER000164–65.

25. At the time of the incident, Frontier aircraft typically underwent "C check" maintenance every two years or 4,750 flight hours. See Excerpts from Deposition of James Mach, Ex. E, at 35:2-4; 35:25–36:3.

26. There are 12 sequential levels of C-checks, and each level involves a series of maintenance tasks recommended by the manufacturer of the aircraft for the specific age of the aircraft. Id. at 35:4-6; 36:4-6.

27. Although C-checks did not necessarily need to be conducted at the beginning or end of an aircraft lease, in 2018 Frontier scheduled C-checks to align with the

1  end of a lease, because virtually all leases require that the next scheduled C-check be
2  performed prior to the return of the aircraft. Id. at 40:25–41:12; 44:12-21.

3        28.    According to Frontier's Director of Maintenance, scheduling C-
4  checks at the end of a lease term was advantageous because it allowed Frontier's
5  maintenance contractor, PEMCO, to conduct various other lease-end tasks at the same time
6  or immediately after performing the C-check, all while the aircraft remained out of service.
7  Id. at 35:11-12, 35:18-21. These lease-end tasks typically include changing aircraft
8  carpeting, painting, refurbishing components such as overhead bins, reupholstering parts
9  of the aircraft, and other tasks specifically requested by the lessor. Id. at 35:11-21.

10       29.    The lease-return tasks required by each lease (and each lessor) are all
11 different. Id. at 38:17-19; 46:20-22 (Mach: "We did a number of lease returns . . . and
12 every one of them varied. They are all different.").

13       30.    Approximately six months prior to a lease return, Frontier examines
14 the lease return conditions, including the next level of C-check required, component
15 longevity, and other lease terms. Id. at 51:3-9. Frontier then meets with the lessor to go
16 over each of the lease definitions and defined requirements of the return. Id. at 51:9-12.
17 During this process, the lessor essentially "tr[ies] to get a brand-new airplane out of
18 [Frontier]" (id. at 51:18-19), and Frontier negotiates with the lessor regarding how much
19 work PEMCO must complete before the aircraft can be returned.

20       31.    In 2018, the lease-return process involved ferrying Frontier aircraft to
21 Tampa, Florida for routine maintenance and inspection. Id. The PEMCO facility in Tampa
22 was Frontier's only essential maintenance provider at the time of the subject incident. Id.
23 at 31:4-7.

24       32.    The A319 aircraft was scheduled to be pulled out of service at the end
25 of April 2018, to be inducted into its lease return C-check on May 1, 2018. Id. at 30:20-
26 25, 37:12-15.

27       33.    Between May 1 and June 21, 2018, the aircraft was scheduled to
28 undergo a C8-level check – a relatively heavy, ten-year maintenance check that would

require PEMCO to examine the cargo compartment of the aircraft, open up certain areas beneath the floor of the aircraft to uncover areas of hidden damage, conduct significant thrust reversal work, and complete over 1500 maintenance tasks. Id. at 43:3-17.

34. The length of time required to complete these tasks generally depends on numerous factors, including the regular wear and tear on a given aircraft, and the extent of the hidden internal damage to the aircraft. Id. at 77:17–78:8 (Mach: "[D]uring a . . . heavy maintenance level check, the bulk of the task cards that are assigned . . . [require] open up and inspection. . . . In other words . . . the task card tells you to open a floorboard and evaluate the floor beams underneath the floor board. That's a routine task card. And . . . when you open [the component up, if you find either corrosion or underlying structure damage . . . that would require maintenance, then you would generate what they called a nonroutine. And then that nonroutine is then negotiated based on the required time and materials it takes to repair it. So every routine task may or may not generate a nonroutine . . . .").

35. At no point did Frontier intend to extend the lease or re-lease the aircraft – the aircraft was being removed from Frontier's fleet in 2018 due to seat capacity issues. Id. at 49:19-25.

36. Frontier's lease with SMBC for the A319 Airbus was unique in that Frontier was required to perform maintenance of more parts of the aircraft than the average lease would require. Id. at 39:2-4, 39:11-15.

37. In April 2018, all of the lease-end work on the A319 aircraft – both the C8 check and the other lease-return tasks negotiated with SMBC – was expected to take between 45 and 60 days to complete. Id. at 53:3-12.

38. For scheduling purposes, Frontier allocated 52 days for the lease-return process – between May 1 and June 21, 2018. Id. at 37:12-20.

39. Had this work taken longer than 52 days to perform, Frontier would have incurred penalties and fees for the period beyond June 21, regardless of any additional damage allegedly caused by Menzies. See Excerpts from Transcript of Deposition of

Frontier Treasury Manager, Sharath Sashikumar, Ex. G, at 41:13–42:4 (Q: "If the C8 [maintenance] check had taken longer than 51 days, would Frontier still have . . . incurred a penalty?" A: " If the damage hadn't happened and we worked on it and if it was five days late, we would have paid that base rent for those five days." Q: "So the penalty had nothing to do with why. It's just a function of whether you turned [the aircraft] in on time or not?" A: "The penalty is a way for the lessor to recoup the fact that they . . . [did not receive] their airplane when they thought they would get it back, right.").

## IV. REPAIR AND MAINTENANCE PROCESS FOLLOWING THE INCIDENT

40. Following the incident, Frontier's maintenance personnel conducted an initial inspection of the aircraft to assess the damage and determined that the aircraft a) had to be taken out of service, and b) could be ferried to the repair location in Tampa, Florida operated by PEMCO. See Excerpts from Deposition of James Mach, at 32:20–33:2; 33:19-24.

41. Roughly one week after PEMCO began its maintenance work on the aircraft, it was clear that the aircraft had suffered internal damage and that assistance from Airbus – the aircraft's manufacturer – would be necessary. Id. at 37:12-20.

42. After sending a technical representative to Tampa to evaluate the aircraft, Airbus determined that the repairs would be extensive, and Frontier decided that it would not attempt to put the aircraft back into revenue service before the expiration of the aircraft's lease. Id. at 38:13-16; 37:21-25.

43. Airbus generated repair instructions after evaluating the damaged parts. Id. at 58:12-16. The evaluation was sent to Toulouse, France for Airbus personnel in Toulouse to generate the repair dossier – i.e., the complete repair instructions for removal, replacement, and evaluation of component parts. Id. at 58:16-23; 59:9-16.

44. Although the aircraft was damaged on April 1, 2018, the repairs purportedly could not begin until May 1, 2018, due to lack of space in the PEMCO hangar in April. Id. at 64:25–65:2. The hangar was occupied with four other Frontier aircraft undergoing maintenance. Id. at 66:4-23.

45. Beginning May 1, 2018, the C-check and lease return work were performed largely simultaneously. Id. at 47:5-11. All told, the repairs and maintenance together took approximately 120 days to complete. Id. at 47:15-16.

46. At no point was a less extensive repair considered – since Airbus owned the repair design and the drawings, Airbus also owned the documentation to support the repair. Id. at 73:3-5.

V.   **FRONTIER'S LATE RETURN OF THE A319 AIRCRAFT**

47. All leases have different terms with regard to late return penalties. See Excerpts from Deposition of Sharath Sashikumar, Ex. G, at 14:7-17; 33:13-16. The A319's lease provided for Frontier to pay the base rent for the first ten days after the agreed return date, an additional 15 percent of the base rent for the next 30 days, and an additional 50 percent for any additional days. Id. at 33:17-24; Ex. F, FRONTIER000228–29.

48. During the repair process, Frontier continued to negotiate its leasing fees with SMBC. See Excerpts from Deposition of Sharath Sashikumar, Ex. G, at 39:19-25.

49. SMBC's representatives were on site in Tampa every day during the repair process, in order to ensure that Frontier was meeting the lease return conditions – the C check, the lease return work, and the damage repairs. See Excerpts from Deposition of James Mach, Ex. E at 83:25–84:6.

50. The aircraft was eventually returned to SMBC on or around September 8, 2018. Ex. G at 56:18–57:2.

51. At no point was the lease discussed with Menzies. Id. at 16:11-14. Frontier's fleet department, which deals with leasing, is separate from its ground handling department, which interfaces with Menzies. Id. at 17:8-12.

VI.   **THE INSTANT ACTION**

52. Through this action, Frontier seeks to recover 1) flight operations costs incurred as a result of having to re-route flights following the incident (totaling $16,642.97), 2) the cost of diagnostics, labor and materials required to repair the subject

aircraft (totaling $622,680.69), and 3) fees and penalties imposed by SMBC due to Frontier's delay in returning the aircraft to SMBC (totaling $763,894.45). ECF No. 55-4 at pp. 15-16; ECF No. 62-1 at p. 2.

53. Frontier also seeks to recover all attorneys' fees arising from prosecuting this action, including those already accrued, pursuant to the indemnification provision in the parties' contract (Compl. at p. 4, ECF No. 55-4 at p. 16) and pursuant to A.R.S. § 12-341.01.

DATED this 30th day of September, 2021.

JONES, SKELTON & HOCHULI, P.L.C.

By _____
J. Gary Linder
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Attorneys for Defendant Menzies Aviation (USA), Inc.

9793015.1

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of September, 2021, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

Adam E. Lang
Snell & Wilmer, LLP
One Arizona Center
00 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

/s/ Jennifer Bernardo

9793015.1