# Exhibit D

---

**Page 1**

```
            UNITED STATES DISTRICT COURT
                 DISTRICT OF ARIZONA

Frontier Airlines, Inc.,        )
                                )
            Plaintiff,          )
                                )
vs.                             ) No. 2:20-cv-01432-ESW
                                )
Menzies Aviation (USA), Inc.,   )
                                )
            Defendant.          )
_____)




      VIDEOCONFERENCE DEPOSITION OF ELI SANCHEZ


               Gilbert, Arizona
                April 7, 2021
                 10:04 a.m.









                          SEYMOUR REPORTING SERVICES
                       Registered Reporting Firm R1000
PREPARED BY:              137 East Elliot Road, #2473
                          Gilbert, Arizona  85299
Courtney C. Vanderwalker, RPR     (P)602.258.5800
Certified Reporter No. 50597      (F)888.881.5440
```

---

**Page 2**

```
      VIDEOCONFERENCE DEPOSITION OF ELI SANCHEZ,
taken on April 7, 2021, commencing at 10:04 a.m.  The
witness was located in Gilbert, Arizona.  COURTNEY C.
VANDERWALKER, Certified Reporter No. 50597, in and for
the State of Arizona, appearing via videoconference.




COUNSEL APPEARING:
      For the Defendant
      JONES, SKELTON & HOCHULI, P.L.C.
      BY:  Mr. J. Gary Linder
           40 North Central Avenue, Suite 2700
           Phoenix, Arizona  85012
           glinder@jshfirm.com
           (Via videoconference)

      For the Plaintiff
      SNELL & WILMER, L.L.P.
      BY:  Mr. Matt Jarvey
           One Arizona Center, 400 East Van Buren, 19th Floor
           Phoenix, Arizona  85004
           mjarvey@swlaw.com
           (Via videoconference)

ALSO PRESENT:
      Ms. Valerie Tyler (via videoconference)
      Ms. Sharon Ourien (via videoconference)
```

---

**Page 3**

```
                    I N D E X
WITNESS                                          PAGE
ELI SANCHEZ

EXAMINATION BY MR. LINDER                           4


                   E X H I B I T S
(None)
```

---

**Page 4**

         ELI SANCHEZ,
a witness herein, having been first duly sworn by the
Certified Reporter to speak the truth and nothing but
the truth, was examined and testified as follows:


                    EXAMINATION
BY MR. LINDER:
   Q.  Mr. Sanchez, my name is Gary Linder.  I'm the
attorney that represents Menzies with respect to a
lawsuit that has arisen as a function of an accident
that happened on April 1, 2018.  You're here today to
give your deposition in that case.  I don't think this
is going to take very long, but who knows.  It depends
on the information you have.
       Have you ever been deposed before?
   A.  Never.
   Q.  Okay.  Well, let me give you a few ground
rules.  They are pretty simple.  The first one is the
court reporter is taking down everything that we say.
And so because of that, it's very important that I let
you finish your answer before I start my next question
and the same thing is true that you're sure to not start
talking until my question is complete because she can't
take us down at the same time.  Okay?

9

1  was it.  And then you are sent off to get your orders
2  and you go straight to your base and then you pretty
3  much hit the ground running.
4      Q.  Do you start as a crew chief?
5      A.  Yes.
6      Q.  As a crew chief do you have people working
7  under you?
8      A.  Not at first.
9      Q.  And that was kind of my question, so as you
10 went higher in rank, did you end up with folks working
11 under you?
12     A.  Yes.
13     Q.  At what time did you start having folks work
14 for you, and not the date, but essentially at what
15 promotion point did you wind up with people working
16 under you?
17     A.  Well, I believe I still -- I believe I had
18 people working under me as an E3, just maybe a year in.
19     Q.  Okay.
20     A.  New airmen would come in and, you know, you
21 would have -- you would be working above them.
22     Q.  While you were in the Air Force as an F15 crew
23 chief, did you receive any training on ground service
24 equipment?
25     A.  I don't remember.

10

1      Q.  Does the Air Force use ground service
2  equipment to move aircraft?
3      A.  Yes.  We would use a ground power unit.
4      Q.  A ground power unit to do what?
5      A.  It just supplies electrical power to the
6  aircraft.
7      Q.  Would you ever move the aircraft?
8      A.  I would brake ride.
9      Q.  When you're brake riding an F15, is there some
10 other piece of equipment that's being used to actually
11 move the aircraft?
12     A.  Yes, a tug.
13     Q.  Were you trained on how to use the tug?
14     A.  I was not.
15     Q.  Did you ever use a tug while you were in the
16 Air Force?
17     A.  No.
18     Q.  So that's a different job responsibility?
19     A.  Yes.
20     Q.  So as an F15 crew chief there would never be a
21 situation in which you personally would actually operate
22 a tug?
23     A.  Correct.
24     Q.  But you would conduct what was called a brake
25 ride?

11

1      A.  Yes.
2      Q.  We are going to get into that in a little bit
3  in a few minutes regarding a brake ride; but tell me
4  generally speaking, what is a brake ride in the context
5  of being an F15 crew chief?
6      A.  It's pretty much a safety precaution.  I am
7  there to provide the emergency brakes in case of an
8  emergency.
9      Q.  Generally speaking, how would you gain access
10 to the F15 when you were completing a brake ride?
11     A.  Well, our F15 have stairs.  Also F15 has a set
12 of stairs that are attached into the aircraft, so
13 there's multiple ways to enter the cockpit.
14     Q.  I see.  There's stairs attached to the actual
15 aircraft and then also you would use movable stairs?
16     A.  Correct.
17     Q.  Were they motorized movable stairs or just
18 airstairs?
19     A.  No.  Neither.  It's essentially a ladder.  It
20 hooks onto the aircraft.
21     Q.  Okay.  While you were in the Air Force working
22 as an F15 crew chief, did you receive any
23 certifications?
24     A.  I don't remember.
25     Q.  So just to summarize what happened is you went

12

1  through basic training and then you received an
2  additional three months of training on being a crew
3  chief for an F15 and that was the extent of your
4  training in the Air Force?
5      A.  Well, I have training records.  I just can't
6  give you a certain answer of what training I received.
7  I'd have to look up my training records.  But you do
8  accrue training records as your career progressed.  But
9  like I said, I can't give you that answer.  I don't have
10 it in front of me.
11     Q.  All right.  After 2016 when you left the Air
12 Force, what was your first -- did you immediately start
13 A&P school?
14     A.  No.
15     Q.  What did you do next?
16     A.  I was a motorcycle technician.
17     Q.  And who did you work for as a motorcycle
18 technician?
19     A.  Las Cruces Motor Sports.
20     Q.  How did you work in that job?
21     A.  I don't understand the question, how?
22     Q.  How long, I'm sorry.
23     A.  How long?  I don't remember how long.
24     Q.  But you know that was the first job you had
25 after you got out of the Air Force?

**Page 13**

1  A. Correct.
2  Q. What was your next job after working at Las
3  Cruces Motor Sports?
4  A. I went to work for a company called STS
5  Aviation.
6  Q. Where was that located?
7  A. Phoenix.
8  Q. And what was your job at STS Aviation?
9  A. I was a contract A&P mechanic.
10 Q. When did that job start?
11 A. I don't remember.
12 Q. Can you give me an approximate even year?
13 A. Yes, sir, I could give you the year.
14 Q. Okay.
15 A. 2017.
16 Q. All right. What did you do next -- well, how
17 long did you work for STS, do you think?
18 A. I don't know, but my next job was Frontier.
19 Q. All right. When did you get your A&P?
20 A. September 20, 2016.
21 Q. I see. So did you receive your A&P prior to
22 going to work for Las Cruces Motor Sports?
23 A. No. I had left.
24 Q. Where did you go to school to receive your
25 A&P?

**Page 14**

1  A. Baker's School of Aeronautics in Tennessee.
2  Q. How long was that course?
3  A. I don't want to guess.
4  Q. Was it a year?
5  A. I believe it was a few weeks. It was a crash
6  course.
7  Q. It was a few -- now -- I'm sorry, I'll start
8  over.
9     Were you able to use the training you had
10 received in the Air Force as part of the curriculum, if
11 you will, to receive your A&P?
12 A. Correct.
13 Q. Is the program in Tennessee specially designed
14 for folks that had come out of the Air Force and then
15 were looking to pick up their A&P on a rapid basis?
16 A. Correct.
17 Q. Did you wind up with a certificate?
18 A. I don't know.
19 Q. How about this way: After you completed the
20 course in Tennessee to receive your A&P, what, if any,
21 documentation did you receive from that school?
22 A. My A&P license.
23 Q. In order to get your A&P license, do you have
24 to sit for an examination?
25 A. Yes.

**Page 15**

1  Q. And that examination, I assume, is the same
2  for everyone?
3  A. Yes.
4  Q. Did you ever take the examination to be an A&P
5  mechanic while you were in the Air Force?
6  A. No.
7  Q. You said that you were a contract A&P mechanic
8  for STS, right?
9  A. Correct.
10 Q. Can you give me -- well, first off, where was
11 that job located?
12 A. Phoenix, Arizona.
13 Q. Was it at Sky Harbor?
14 A. Yes.
15 Q. Can you give me a general idea of what your
16 job responsibilities were?
17 A. I can. We were contracted by Frontier
18 Airlines to answer gate calls.
19 Q. And can you break that down for me as someone
20 who is not an A&P mechanic what it means to respond to
21 gate calls?
22 A. Yes, I can. So when an airline doesn't have
23 their own maintenance at the station, they contract out.
24 And so it was my job to stand by on-call in the office.
25 And if there was a call from maintenance, Frontier's

**Page 16**

1  maintenance control, we would then go to the gate and
2  answer whatever needed to be done.
3  Q. So at that time you were an STS employee, not
4  a Frontier employee?
5  A. Correct.
6  Q. And STS was a contractor that provided some
7  maintenance services to Frontier?
8  A. Correct.
9  Q. And you think that job started -- well,
10 actually about what year do you think that job started
11 with STS, 2017?
12 A. 2017.
13 Q. Was it early 2017 or mid 2017, do you recall?
14 A. It was early 2017.
15 Q. And then I think I asked you this, but I am
16 going through my notes here. How long did you work for
17 STS?
18 A. I don't remember.
19 Q. Was it -- so this accident happened April 1,
20 2018. At the time of this accident were you working for
21 Frontier or STS?
22 A. Frontier.
23 Q. If we were to look at it backwards, about how
24 long do you think you had worked for Frontier prior to
25 this accident?

17

1  A. I started in July of 2017, so...
2  Q. About ten months?
3  A. Yeah.
4  Q. What was your job title at Frontier?
5  A. Line A&P mechanic.
6  Q. Can you tell me why you wound up switching
7  employment from STS to Frontier?
8  A. Yes. It was just a better opportunity. It
9  was -- I was already working on Frontier's aircraft. I
10 was familiar with it, so I thought might as well apply.
11 And I was able to get an interview and hired.
12 Q. During the time that you worked for STS, did
13 Frontier not have any maintenance staff on-site there at
14 Sky Harbor?
15 A. Correct.
16 Q. So then there was a move by Frontier to
17 actually have their own employed A&P mechanics there at
18 Sky Harbor?
19 A. Yes.
20 Q. So you would have been some of -- one of the
21 first Frontier maintenance, you know, employees working
22 at Sky Harbor?
23 A. That's correct.
24 Q. Did STS continue to provide services as well
25 to Frontier even when you moved to Frontier from STS?

18

1  A. No.
2  Q. Same question I had before, what were your job
3  responsibilities as a line A&P mechanic for Frontier?
4  A. My job was to coordinate with maintenance
5  control on a scheduled maintenance as well as answer
6  gate calls and stuff like that, and do preflight,
7  postflight inspections.
8  Q. Was your job with Frontier different than your
9  job with STS?
10 A. Yes.
11 Q. Can you explain to me how it was different?
12 A. It was more hands-on. I was a Frontier
13 employee.
14 Q. When you worked for STS, did you complete
15 brake rides?
16 A. I don't remember. I do remember doing
17 multiple gate calls and that seemed to be the majority
18 of the work I did on Frontier's aircraft.
19 Q. When you say gate call, I am assuming what you
20 mean by that is that the aircraft is actually parked at
21 a gate so you can access the aircraft via the jetway
22 or -- well, via the jetway equipment?
23 A. Yes.
24 Q. That's what I mean.
25 A. Yes.

19

1  Q. When you worked for STS you don't recall a
2  time period in which you were to complete the same
3  function as far as brake riding is concerned that was
4  going on, on the night of this accident, right?
5  A. Right, I don't remember.
6  Q. In order to complete your job at STS, did you
7  have to undergo training?
8  A. There was training that was online training;
9  but as far as any classes I was sent to or anything like
10 that, that's negative.
11 Q. When you worked at STS were you trained to
12 operate any ground equipment?
13 A. No.
14 Q. At the time of the accident was your job title
15 still line A&P mechanic?
16 A. Yes.
17 Q. Who was your direct supervisor at the time of
18 the accident?
19 A. Mr. Greg Newberry.
20 Q. What was Mr. Newberry's title, do you know?
21 A. I believe station manager.
22 Q. At the time of the accident in April of 2018,
23 approximately how many Frontier maintenance staff was
24 there at Sky Harbor?
25 A. I don't remember.

20

1  Q. When did you leave Frontier's employment?
2  A. July 2019? I can't answer that. I don't
3  remember, to be honest.
4  Q. Do you recall why you left Frontier's
5  employment?
6  A. I do.
7  Q. Why is that?
8  A. I found a better job opportunity.
9  Q. I'm sorry, it cut out.
10 A. I said I found a better job opportunity.
11 Q. And what was that job opportunity?
12 A. I went to work for Air Transport
13 International. It's a cargo -- it's a freight airline.
14 Q. Is that still at Sky Harbor?
15 A. Yes.
16 Q. What is your job for ATI?
17 A. My job is lead A&P mechanic.
18 Q. And is that the job you are in today still?
19 A. Yes.
20 Q. When you say you left for a better
21 opportunity, was that a function of pay?
22 A. Yes.
23 Q. And is your job title today at ATI still lead
24 A&P?
25 A. Yes.

21

1   Q.   And does that mean you have got folks working
2   under you?
3   A.   I do.
4   Q.   Other A&P mechanics?
5   A.   Yes.
6   Q.   As part of your job at ATI, have you ever
7   received training on the operation of ground service
8   equipment?
9   A.   No.
10  Q.   So is it fair to say that essentially -- well,
11  not essentially, but that you have never received
12  training on the operation of ground service equipment?
13  A.   That's correct.
14  Q.   So you've been working at Sky Harbor Airport
15  from 2016 to the present?
16  A.   2017.
17  Q.   2017.
18       Prior to the incident in question, had you
19  ever been involved in any other incidents involving
20  damage to an aircraft?
21  A.   No.
22  Q.   Did Frontier offer training in ground service
23  equipment to A&P mechanics?
24  A.   I don't remember.
25  Q.   At the time of the incident, did Frontier have

22

1   employees that would assist you in moving aircraft?
2   A.   No.
3   Q.   So all the movement of the aircraft had to do
4   or was through a contractor?
5   A.   Correct.  I believe that in their contract
6   that was their duties.
7   Q.   And was it always Menzies?
8   A.   Yes.
9   Q.   How often would you complete brake rides back
10  in April of 2018 as part of your job?
11  A.   Almost every night.
12  Q.   So was it a similar system every night,
13  similar to what was occurring on the night in question
14  where you needed to move an aircraft that was sitting
15  away from a jetway and went back to a jetway?
16  A.   Yes.
17  Q.   And the reason why you would be in the cockpit
18  is to be -- is for safety reasons to be able to apply
19  the brakes?
20  A.   Yes.
21  Q.   Was there any other reason for you to gain
22  access to the aircraft in terms of some sort of a
23  maintenance function other than being a brake rider?
24  A.   Sometimes if need be, I would communicate with
25  the tower.

23

1   Q.   You would communicate with the tower regarding
2   the movement of the aircraft?
3   A.   Of course.
4   Q.   Okay.  You were saying sometimes or all the
5   time?
6   A.   Well, it depends if we were crossing into a
7   taxiway or not.  If you didn't -- to cross into a
8   taxiway, you are obligated to contact the tower.
9   Q.   Did you receive training from Frontier or at
10  any point in your career about how to complete a brake
11  ride, how to do that job?
12  A.   I did in the Air Force.
13  Q.   Did you receive training with respect to how
14  to complete a brake ride through Frontier as well on
15  their aircraft?
16  A.   I can't tell you for sure.  I don't remember.
17  Q.   Were you ever allowed under any circumstances
18  to operate Frontier's ground service equipment?
19  A.   No.
20  Q.   I know I'm beating this to death.  So just
21  generally speaking, what, if any, training did you
22  receive from Frontier to do your job at Sky Harbor, if
23  any?
24  A.   You said at Frontier?
25  Q.   Yes, sir.

24

1   A.   I had to attend a 120-hour general
2   familiarization course in Denver.  And that's a
3   week-long course.
4   Q.   What's 120 hours -- I assume it's more than a
5   week?
6   A.   Right.  I don't remember how long I was there.
7   I just remember staying in a hotel for a very long time.
8   Q.   And did you complete that training in Denver
9   before starting your job for Frontier?
10  A.   No, during.
11  Q.   Was it early, though, in your job with
12  Frontier?
13  A.   Yes.
14  Q.   You said that was a general familiarization
15  course?
16  A.   Yes.
17  Q.   And that was a general familiarization with
18  what, with the aircraft you would be working on?
19  A.   With the Airbus, A319, 320s, et cetera.
20  Q.   I see.  Who put on that course?
21  A.   Frontier.
22  Q.   I'm sorry if I asked this question before.  Of
23  the Frontier maintenance staff, were any of those folks
24  trained to operate any ground service equipment?
25  A.   I couldn't give you a certain answer.  I

25

1 never -- I still have never seen a mechanic use ground
2 service equipment or have been trained.
3     Q.  All right.  Let me switch to a different
4 topic.  As I told you, the accident happened on April 1,
5 2018.  On that day do you recall what time your shift
6 had started?
7     A.  I do.  8:00 p.m. the evening before the
8 incident.
9     Q.  And the incident happened I think around
10 12:20 a.m.?
11     A.  Okay.
12     Q.  So it would have been sort of right in the
13 middle of your shift?
14     A.  Correct.
15     Q.  What time was your shift scheduled to end?
16     A.  8:00 a.m.
17     Q.  So you worked 12-hour shifts?
18     A.  Correct.
19     Q.  How many hours a week would you normally work?
20     A.  Well, it was 12 for three on, four off, four
21 on, three off.  So if I'm doing the math that's just
22 over 40 hours a week.
23     Q.  And during the time period this accident
24 happened, you had -- your testimony would be that you
25 generally worked a little bit over 40 hours a week?

26

1     A.  Uh-huh.
2     Q.  Yes?
3     A.  Yes, sorry.
4     Q.  No problem.  Had you worked the day before
5 this accident?
6     A.  I don't remember.
7     Q.  Generally speaking, take me through a day back
8 during that time period of what your day would look like
9 over the course of a 12-hour shift?
10     A.  Come on shift.  Get to the gate.  Pretty much
11 get debriefed from my lead on what we had coming in,
12 stuff like that.  And when aircraft did arrive, we would
13 perform routine maintenance, that would be inspections,
14 walk around, stuff like that, checking logbooks, getting
15 with maintenance control, very general stuff.  If there
16 was work to be done, parts to be installed, stuff like
17 that, we would handle that as well as brake rides later
18 in the night, if we needed to do that.
19     Q.  What would cause the need for a brake ride?
20 Just a situation where the aircraft needed to be at the
21 gate but it wasn't parked at the gate at that time?
22     A.  Correct.  So at the time Frontier did not have
23 multiple gates.  We had one gate.  And I believe three
24 overnight aircrafts.  So we would have to park aircraft
25 on a parking pad and play musical aircraft with the

27

1 gates when one became available.  Jet Blue used to let
2 us use their gate when they didn't have an aircraft on
3 it.  But if they did, we would have to move it.  So, I
4 mean, it was pretty much a normal thing.
5     Q.  So you had -- Frontier had one gate available
6 to it, at least on a full-time basis, at the time of
7 your employment?
8     A.  Correct.
9     Q.  And that was the only gate you would work at?
10     A.  Correct.
11     Q.  Unless there was an aircraft parked at the Jet
12 Blue gate and they were using it, you would work at that
13 gate too?
14     A.  Correct.  If it was available.
15     Q.  Would you be involved in terms of the brake
16 riding aircraft both ways from the gate and to the gate?
17     A.  I don't understand the question.
18     Q.  So you're saying you had to play musical
19 aircraft.  So I'm wondering, you know, I know that on
20 the night in question at least I think I know that you
21 were trying to brake ride an aircraft from a location
22 where it was parked out on the Tarmac back to the gate?
23     A.  Correct.
24     Q.  I'm assuming that the reason why you were
25 doing that at 12:20 in the morning is that aircraft was

28

1 to be the next aircraft up to cover a route for
2 Frontier?
3     A.  Correct.
4     Q.  So the question I have for you is that --
5 would you ever do the reverse in which you would wind up
6 helping take an aircraft away from the gate to go park
7 it out in a parking spot?
8     A.  Correct.
9     Q.  So you would do that sometimes too?
10     A.  Yes.  Any time the aircraft was moved, you
11 need a brake rider.
12     Q.  So it sounds like the brake rider function you
13 completed multiple times every day?
14     A.  Correct.
15     Q.  And every time you would perform that
16 function, would you be assisted by or the actual moving
17 of the aircraft would happen with a Menzies employee?
18     A.  Can you say that one more time?
19     Q.  Every time you completed the process of moving
20 an aircraft and you being the brake rider, would the
21 person operating the tug be a Menzies' employee?
22     A.  Correct.
23     Q.  Do you remember how it is you became involved
24 in the movement of the aircraft in question?  What --
25 take me through that process.

29

1  A. Generally or specifically?
2  Q. Specifically.
3  A. Specifically I don't remember much of that
4  night. I just remember the incident.
5  Q. All right. And then how about generally.
6  Generally how would you have been called in to move this
7  aircraft to the gate?
8  A. Generally that's my lead's call and he would
9  just instruct me of what I needed to do, brake ride, you
10 know, there to there and, you know, and that was what I
11 did.
12 Q. Who was your lead that night?
13 A. I don't remember his name.
14 Q. But you know -- this is silly. You don't
15 remember his name, but you remember who it was?
16 A. Yes.
17 Q. Did you have the same lead every shift or
18 would it change?
19 A. My lead was -- stayed the same.
20 Q. Do you remember his first name?
21 A. I don't. I know it's bad, but I don't
22 remember that far back.
23 Q. That's not bad, I was just wondering.
24    Do you recall having any conversations with
25 Menzies' staff on the date in question with respect to

30

1  the accident in question?
2  A. I don't.
3  Q. So I'm assuming there must be some way in
4  which you as a Frontier A&P mechanic who is going to
5  move an aircraft or do a brake ride has to communicate
6  with Menzies to alert them that you are going to need
7  them to assist you in that move. Correct?
8  A. Well, my lead would contact Menzies and they
9  would handle the logistics of everything. I was just
10 the brake rider.
11 Q. So you would never contact Menzies?
12 A. I don't believe so. Under normal
13 circumstances, no.
14 Q. Do you remember any other circumstances
15 whereby you had direct contact with a Menzies employee?
16 A. I don't.
17 Q. Do you know when your lead would contact
18 Menzies employees, was that in person or over some sort
19 of radio?
20 A. In person.
21 Q. And how do you know that?
22 A. I've witnessed it.
23 Q. Tell me about how you go about witnessing that
24 type of communication. Were you guys all in the same
25 room?

31

1  A. Our offices were next door to each other.
2  Q. So you would, from time to time, observe your
3  lead talk to Menzies about the need to move an aircraft?
4  A. Correct.
5  Q. On the night in question, do you recall if you
6  witnessed your lead making contact with the Menzies
7  employee about moving the aircraft?
8  A. I don't.
9  Q. On the night of the incident, do you know
10 where you were at when you were told to go and brake
11 ride the aircraft back to the gate?
12 A. The office.
13 Q. About how far is the office from the gate?
14 A. From -- it's directly underneath the gate.
15 Q. About how far was the aircraft parked away
16 from the gate in its location before you were going to
17 move it?
18 A. Over a hundred yards.
19 Q. How -- I know you were -- well, I think -- so
20 at the time of the accident you were on your way from
21 your office to the aircraft. Correct?
22 A. Correct.
23 Q. And how were you making that trip? Were you
24 walking?
25 A. I was.

32

1  Q. Was that the normal way that you would make it
2  from your office to the gate?
3  A. Yes.
4  Q. Prior to this incident, did you have -- okay.
5  Hold on. I'll start over.
6     The person's name that was operating the belt
7  loader at the time of the incident was Shantell Jordan.
8  Prior to this incident, had you had any communications
9  with Shantell Jordan?
10 A. No.
11 Q. You didn't know him at all?
12 A. I didn't know many Menzies employees. They
13 would circulate quite a bit. They would come in and
14 out, so no, I never met Jordan.
15 Q. Did you know any Menzies employees as far as
16 you can -- can you recall any of their names?
17 A. I can't recall any of their names, but I
18 remember their faces.
19 Q. Does the name Robert Lammon ring a bell for
20 you?
21 A. No, sir.
22 Q. Prior to this incident had you ever used a
23 belt loader to gain access to an aircraft?
24 A. Is the question -- could you repeat the --
25 I've never driven a belt loader.

33

1  Q. No, I understand. My understanding is, is
2  that as part of your job you don't ever operate ground
3  service equipment?
4  A. Correct.
5  Q. So my question was in terms of you actually
6  physically getting on the aircraft, had you ever used a
7  belt loader to get onto the aircraft?
8  A. Yes.
9  Q. About how many times?
10 A. I don't remember.
11 Q. Was that the normal piece of equipment you
12 would use to gain assess to the aircraft at the time of
13 this incident?
14 A. Correct.
15 Q. So it's fair to say that you would -- you
16 would use a belt loader multiple times every day to gain
17 assess to the aircraft to complete the brake rides?
18 A. Correct.
19 Q. Do you recall using any other type of
20 equipment to gain assess to the aircraft during the time
21 period of this incident?
22 A. No.
23 Q. Did you think it was safe to use a belt loader
24 to access the aircraft?
25 A. I didn't have an issue with it. I remember

34

1  other employees having safety issues with it. I myself
2  did not.
3  Q. By that, of course -- well, not of course, but
4  I'm not talking about safety with respect to the
5  aircraft itself. I'm talking about safety with respect
6  to you as an individual safely getting onto the
7  aircraft. Do you understand that to be my question?
8  A. Yes, sir. It's not the safest way to get onto
9  an aircraft.
10 Q. You said that you personally didn't have a
11 problem with it, but some of your coworkers did?
12 A. Yes, sir. Some of my coworkers were a lot
13 older than I was.
14 Q. So they expressed some concern with using the
15 belt loader?
16 A. Yes. Yes, sir.
17 Q. Because they felt like it was not as safe as
18 using other pieces of equipment?
19 A. Yes, sir. It's steep.
20 Q. Do you recall any sort of a conversation with
21 Menzies' employees about using a different type of
22 equipment to access the aircraft?
23 A. I do not.
24 Q. When you were approaching the aircraft, can
25 you describe to me the lighting at that time. It's

35

1  12:20 at night. How would you describe the lighting
2  there on the Tarmac at that point?
3  A. The lighting, yes, sir, fair. There was --
4  there was lighting around the pad area where the
5  aircraft was parked. I would say fair. I didn't have
6  to necessarily worry about maybe not being seen by a
7  vehicle or anything like that.
8  Q. Is it fair to say that in terms of moving an
9  aircraft back to the jetway, this is something that
10 happened every night?
11 A. It was -- it's hard to say if it was every
12 night because some nights Jet Blue wouldn't be using
13 their gates, so some nights we wouldn't have to move an
14 aircraft, and that was a good night.
15 Q. So you wouldn't have to move an aircraft if
16 you had one extra gate open even though you guys had
17 four aircraft?
18 A. Sometimes Jet Blue would come in at a
19 different time than our aircraft and quick turn, and so
20 it just worked out to where we were able to use their
21 gates and we didn't have to put any aircraft on the pad
22 at, you know, that night.
23 Q. Do you know if Frontier or your lead had any
24 role in what piece of equipment to use to access the
25 aircraft?

36

1  A. I don't.
2  Q. Do you know if there were any stairs that were
3  operational at the time of the incident?
4  A. There were not any stairs.
5  Q. And that is the way it had been the whole
6  time?
7  A. Yes, sir.
8  Q. Since there were no stairs, it sounds like the
9  only way you would access the aircraft out on the Tarmac
10 would be via the belt loader?
11 A. Correct.
12 Q. On the night in question, it was 12:20 a.m.,
13 do you think you had already completed a brake ride?
14 A. I don't remember.
15 Q. Would it have been normal for you to have
16 completed a brake ride before 12:20 a.m. on a normal
17 shift?
18 A. The only way I would have completed a brake
19 ride would have been from that gate to that pad prior to
20 that, but I don't remember.
21 Q. Do you recall the gate number? That's a
22 random question.
23 A. I don't.
24 Q. Did Frontier's gate stay the same the entire
25 time you worked for Frontier at Sky Harbor Airport?

37

1   A.  Yes.
2   Q.  I think I asked this in a general way before
3   so I'll be more specific.  On the night in question were
4   you going to complete anything else to this aircraft by
5   accessing it other than a brake ride?
6   A.  I don't remember.
7   Q.  And again, I don't have a lot of knowledge
8   with respect to what your job actually entails.  Would
9   there be occasions that you would need to access an
10  aircraft on the Tarmac to complete anything other than a
11  brake ride?
12  A.  Do you mean on the pad where it was parked?
13  Other than the --
14  Q.  Yes.
15  A.  I don't remember.  I can't give you a definite
16  answer on that.
17  Q.  As you were walking to the aircraft, did you
18  see a tug also being moved to the aircraft in order to
19  move it?
20  A.  I'm not sure if I recall a tug.
21  Q.  Would it be normal for the tug and the belt
22  loader to be moved towards the aircraft at the same
23  time?
24  A.  Generally, yes.
25  Q.  As you were walking to the aircraft, was

38

1   anybody else with you?
2   A.  No.
3   Q.  All right.  So if you could, on a step-by-step
4   basis, can you take me from the time that you were in
5   the office before you got the instruction to the moment
6   or second that you observed the belt loader come in
7   contact with the aircraft?
8   A.  Yes, sir.  It's pretty simple.  I didn't
9   really make it that far out of the office.  I made it
10  out of the office past the gate, looking northwest
11  towards the pad.  I hear the -- and it's pretty far of a
12  distance, I hear the belt loader rev up, ram into the
13  aircraft.  The aircraft shook.  And at that point I
14  realized what I had seen.  I turned right back around
15  and I let my lead know what I had just seen.
16  Q.  So you did not walk up to the aircraft at that
17  time to observe any damage?
18  A.  No.
19  Q.  You said you saw the aircraft shake?
20  A.  Yes.
21  Q.  Did you also hear the incident?
22  A.  I don't understand the question.
23  Q.  Did you actually here the collision with your
24  ears?
25  A.  The collision, not so much as the belt loader

39

1   in the high RPMs.
2   Q.  About how long had you been watching the belt
3   loader before it hit the aircraft?
4   A.  I can't remember.
5   Q.  As you were walking out to the aircraft, you
6   have -- do you have a radio on you?
7   A.  No.
8   Q.  So as soon as you saw the accident, you did
9   not talk to the person that was on the belt loader.
10  Correct?
11  A.  No.
12  Q.  You immediately turned around and walked back
13  to your office?
14  A.  Yes, sir.
15  Q.  And that's where you told the lead that you
16  had seen this collision?
17  A.  Yes, sir.
18  Q.  And what happened next?
19  A.  I believe he called -- he contacted our
20  station manager.
21  Q.  What did you do next?
22  A.  I just sat there and listened to my lead talk
23  to Greg.
24  Q.  At some point did you go out to the aircraft
25  to take a look at what happened?

40

1   A.  I did.  I went with my lead out there to
2   assess the damage.
3   Q.  About how long was it between the time of the
4   incident and when you and your lead walked out to
5   inspect the damage?
6   A.  I don't remember.
7   Q.  Was it just a matter of minutes?
8   A.  I would be guessing.
9   Q.  Okay.  I don't want you to do that.  As far as
10  this aircraft is concerned, did you ever brake ride this
11  aircraft that night?
12  A.  I don't remember.
13  Q.  I didn't know if you guys moved it to the gate
14  or somewhere else after the incident.
15  A.  After the incident?
16  Q.  Yes, sir.
17  A.  No, we didn't move it.
18  Q.  Did you talk to any Menzies employees after
19  the incident?
20  A.  I don't remember.
21  Q.  The next question was going to be:  Did you
22  ever talk to Shantell Jordan after the incident?  I'm
23  assuming that also is an "I don't remember"?
24  A.  I don't remember.
25  Q.  Do you remember ever seeing Shantell Jordan

Page 45

1  Q. Did your station manager know that belt
2  loaders were being used to access the aircraft?
3  A. Yes, sir.
4  Q. Did he ever instruct you not to use belt
5  loaders to access the aircraft?
6  A. I don't remember.
7  Q. Did anyone including your lead ever instruct
8  you to not use a belt loader when accessing the
9  aircraft?
10  A. No. If you are asking if my lead ever said
11  that, no.
12  Q. That was a bad question. Yes, with respect to
13  the lead and then my question was going to be: Did
14  anyone other than the station manager -- because I know
15  you don't remember that --
16  A. Yes, sir. I didn't have a conversation with
17  Greg Newberry on whether or not to use a belt loader and
18  I also didn't see Greg Newberry very often.
19  Q. Okay. And then it's a true statement that
20  your lead never instructed you to not use a belt loader?
21  A. That's correct.
22  Q. Would there be occasions in which your lead
23  would be the brake rider?
24  A. I don't remember.
25  Q. Do you recall in the past that Menzies would

Page 46

1  use someone walking on the ground as well as driving the
2  belt loader in order to position the belt loader to the
3  aircraft, like a spotter?
4  A. I believe you are saying like a marshaler,
5  like a -- I know that I've seen that in the past. I
6  don't know if Menzies used that method or not.
7  Q. You've seen it in the past in other
8  situations, you just don't recall it --
9  A. Correct.
10  Q. -- happening with Menzies and Frontier?
11  A. Correct.
12  Q. After the incident were you instructed to stop
13  using the belt loader to access the aircraft?
14  A. I couldn't tell you. I wouldn't be able to
15  remember a specific conversation like that.
16  Q. But you know that you continued to use the
17  belt loader?
18  MR. JARVEY: Form.
19  A. I -- so when the stairs arrived, that's when
20  we started using stairs. So up until then it was a belt
21  loader.
22  BY MR. LINDER:
23  Q. So between the time of the incident and when
24  the stairs arrived, the only way you could get onto the
25  aircraft still was the belt loader?

Page 47

1  A. I believe so.
2  Q. All right.
3  MR. LINDER: That's all the questions I
4  have for now.
5  MR. JARVEY: No questions for me. We'll
6  read and sign.
7  (Whereupon the deposition concluded at
8  11:16 a.m.)

Page 48

7  I, the undersigned, say that I have
8  read the foregoing transcript of testimony taken April
9  7, 2021, and I declare, under penalty of perjury, that
10  the foregoing is a true and correct transcript of my
11  testimony contained therein.

13  EXECUTED this _____day of
14  _____, 2021.

17  _____
     ELI SANCHEZ

```
                                                            49
 1   STATE OF ARIZONA      )
                           ) SS.
 2   COUNTY OF MARICOPA    )
 3
           BE IT KNOWN that the foregoing transcript was
 4   taken before me, COURTNEY C. VANDERWALKER, a Certified
     Reporter in the State of Arizona; that the witness
 5   before testifying was duly sworn by me to testify to the
     whole truth; that the questions propounded to the
 6   witness and the answers of the witness thereto were
     taken down by me in shorthand and thereafter reduced to
 7   print under my direction; that the foregoing pages are a
     true and correct transcript of all proceedings, all done
 8   to the best of my skill and ability.
 9        [X]  Review and signature was requested.
10        [ ]  Review and signature was waived.
11        [ ]  Review and signature not required.
12         I CERTIFY that I am in no way related to any
     of the parties hereto nor am I in any way interested in
13   the outcome hereof.
14         I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in ACJA 7-206.
15   DATED at Gilbert, Arizona this 15th day of April, 2021.
16
17     _____
            COURTNEY C. VANDERWALKER, RPR
18          AZ Certified Reporter No. 50597
19        * * * * * *
           I CERTIFY that SEYMOUR REPORTING SERVICES has
20   complied with the ethical obligations set forth in ACJA
     7-206.
21
22     _____
         Rosina Seymour, RPR, Owner
23          Seymour Reporting
            Arizona RRF No. R1000
24
25
```