# Exhibit G

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF ARIZONA
 3
 4  Frontier Airlines, Inc.,      )
                                  )
 5       Plaintiff,                )
                                  )
 6  v.                            )  No. 2:20-cv-01432-ESW
                                  )
 7  Menzies Aviation (USA), Inc., )
                                  )
 8       Defendant.                )
    _____)
 9
10
11
12
13
14
15       VIDEOCONFERENCE DEPOSITION OF SHARATH SASHIKUMAR
16                       Peoria, Illinois
                          April 9, 2021
17                       11:58 a.m. (CDT)
18
19
20
21
22                              SEYMOUR REPORTING SERVICES
    PREPARED BY:             Registered Reporting Firm R1000
23                             137 East Elliot Road, #2473
    KATE E. ROUNDY, RPR           Gilbert, Arizona 85299
24  Certified Reporter              (P)602.258.5800
    Certificate No. 50582           (F)888.881.5400
25
```

**Page 2**

```
 1                        I N D E X
 2  WITNESS                                            PAGE
 3  SHARATH SASHIKUMAR
 4       EXAMINATION BY MR. LINDER                       4
 5
 6
 7
 8
 9
10                      E X H I B I T S
11  NO.          DESCRIPTION                           PAGE
12  Exhibit 17   PEMCO invoice, Bates No.                52
                 FRONTIER 000109 (1 page)
13
    Exhibit 18   Frontier Aircraft Damage Associated     52
14               Costs form, Bates Nos.
                 FRONTIER 000095 to 97 (3 pages)
15
    Exhibit 19   Airbus Sales Agreement, Bates Nos.      53
16               FRONTIER 000131 to 133 (3 pages)
17  Exhibit 20   SMBC invoice, Bates Nos.                54
                 FRONTIER 000117 to 119 (3 pages)
18
    Exhibit 21   E-mail chain ending September 13,       55
19               2018, Bates Nos. FRONTIER
                 001772 to 1774 (3 pages)
20
    Exhibit 22   Repair R1 door damage on N947FR/MSN     60
21               2808, Bates No. FRONTIER 001852
                 (1 page)
22
23
24
25
```

**Page 3**

```
 1       VIDEOCONFERENCE DEPOSITION OF SHARATH SASHIKUMAR,
 2  was taken on April 9, 2021, commencing at 11:58 a.m.
 3  (CDT).  The witness was located in Peoria, Illinois.
 4  KATE E. ROUNDY, RPR, a Certified Court Reporter,
 5  Certificate No. 50582, for the State of Arizona, appeared
 6  via videoconference.
 7
 8  COUNSEL APPEARING:
 9  For the Plaintiff:
10       SNELL & WILMER, L.L.P.
         By:  Matt Jarvey, Esq.
11            Adam Lang, Esq.
         400 East Van Buren, Suite 1900
12       Phoenix, Arizona 85004
         (602) 382-6000
13       mjarvey@swlaw.com
         alang@swlaw.com
14       (Appearing via videoconference)
15
    For the Defendant:
16
         JONES, SKELTON & HOCHULI
17       By:  J. Gary Linder, Esq.
         40 North Central, Suite 2700
18       Phoenix, Arizona 85004
         (602) 263-1700
19       glinder@jshfirm.com
         (Appearing via videoconference)
20
21  Also present:
22       Sharon Ourien (Appearing via videoconference)
23       Valerie Tyler (Appearing via videoconference)
24
25
```

**Page 4**

```
 1             SHARATH SASHIKUMAR,
 2  called as a witness herein, having been first duly sworn
 3  by the Certified Court Reporter to speak the truth and
 4  nothing but the truth, was examined and testified as
 5  follows:
 6
 7                  EXAMINATION
 8  BY MR. LINDER:
 9       Q.  Good morning, sir.
10           Is your video on, because for some reason when
11  you talk, it doesn't pop up on my side.
12       A.  It is.
13       Q.  Oh, there we go.  There is just a delay.
14           All right.  My name is Gary Linder.  I'm an
15  attorney that represents Menzies with respect to a lawsuit
16  that has been filed by Frontier having to do with an
17  accident that happened on April 1st, 2018.
18           Do you understand that's why you are here today?
19       A.  I do, yes.
20       Q.  So let me give you a little bit of background
21  introduction.
22           Have you been deposed before?
23       A.  I have not.
24       Q.  All right.  So in a deposition it's a
25  question-and-answer session.  It's all being taken down by
```

9

1  A. Yes, I am.
2  Q. Holy cow, you are young compared to me.
3     But, anyway, give me a rundown, if you would, of
4  your work history.
5  A. Sure.
6  Q. Go ahead.
7  A. Go ahead.
8  Q. I was just going to ask you, did you work prior
9  to receiving your degree in India?
10 A. Did not (unintelligible) in U.S.
11    THE COURT REPORTER: He cut out.
12    THE WITNESS: I said I did not work in India.
13 And directly out of my bachelor's I decided to pursue my
14 master's in the U.S. So the same year I graduated in
15 India, which was 2014, August of 2014, fall of 2014, I
16 joined my master's in the U.S.
17    So, no, I did not work after my education in
18 India.
19 BY MR. LINDER:
20 Q. When did you go to work for Frontier?
21 A. January of 2017, right after graduation from
22 school.
23 Q. And what job were you hired to do in
24 January 2017?
25 A. So I was a fleet analyst II for the company,

10

1  which was, that was my degree.
2     But, yeah, I was a fleet analyst -- financial
3  analyst for the fleet department.
4  Q. And give me an idea of what the layperson's
5  perspective of what the job responsibilities are of being
6  a fleet analyst.
7  A. Sure.
8     So it's primarily dealing with leasing companies
9  and with our main manufacturers, being, for us, at least,
10 an Airbus company on the aircraft side. And then we have
11 engine manufacturers and APU manufacturers and other
12 companies that we have big contracts with.
13    And on the flip side, like I said, with the
14 leasing companies, Frontier at the time was, I believe,
15 90 percent leased. So we had a lot of relationships with
16 leasing companies which included, for example, reporting
17 monthly utilization on all the aircraft. It included
18 reporting when an aircraft goes into the scheduled
19 maintenance. It included any discussions about rent
20 payments, managing weekly/monthly rental payments that
21 were due on all the aircraft we had in the fleet.
22    So, basically, getting those out for approval,
23 getting my director's approval. And then obviously
24 liaisoning with the treasury team to make sure it gets
25 paid. And so being kind of the liaison with the lessor

11

1  and internally in that front.
2  Q. Is that your job to this day?
3  A. I am now the manager for fleet and strategic
4  sourcing. So since then I have been promoted twice, taken
5  on additional responsibilities.
6     But, yeah, the job description is similar but
7  more -- obviously, more responsibility as far as taking on
8  additional things with, for example, working on bigger
9  projects for the company as well, when it comes to newer
10 projects.
11 Q. I'm sorry. So let's talk for a second -- let's
12 back up.
13    What was your first promotion then, what to what
14 position?
15 A. It was to a senior analyst. From analyst II,
16 which is what I was hired as, and then from senior analyst
17 I got promoted to the manager.
18 Q. And how long have you been in that position, as
19 manager?
20 A. Year 2019 is when I got promoted. So year and a
21 half-plus. Year, eight months, nine months.
22 Q. All right. At the present time are you involved
23 in the negotiation of leases on aircraft?
24 A. Yes, I am.
25 Q. What role do you play in that?

12

1  A. Actively negotiating leases (unintelligible).
2  It's one of the main changes outside of, let's say, being
3  an analyst II would be, of (unintelligible).
4     THE COURT REPORTER: I missed the end of that.
5  I'm sorry.
6     I'm going to ask you to slow down, too, because
7  the sound is not the best.
8     (Requested portion of the record was read.)
9     THE WITNESS: That's all I said, yeah.
10 BY MR. LINDER:
11 Q. Sir, do you know when Frontier started leasing
12 aircraft from SMBC?
13 A. The year that we started leasing from them, no.
14 It was before I joined Frontier.
15 Q. Do you know how many aircraft Frontier leased
16 from SMBC?
17 A. As of that time, I know we had returned one
18 aircraft in the past. And when I was on, we had one
19 aircraft with them, which was 947.
20 Q. The one aircraft that you knew about was the
21 aircraft subject to the incident?
22 A. That's right. That was the aircraft we had
23 leased with SMBC at that time. It was the one aircraft we
24 had with them, yeah.
25 Q. Does SMBC currently have any aircraft leased to

13

1  Frontier?
2     A.  They do not.
3     Q.  Why is that?
4     A.  We run a pretty competitive process when it comes
5  to awarding leases to different lessors.  They have
6  participated in, I want to say, almost all of the RFPs
7  that we have run for awarding airplanes to leasing
8  companies, but they have just not been competitive, I will
9  just say, in the newer airplane space that we are in right
10 now, which is what Frontier primarily deals with today.
11    Q.  When you say "competitive," what are the
12 differences regarding the response to RFPs between these
13 leases, other than price?
14    A.  A lot of it is to do with price, and basically
15 when I say "price," it includes price for the airplane and
16 also the lease rate that goes with that aircraft.  So that
17 forms one of the biggest components of what that
18 negotiation ends up being.
19        But it's also the rates related to the
20 maintenance of the aircraft that you owe the lessor
21 through the period of the lease or sometimes at the end of
22 the lease depending on what lease you're negotiating.
23        And then also the term of the lease is also an
24 important factor when it comes to negotiating those lease
25 agreements.

14

1     Q.  Do you know what the term was on the aircraft in
2  question?  How long was that lease?
3     A.  I do not off the top.  I'm sure I will be able
4  to -- if I looked at the lease agreement.  I don't think I
5  looked at the lease terms specifically before this, so,
6  no.
7     Q.  Okay.  Is there a difference between various
8  leases regarding the language associated with late return
9  penalties?
10    A.  Yes, there is.
11        The standard language is definitely there is a
12 period of time for which you have after return, where you
13 pay the rent.  And then there is a typical step-up in that
14 penalty in almost all leases that are negotiated even
15 today.
16    Q.  And is that different between various leases?
17    A.  Yes, it is.
18    Q.  Can you give me a range of how those are
19 different?
20    A.  I would --
21    Q.  The lease return penalty.  I'm sorry.  I
22 interrupted you, but a range of the difference between the
23 lease rental penalties.
24    A.  Yes.  So, typically, you have something from
25 10 percent all the way to 50 percent in penalty over the

15

1  base rent that you have on these aircraft.
2     Q.  On your newer leases does it tend to be lower or
3  does it just depend?
4     A.  It depends.  It is one of the more negotiated
5  points as part of the lease, but it does depend upon some
6  leases.
7     Q.  Does Frontier lease 100 percent of its aircraft
8  now?
9     A.  Now, yes.
10    Q.  And why is that?
11    A.  It is just a more efficient way to run the
12 business.  There's better turnover for the aircraft when
13 you are leasing them.  We are able to take advantage of
14 new technology.  It's just a business model that works for
15 a low-cost airline.
16    Q.  What other companies does Frontier lease from
17 now?
18    A.  We have a total of about 20 lessors.
19    Q.  Okay.
20    A.  For about 107 airplanes we have today and 12
21 engines-ish.  So between engine lessors and aircraft
22 lessors we have about 20 -- around 20.
23    Q.  Who are the major aircraft lessors?
24    A.  We have -- major right now would be GECAS --
25 well, actually that got acquired by one of our major

16

1  lessors, which is AerCap, so...
2     Q.  Can you say that again?
3     A.  Top two would be GECAS and AerCap, who recently
4  bought GECAS as well.  So those would be the top two
5  lessors.
6     Q.  Can you give me a few more, maybe, in the top
7  five?
8     A.  AMCK Aviation is one of them.  Jackson Square
9  Aviation is another.  And Avolon is another.
10        That would be my top five.
11    Q.  Does Frontier normally communicate with my
12 client, Menzies, or any other contractors regarding the
13 terms of its lease or the end date of a lease?
14    A.  No.  Not that I'm aware of, no.
15    Q.  I think this -- I just have these questions here
16 that you can -- I mean, I think it's pretty obvious, but
17 have you ever spoken to anyone at Menzies about lease
18 terms or lease end dates?
19    A.  No.
20    Q.  Did you have anything to do with the negotiation
21 of the contract between Frontier and Menzies?
22    A.  No, I did not.
23    Q.  Do you know who is in charge of that, what
24 department?
25    A.  I would have to -- I don't necessarily want to

17

1 guess, but I think it's through Ground Handling, but, no,
2 not that I'm directly familiar with.
3    Q.  Would that negotiation be handled by someone in
4 the Treasury Department, similar to what you do?
5    A.  No, not -- not with Menzies.  It's not a company
6 that I have heard having to negotiate with any of the
7 contracts.
8    Q.  Can you think of anyone else at Frontier, other
9 than the Treasury Department, that would have communicated
10 to Menzies about the lease term or the lease end date?
11    A.  No.  Our -- the Fleet Department is the one that
12 closes the lease agreements.  So, no.
13    Q.  I think this is pretty obvious, this aircraft was
14 old enough to where you were not with the company at the
15 time the lease was executed?
16    A.  That's right.
17    Q.  And I think I asked you this before, but do you
18 know how long the term of the lease was?
19    A.  Not off the top of my head, no.
20    Q.  Do you know who at Frontier was in charge of the
21 negotiation of the lease of the aircraft in question?
22    A.  I do not.
23    Q.  My understanding is that as the old aircraft come
24 in to be turned in off lease, Frontier takes delivery of
25 the new aircraft.  There's a replacement process.

18

1     Do you know if the aircraft that was replacing
2 the subject aircraft had been received yet?
3       MR. JARVEY:  Form.
4       THE WITNESS:  It is not a one-to-one replacement.
5     So how it works for the business is having a
6 fleet plan for your conduction in any given year versus
7 what returns you have within that year.
8     So it's not a one-to-one slot-in replacement for
9 any airplane that gets returned.
10 BY MR. LINDER:
11    Q.  As you sit here today, do you know how long the
12 aircraft had been in service with Frontier?
13    A.  No.
14    Q.  Do you know if Frontier received the aircraft new
15 or used?
16    A.  I do not.
17    Q.  What -- do you guys ever lease used aircraft or
18 is it always new aircraft?
19    A.  We have leased some used aircraft in the past,
20 yes.
21    Q.  What about today?  Are any of the new leases for
22 used aircraft or are they all new?
23    A.  Right now we are only doing new leases for --
24 leases for new aircraft.
25    Q.  And my understanding is is that you guys are

19

1 exclusively an Airbus airline?
2    A.  That's correct.
3    Q.  And the new leases are on A320 and A321s?
4    A.  That's correct.
5    Q.  Any other aircraft that you are leasing right
6 now?
7    A.  Nope.  Just a distinction to say those are
8 A320neos and A321neos.
9    Q.  Have you started leasing those yet?
10    A.  The A320neos, yes; the A321neos, no.  We will in
11 2022.
12    Q.  You said you will in 2022?
13    A.  That's correct.
14    Q.  Do you know who Frontier originally leased its
15 aircraft from?  Because I saw a note, and I wasn't
16 planning on showing you the lease itself -- that it was --
17 there was a Wells Fargo notation, but then I know at the
18 time of it it was SMBC?
19    A.  I apologize.  The first half of your question got
20 cut off.  My screen froze.  Do you mind repeating that?
21    Q.  Sure.  No problem.
22     Do you know who the original aircraft was leased
23 from?  And I ask that question because I saw a lease that
24 was -- it looked like it was with Wells Fargo, and then --
25 but I know at the time of this it was SMBC.

20

1     So can you help me understand that change?
2    A.  Yeah.  The way I understand it and the way we do
3 our lease agreements, there is a structure where there is
4 an owner trustee in the lease as well.  Wells Fargo acts
5 as the owner trustee in the lease, and there is always a
6 leasing company that has a trustee participate in the
7 lease as (unintelligible) official beneficial owner or the
8 aircraft leasing company.
9     So my understanding, I believe, is that SMBC is
10 the lessor.  Wells Fargo may receive from a
11 (unintelligible).
12       THE COURT REPORTER:  I missed the end of that.
13       MR. LINDER:  Hey, Kate, you are on mute, but I
14 know you had a hard time hearing him.
15       THE COURT REPORTER:  I'm sorry.  Yes.  I missed
16 the end of that.
17       THE WITNESS:  The end of that was that
18 Wells Fargo, from my understanding, is the owner trustee
19 in the lease, where SMBC was still the lessor.
20 BY MR. LINDER:
21    Q.  Sir, was there anything unique about the
22 particular lease on the aircraft in question?
23    A.  Again, I was not involved in the negotiation of
24 the lease, but from where I was involved in from the
25 payments we made to the lease return discussions that were

33

1  you didn't recall situations to where there had been
2  penalties, so I'm talking about the direct damage.
3     A.  Yeah.  There have been damages where direct
4  damages have been covered, yes.
5     Q.  They have been recovered?
6     A.  Between submitting the claim and us recovering
7  that, yes, there have been instances where we have
8  recovered damages.
9     Q.  How many times has that happened that you recall?
10    A.  Again, being one piece of that puzzle, I can
11 recall probably two, maybe three settlement notices that I
12 have seen with damages related to aircraft.
13    Q.  I think I have asked you this before, but do all
14 the Frontier leases include a penalty for late return?
15    A.  Yes, they do, but in different structures like
16 you said before, so...
17    Q.  It looks like on this lease the penalty was a
18 50 percent charge on top of the lease payment due; is that
19 correct?
20    A.  My understanding is there was a step-up on that
21 as well for a period of time.  So this is one lease where
22 the base rent applied for ten days after return, went up
23 to 15 percent for the next 30 days, I believe, and then up
24 to 50 percent for days following that date.
25        So there was a step-up in the penalty for the

34

1  aircraft.
2     Q.  And was that step-up system common in aircraft
3  leases?
4     A.  I can't recall any of our newer leases where we
5  have a step-up, but, again, this was part of an older set
6  of leases that we had that I wasn't involved in
7  negotiating.  The newer leases have a more stable penalty
8  for X number of days after return.
9     Q.  As of April 1, 2018, what was your job?  How far
10 had you moved there in terms of your progression?
11    A.  I believe I was still an analyst II as of
12 April 1st, and June of 2018, I was made senior analyst, I
13 think.
14    Q.  Okay.  So you were made a senior analyst while
15 this aircraft was being repaired?
16    A.  Yes, from memory.  Yes.
17    Q.  I mean, I'm not trying to test your memory in
18 that regard.  It was still in the shop in June of '18, and
19 so that's when you would have been promoted; correct?
20    A.  Correct.  Yes.
21    Q.  I know I asked this before, maybe in a different
22 way, but as of the date of the accident, what were your
23 job responsibilities?
24    A.  It was the responsibilities we discussed as far
25 as financial analyst II.  So it was me reporting into the

35

1  lessors, again, fielding questions we got back from them,
2  making sure lease payments were made on time, making sure
3  that all the other operative contracts we had with
4  manufacturers and others were analyzed appropriately and
5  carried out appropriately, so...
6     Q.  What would your job responsibilities have been
7  relative to the incident in question?
8     A.  It would have been to -- no direct contact, I
9  want to say, with the lessor as far the damages itself.
10 It would have been to do with payments.  It would have
11 been to do with the lease during that period of time and
12 what we -- what would be the lease payments after the
13 return date, which, again, would be broken up --
14        THE COURT REPORTER:  I need you to slow down and
15 repeat that end part.
16        What would be the lease payment after the return
17 date, which, again?
18        THE WITNESS:  Would be just us talking to the
19 lessor for what the lease payment expectations would be
20 from us to them.
21        THE COURT REPORTER:  Thank you.
22 BY MR. LINDER:
23    Q.  When would you have been notified of the
24 incident?
25    A.  Typically, if it affects the return of the

36

1  aircraft, either me or my senior director now would have
2  been notified of the incident shortly after it happened
3  and would have been notified if that's being communicated
4  to the lessor or not, because sometimes the maintenance
5  team also communicates with the lessor in the case of
6  lease return-related items.
7     Q.  Do you, as you sit here today, and I know it was
8  some time ago, do you recall being notified of this
9  particular incident?
10    A.  I don't recall this, no.
11    Q.  Do you recall or can you tell me generally
12 speaking how you would be notified of the incident in
13 question?
14    A.  Generally, I think it would have been an e-mail
15 from one of our maintenance folks, typically Jim Mach, and
16 he would have let Robert or me know the process about what
17 is going on with the aircraft and what he thinks next
18 steps are.
19    Q.  And who is Robert?
20    A.  Robert Fanning is my senior director.
21    Q.  That's F-a-n-n-i-n-g?
22    A.  That's correct.
23    Q.  And you said Mr. Fanning's job is senior
24 director?
25    A.  Currently, yes.

**37**

1  Q.  What role would Mr. Fanning have planned with
2  respect to the damage to this aircraft and the fallout?
3  **A.  He is my boss.  He would have had to deal**
4  **directly with the leasing company as far as any**
5  **discussions that would have had to have been had from a**
6  **commercial perspective with them at that time.**
7  Q.  Do you know -- you are saying that Robert Fanning
8  would have contact with the lessor.
9      Would the lessor have been immediately notified
10 of the accident, or would the lessor only have been
11 notified when it was clear that Frontier would not be able
12 to return the aircraft pursuant to the lease on June 21?
13     MR. JARVEY:  Form.  Foundation.
14     THE WITNESS:  Typically, the lessor is notified
15 depending on the extent of the damage to the aircraft.  We
16 have what we call damage thresholds that we use today as
17 well.  Again, I'm not particularly familiar with this
18 specific lease, but we have to notify them of the extent
19 of the damage.
20     And specifically at lease return, yes, they would
21 be notified of the damage at that time.  And if it was
22 going to impact the return of the aircraft, we would have
23 notified them that as well.
24 BY MR. LINDER:
25  Q.  Did you have any involvement with notifying the

**38**

1  lessor with respect to the damages that had been caused to
2  this aircraft?
3  **A.  I did not, no.  I don't recall directly informing**
4  **them of the damage, no.**
5  Q.  You think that would have been the function of
6  maintenance or maybe Mr. Fanning?
7  **A.  It would have had to have been one of the two.**
8  Q.  Did you ever have any conversations with the
9  lessor regarding the late return of the aircraft?
10 **A.  Not that I recall except, like I said, for being**
11 **involved in e-mails related to the calculations as of, you**
12 **know, return of the aircraft that included the redelivery**
13 **payments and other payments that were due as of the**
14 **return.**
15 Q.  Do you recall any of those e-mails ever
16 discussing the reasons for the delay?
17 **A.  No, not that I know of.**
18 Q.  Do you know, did anyone else in the Treasury
19 Department create any reports or documents related to the
20 delay in returning the aircraft?
21 **A.  Not that I'm aware of.**
22 Q.  Do you recall there being negotiations regarding
23 the penalties with SMBC regarding the return of the
24 aircraft?
25 **A.  Yes.  I was on some e-mails in relation to that,**

**39**

1  yes.
2  Q.  I saw an e-mail to that effect, which I am going
3  to show you hopefully if I can figure out share screen
4  appropriately, the -- with respect to those negotiations.
5  But I didn't see e-mails directly from you.
6      Were you just carbon-copied on those e-mails?
7  **A.  I was just carbon-copied on those e-mails, yes.**
8  Q.  Who at Frontier was in charge of negotiating
9  those late penalties?
10 **A.  Robert Fanning.**
11 Q.  Generally speaking, what was the nature of those
12 negotiations?  What was the back and forth?
13 **A.  Back and forth was pretty much about the return**
14 **of the aircraft and basically the penalty that the lease**
15 **stipulated that we owed and how we can eliminate paying**
16 **that penalty, frankly.  But per the lease, lessor had all**
17 **the rights to claim that penalty within the document and**
18 **we are obligated to do what's in the lease.**
19 Q.  Do you know what the outcome was of those
20 negotiations?
21 **A.  Yes.  So we paid them base rent for August and**
22 **for the first seven days of September, but the penalty**
23 **went for August and September.  We settled at half of what**
24 **the penalty portion would have been had we not had those**
25 **discussions with them.**

**40**

1      **So we paid them half of what we would have owed**
2  **them but for that penalty portion.**
3  Q.  Did you also pay a penalty for part of June and
4  July?
5  **A.  I apologize.  My screen froze again.  Can you**
6  **repeat the question again?  Sorry.**
7  Q.  Sure.
8      Did Frontier also pay a penalty for June and
9  July?
10 **A.  My recollection is that for June per the lease**
11 **for the first ten days after return, it's at the base**
12 **rent.  So, like I said, the structure for how they can**
13 **bill us is a little different, but the first ten days was**
14 **at base rent after the scheduled return date.  And then**
15 **for 30 days after that it was at 15 percent, which was**
16 **the -- which was the July period that we had.**
17 Q.  Was there any sort of negotiation regarding the
18 15 percent in July?
19 **A.  Not that I recall because that is typically more**
20 **in line with what a standard lease we have, for example,**
21 **today is as far as that penalty percentage.  And, again,**
22 **there needs to be a reason from our side that we go and**
23 **try to negotiate with the lessor about that.**
24 Q.  There was a reason -- or was there a reason with
25 respect to your ability to negotiate the penalty down to

                                                                                    41

1  half of what it would have been in August as opposed to
2  July?
3     A.  The reason was us trying to minimize, spend as
4  much (sic) as possible for the company.  I think that's
5  our goal while we're working every day, and part of that
6  was to ensure that we don't spend anything on it.  But as
7  we went to negotiate it, what we had to settle on was that
8  50 percent -- or half, close to half of what that penalty
9  was.
10    Q.  The aircraft was scheduled to go out of service
11 on May 1st and to return to the lessor on June 21st.  So
12 that's about 51 days for this C8 check to take place.
13        If the C8 check had taken longer than 51 days,
14 would Frontier still have -- would still have incurred a
15 penalty?
16        MR. JARVEY:  Form.
17        THE WITNESS:  Again, based on the structure of
18 the lease, if it extended beyond that, it would be based
19 on what the lease stated it was.
20        If the damage hadn't happened and we worked on it
21 and if it was five days late, we would have paid that base
22 rent for those five days.
23 BY MR. LINDER:
24    Q.  So the penalty had nothing to do with why.  It's
25 just a function of whether you turned it in on time or

                                                                                    42

1  not?
2     A.  The penalty is a way for the lessor to recoup the
3  fact that they have not got their airplane when they
4  thought they would get it back, right.
5     Q.  Have you been involved in situations in which a
6  C check has taken longer than expected?
7     A.  Not directly or I have no capacity to say I know,
8  you know, these checks have taken longer than expected.
9  So, no.
10    Q.  And maybe a more specific question is is that
11 since -- since C checks typically have to take place at
12 the end of a lease, I think you're always going to be
13 dealing with this question of when to take an aircraft out
14 of service to complete the end-of-lease requirements.
15       So the question I have for you, have you or the
16 people that you work with in the Treasury Department been
17 involved in prior situations in which the lease-end
18 requirements, we will call them, all of them, have taken
19 longer than expected, which resulted in Frontier having to
20 pay a penalty?
21    A.  In some cases the lease return date has extended
22 from what it originally was, but typically it's -- what we
23 have seen in the leases we have been involved in is maybe
24 five or seven days from when it was originally planned to
25 be returned.  And that's normally what we see and what we

                                                                                    43

1  obviously work to do, is to get it back within the planned
2  return date, which is -- which means we want to return it
3  by then.
4        Yeah, we don't expect to return it late, but in
5  some cases we see them go over maybe five days, maybe
6  seven days late.
7     Q.  Do you know if the C8 check on this aircraft took
8  longer than 51 days to complete?
9     A.  I do not.  Specifically for the check, no, I
10 don't.
11    Q.  I just didn't know if from the Treasury
12 Department's standpoint you guys broke it down between how
13 long the C check took as opposed to how long it took to
14 repair the aircraft?
15    A.  I don't think at the time, I can't recall, during
16 the -- in 2018, I can't recall if that was done to that
17 effect.  It would have been maintenance handling all the
18 discussions, frankly, between when the repair has to be
19 done, what needs to be done to the aircraft to what needs
20 to be done to do the return.
21    Q.  I know this is a hard question to answer, but you
22 mentioned earlier that there have been situations in which
23 an aircraft has taken longer than expected to recondition
24 which resulted in Frontier having to pay some sort of
25 penalty; correct?

                                                                                    44

1     A.  I wouldn't call it penalty, but, yes.
2     Q.  What would you call it?
3     A.  It's just rent for the time that we are holding
4  onto the airplane before returning it back to the lessor,
5  right?  So, in most cases, it will just be an extension of
6  that base rent that we owe the lessor for the additional
7  five or seven days that it takes to return the airplane
8  back to them.
9     Q.  Okay.  So oftentimes the penalty provisions don't
10 kick in until later?
11    A.  That is correct.
12    Q.  And then what -- in those situations is the
13 typical reason for delay is just maintenance taking longer
14 than expected?
15    A.  Typically, what we have heard is just findings
16 that we get during the course of the check that are
17 unexpected.  Frankly, from what I understand, the work
18 package that's built is based on the return conditions in
19 the lease, and when we actually get in and do the work,
20 there is no way that findings that goes further than
21 expected by a few days.  But it stays pretty close to what
22 the expectation is.
23    Q.  Can you tell me from the Treasury standpoint, I
24 suppose, what is the process of deciding the date to which
25 to take an aircraft out of service to start the

53

1  Q. What would this document represent?
2  A. From when I did it, again, not specific to this,
3  it was us capturing costs related to a damage.
4  Specifically, this one is for the Flight Ops Department
5  and costs that they would incur.
6  Q. Do you know how much it costs typically to ferry
7  an aircraft to the location of the lease return?
8  A. I do not.
9  Q. All right. I am going to switch to -- hold on.
10 Bear with me.
11     MR. LINDER: This will be Exhibit 19.
12     (Exhibit 19 was marked for identification.)
13 BY MR. LINDER:
14 Q. Exhibit 19 is Airbus 131 through 133 -- not
15 Airbus, FRONTIER 131 through 133.
16     Do you recognize this invoice?
17 A. No, I do not.
18 Q. So this invoice is for a total of $195,000.
19     In connection with the repairs to this aircraft,
20 do you have any knowledge of a payment made to Airbus for
21 $195,000?
22 A. No. I don't directly, no.
23 Q. Then if you take a look at this first page,
24 paragraph 1, I will have you -- just read that to yourself
25 for a second, and then I will ask you a question.

54

1  A. Okay.
2  Q. Do you know what they are talking about regarding
3  the purchase of software?
4  A. No. No, I do not.
5  Q. Okay.
6     MR. LINDER: All right. So this is Exhibit 20.
7  It's FRONTIER 117 through 119.
8     (Exhibit 20 was marked for identification.)
9  BY MR. LINDER:
10 Q. I know that it's a bad copy, or at least it
11 doesn't look very good on my end.
12    Do you recognize this invoice?
13 A. Yes, I do.
14 Q. What does this invoice represent?
15 A. The one you are on represents the base of rent
16 payment for 2 through 31st August, through the month of
17 August.
18 Q. It covers the month of August?
19 A. For base rent, yes.
20 Q. Okay. And then the next page, does that
21 represent the month of June -- I'm sorry -- July?
22 A. That's correct.
23 Q. These invoices include -- actually, does the next
24 one, this is for June; correct?
25 A. Correct.

55

1  Q. Do any of these invoice include a penalty?
2  A. July does.
3     Sorry. Go ahead.
4  Q. No. No. I wasn't talking.
5     So does the invoice for July then reflect a
6  penalty?
7  A. Yes, it does.
8  Q. Do you know how much the penalty was for July?
9  A. It was 15 percent of that base rent that you saw
10 on the previous document. So we can probably tab it.
11 It's 15 percent over base rent for the period from 2nd
12 July to 31st of July.
13 Q. Do you know if Frontier has fully paid all of
14 these invoices?
15 A. Yes, I do.
16 Q. And was that because that would come out of your
17 department?
18 A. Yes. I would have had to process them for
19 approval and then followed through and make sure that they
20 were paid, yes.
21 Q. Okay. All right.
22    MR. LINDER: So this will be Exhibit 21. It's
23 FRONTIER 1772 through 1774.
24    (Exhibit 21 was marked for identification.)
25    (Next page, please.)

56

1  BY MR. LINDER:
2  Q. There is an e-mail at the top that is dated
3  September 13, 2018. Before I ask you questions on this, I
4  want to give you a chance to read them, if you don't mind.
5  Unless, of course, you are already familiar.
6     Are these the e-mails that you looked at
7  yesterday?
8  A. That's right. We did look at these yesterday.
9  So I am a little familiar with them, yep.
10 Q. Is this an e-mail exchange between Frontier and
11 SMBC concerning the penalties incurred for the month of
12 August?
13 A. Yes. And it also includes redelivery amount
14 discussions as part of that, yes.
15 Q. Were there similar e-mail exchanges in the months
16 of April, May, or June or July regarding the penalties?
17 A. Not that I know of.
18 Q. Do you know, sitting here today, what the total
19 amount of penalties were paid by Frontier regarding the
20 return of the subject aircraft?
21 A. Just the penalty portion of it, but also
22 including the late rent. So the invoices that you showed
23 before, obviously we made those payments. And outside of
24 that, we had a settlement, I think that is a part of this
25 e-mail chain as well, for the penalty that was from

57

1  August 2nd, I think it was, to September 7th, and what
2  that settlement was between Frontier and SMBC.
3     Q.  I think you said it but I want to break it down a
4  little bit.
5         What is RDA?
6     A.  Redelivery adjustment or redelivery and balance
7  for what we owe the lessor at the end of the lease.
8     Q.  What would the RDA typically include?
9     A.  It would include any maintenance true-ups, is
10 what we call it, typically, for utilization on the
11 aircraft that we have had over the term we have had it,
12 and ideally in a structure where you are not paying
13 maintenance reserves but you owe the lessor for the time
14 you used the aircraft when you leased it.
15        So it's just typically those payment accounts.
16    Q.  If you take a look at the second to the last
17 paragraph of what I'm showing you here.  It starts with:
18 Dan and I discussed showing $85,000 as a buy out.
19        Do you see that?
20    A.  Yep.
21    Q.  Can you tell me what that would mean in the
22 context of this payment in terms of something being a buy
23 out?
24    A.  Yeah.  So, typically, between the lessee and
25 lessor during discussions on what we can pay to buy out if

58

1  there are some obligations that the lessor does not need
2  us to satisfy and if it can be settled between the lessee
3  and the lessor.
4         This, I believe, is just referring to that 85,000
5  amount, which was, what I said, the settlement on that
6  penalty payment between the month of August and the
7  seven days in September.
8     Q.  Who is Dan Hickey?
9     A.  He is the contract lead for the -- the main
10 person that we spoke to from SMBC from a commercial
11 perspective as far as the return goes.
12    Q.  We already talked about who Robert Fanning is.
13        What about Claire Bensahmoun?
14    A.  My interactions with her have only been in
15 relation to her sending us the invoices or the redelivery
16 amounts.  So my assumption is she was in a role similar to
17 mine on the leasing company side.
18    Q.  And then it looks like John Burtz is with SMBC.
19        Do you know Mr. Burtz?
20    A.  Yes.  He is also part of the DOT or the
21 negotiating team.  So Dan and him work pretty closely.
22 I'm not sure of the exact hierarchy of Dan and John.  They
23 are both on the contract side of things.
24    Q.  And then it looks like how you got involved in
25 this e-mail chain is that Mr. Fanning carbon-copied you on

59

1  it as an FYI?
2     A.  This was an e-mail that he forwarded to Spencer
3  and myself as an FYI, yes.
4     Q.  And why would you need to know about this
5  particular situation?  What would you have done with this
6  information?
7     A.  Yeah, so it would have to be part of the -- the
8  back and forth on the redelivery amounts and all the
9  payments we owed them.
10        So this -- the, quote/unquote, buy out we have in
11 that e-mail would have been part of the redelivery
12 certificate on what we're agreeing to pay SMBC for as part
13 of that redelivery amount and return of the aircraft.
14    Q.  So it's fair to say and based on these e-mails it
15 looks like you had nothing to do with the negotiations of
16 settling the lease penalty amount?
17    A.  That's correct.
18    Q.  That was all done through Robert Fanning and
19 Dan Hickey?
20    A.  From the e-mail I think it was between Robert and
21 John.
22    Q.  Is it fair to say that in this e-mail where it
23 says, I understand the full amount of penalty rent is
24 somewhere between 170 and 180, that was a calculation,
25 again, of what the full amount of penalty would have been

60

1  before the reduction?
2     A.  That would be the calculation for the penalty
3  portion of it between the month of August and the
4  beginning of September, yes.
5     Q.  And then it says in the same paragraph, another
6  sentence away, it says:  Frontier is an important
7  long-time customer, and even though this is our last
8  aircraft, we don't take a short-term view.
9         Is that -- is that confirming the fact that this
10 was the last aircraft that Frontier had under lease with
11 SMBC?
12    A.  That's correct.
13    Q.  All right.
14        MR. LINDER:  This will be Exhibit 22.  It's
15 FRONTIER 1852.
16        (Exhibit 22 was marked for identification.)
17 BY MR. LINDER:
18    Q.  Let me scroll down just a little bit here.
19        Do you recognize a document like this?
20    A.  We maybe glanced over it yesterday, but, no, this
21 is not a document that I had seen before then.
22    Q.  Do you know what it means where it says:  P&L,
23 and then it says, 195 will be expensed against the lease
24 return accrual for N947FR?
25    A.  No, not in this specific case.  But I'm familiar

65

I, the undersigned, say that I have read the foregoing transcript of testimony taken April 9, 2021, and I declare, under penalty of perjury, that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this _____ day of _____, 2021.

_____
SHARATH SASHIKUMAR

66

STATE OF ARIZONA    ) SS.
                    )
COUNTY OF MARICOPA  )

BE IT KNOWN that the foregoing proceedings were taken before me, KATE E. ROUNDY, RPR, Certified Reporter No. 50582 that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing 66 pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

[X] Review and signature was requested.

[ ] Review and signature was waived.

[ ] Review and signature was not requested.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

I FURTHER CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206. Dated at Phoenix, Arizona, this 19th day of April, 2021.

_____
Kate E. Roundy, RPR
Certified Reporter
Certificate No. 50582

* * *

I CERTIFY that SEYMOUR REPORTING SERVICES has complied with the ethical obligations set forth in ACJA 7-206.

_____
Rosina Seymour, RPR, Owner
Seymour Reporting Services
Arizona RRF No. R1000